## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NCTA—THE INTERNET & TELEVISION ASSOCIATION, 25 Massachusetts Avenue, NW Suite 100 Washington, DC 20001, | |
| _Plaintiff,_ | |
| v. | |
| UNITED STATES COPYRIGHT OFFICE, 101 Independence Avenue, SE Washington, DC 20559; | |
| SHIRA PERLMUTTER, _in her official capacity as Register of Copyrights and Director of the United States Copyright Office_, 101 Independence Avenue, SE Washington, DC 20559; | Case No. 1:26-cv-713 |
| THE LIBRARY OF CONGRESS, 101 Independence Avenue, SE Washington, DC 20540; | |
| ROBERT NEWLEN, _in his official capacity as Acting Librarian of Congress_, 101 Independence Avenue, SE Washington, DC 20540, | |
| _Defendants._ | |

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## PRELIMINARY STATEMENT

1.     Under Section 111 of the Copyright Act, cable companies must pay fees to the U.S. Copyright Office for the right to retransmit over-the-air television broadcast content to their cable television subscribers; the Copyright Office distributes those fees to the copyright owners of that content.

2.     Section 111 fees are calculated as a percentage of "*gross receipts from* subscribers to the cable service . . . *for* the basic service of providing secondary transmissions of primary broadcast transmitters." 17 U.S.C. § 111(d)(1)(B) (emphases added). The statute makes clear that the term "gross receipts" is meant to capture only the "*actual* gross receipts" "for" that "basic service." *See id.* §§ 111(d)(1)(E), (F) (emphasis added).

3.     When the statute was enacted in 1976, cable companies delivered only television services to customers. And many cable customers received cable television programming via set-top converter boxes. But in the 1990s, the cable industry made significant infrastructure investments to enable the delivery of broadband internet access and voice services,[1] in addition to traditional television services, leading to an explosion of access to broadband services, new competition, and greater consumer choice. Today, cable companies offer consumers these services in a variety of configurations, including "triple-play" and "double-play" bundles that combine all or a subset of cable, internet access, and voice together at a single price that is discounted compared to the standalone prices for those services.

4.     Those infrastructure and product innovations have been mirrored by significant technological innovations in the way that cable television and other services are delivered to

---

[1] Cable companies generally offer Voice over Internet Protocol ("VoIP") services, which rely on packet-switching technology to deliver voice signals digitally, rather than traditional telephone services.

consumers.  Early set-top converter boxes have given way to new devices that offer a range of services like video on demand, DVR, and voice recognition.  In fact, set-top boxes have been rendered unnecessary by the advent of alternatives for delivering video programming, including applications that enable consumers to access such programming on a wide variety of devices, such as smart televisions and streaming devices from providers like Roku, Apple, Google, and Amazon.

5.    In 2005, the Copyright Office was petitioned to address some copyright owners' concerns about, among other things, the reporting of "gross receipts" under Section 111.  The Copyright Office issued a Notice of Inquiry in 2006.  In the ensuing decade, Congress and the Copyright Office addressed some of the issues in this inquiry, but left others open.

6.    In 2017, the Copyright Office initiated a rulemaking to address the amount of "actual gross receipts" to be used for royalty-calculation purposes.  The Office proposed to address two issues relevant here:  First, how to calculate gross receipts when cable companies provide "the basic service of providing secondary transmissions of primary broadcast transmitters" as part of a bundle with internet and/or voice service.  Second, whether to include the amount of equipment fees for set-top boxes when reporting gross receipts.

7.    NCTA—the Internet & Television Association ("NCTA"),[2] representing the cable industry, weighed in on both issues.  With respect to the method for calculating gross receipts for Section 111 purposes when basic cable service is included in a bundle with other services, NCTA urged the Office to adopt generally accepted accounting principles ("GAAP").  As NCTA explained to the Office, GAAP directs that when a bundle of services is sold at a discount off standalone prices, the revenue deemed to be received for each individual service in the bundle must include an allocation of the discount that reflects the proportional value of that service relative

---

[2] NCTA formerly was known as the National Cable & Telecommunications Association.

to the other services in the bundle.  For instance, if cable, internet, and voice services are each available at a standalone price of $40, but a bundle of the three is sold at a discounted price of $99, then according to GAAP, the revenue attributable to the cable television service when sold within that bundle is $33 (i.e., $40/$120 times $99).  In other words, if the bundled price reflects a $21 discount, that discount must be allocated proportionally among the three services ($7 for each service).  This methodology not only represents the best reading of the statutory text, but is eminently logical because the revenue attributable to each service sold as part of a bundle should, in the aggregate, total the discounted price of the overall bundle.

8.     With respect to equipment fees, NCTA criticized the Office's plan to include equipment fees when determining the amount of gross receipts for the basic service of providing broadcast programming.  Rather than base this interpretation on the text of the statute, the Copyright Office relied on an interpretation it first adopted in the 1970s—that gross receipts should include fees charged for equipment like cable converters because they are "necessary" to obtain cable service.  But as NCTA explained, by definition, equipment fees are not receipts for the *service* of providing broadcast programming.  As a result, the Copyright Office's interpretation runs directly counter to the text of the statute.  And even if one were to assume that it is acceptable to include "necessary" equipment fees, NCTA explained that the Office's interpretation still is flawed because it requires cable companies to report equipment fees even when a consumer could receive cable service *without* paying for any equipment—for example, by using an IP-video application provided by a cable operator—but nonetheless chooses not to use the free alternative. Presumably, consumers who use cable boxes today do so for a wide variety of purposes *other than* receiving basic cable service, such as receiving an enhanced interactive programming guide and

user interface, premium cable channels, video on demand, DVR, and voice recognition.  At a minimum, in that scenario the equipment is not "necessary" to receive cable service.

9.    On December 12, 2024, the Copyright Office issued a final rule that brushed aside NCTA's comments and concerns and defied congressional intent.

10.    First, instead of using GAAP to determine gross receipts when cable is sold as part of a discounted bundle with internet and voice services, the Office's rule requires the use of the amount that hypothetically *would have been received* by a cable company *if the customer had purchased cable as a standalone service*.  In other words, in the first example above, the Copyright Office ruled that the amount attributable to basic cable was $40, even though—both under GAAP and as a matter of common sense—the cable company did *not* actually receive that amount for basic cable.  Consider another example, where the standalone price of cable, broadband, and voice is $30, $20, and $10, respectively, but a triple-play bundle is offered for $25.  Under the Copyright Office's Rule, gross receipts are calculated at $30—even though the total amount received is $25. The Copyright Office's rule thus runs directly counter to the statute, by charging royalties on an amount greater than the "actual gross receipts" for the "basic service" of retransmitting broadcast television content.  The Office's methodology is unlawful for other reasons as well, including that it rests on assumptions about consumer preferences and a critique of GAAP that were unsupported by the rulemaking record.

11.    Second, with respect to equipment fees, the Office acknowledged that the statute requires reporting of gross receipts only for the "basic *service* of providing secondary transmissions of primary broadcast transmitters," 17 U.S.C. § 111(d)(1)(B) (emphasis added), but the Office simply ignored NCTA's textual argument and the marketplace developments since the

1970s, opting instead to summarily reaffirm its position that equipment fees must be included in royalty payments for basic cable service.

12.     The Court should vacate the Office's rule and remand the matter with instructions to establish a revenue-allocation methodology that does not require royalties in excess of actual "gross receipts" for basic cable *service* and that excludes fees for equipment.

## PARTIES

13.     Plaintiff NCTA is the principal national trade association of the cable industry in the United States.  Its mission is to protect and advocate for the interests of the cable industry.  Its members include cable operators offering cable services to households, businesses, and governmental entities throughout the country.  NCTA maintains its principal place of business at 25 Massachusetts Avenue, NW, Suite 100, Washington, DC.

14.     NCTA has standing to bring the claims asserted in this Complaint on behalf of its members because (a) the interests it seeks to protect through this suit are germane to NCTA's purpose; (b) members of NCTA would have standing on their own to bring these claims, given the substantial harms that members face if the unlawful measures at issue here were to be enforced; and (c) neither the claims asserted, nor the relief requested, requires the participation of NCTA's individual members in this lawsuit.

15.     Shira Perlmutter is the Register of Copyrights and Director of the United States Copyright Office.[3]  The Register of Copyrights, in her official capacity, has ultimate responsibility for activities at the Copyright Office, including the actions complained of herein.

---

[3] Paul R. Perkins was designated as Acting Register and Acting Director following President Donald Trump's dismissal of Shira Perlmutter as Register of Copyrights and Director of the United States Copyright Office on May 10, 2025.  Register Perlmutter's removal and Acting Register Perkins's appointment is the subject of ongoing litigation, in which the removal order has been

16.     The United States Copyright Office is a department of the Library of Congress.  Its headquarters and principal place of business are at 101 Independence Avenue, SE, Washington, DC.

17.     Robert Newlen is the Acting Librarian of Congress.  The Librarian of Congress is the head of the Library of Congress and approves all regulations under the Copyright Act.  *See* 17 U.S.C. § 702 ("All regulations established by the Register under this title are subject to the approval of the Librarian of Congress.").

18.     The Library of Congress houses the United States Copyright Office.   Its headquarters and principal place of business are at 101 Independence Avenue, SE, Washington, DC.

## JURISDICTION, VENUE, EXHAUSTION, AND FINALITY

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, which is made applicable to decisions of the Register of Copyrights by 17 U.S.C. § 701(e).

20.     NCTA's prayers for a declaratory judgment and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. §§ 701-706, and 28 U.S.C. § 1361.

21.     Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Defendant is an officer or agency of the United States and resides in this District.

---

preliminarily enjoined.  *See Perlmutter v. Blanche*, No. 25-cv-01659, 2025 WL 2159197 (D.D.C. July 30, 2025); *Perlmutter v. Blanche*, No. 25-5285, 2025 WL 2627965 (D.C. Cir. Sept. 10, 2025); *Blanche v. Perlmutter*, No. 25A478, 2025 WL 3290061 (U.S. Nov. 26, 2025).  NCTA takes no position on the merits of that litigation, and the ultimate identity of the correct officeholder is immaterial to the outcome of this official-capacity litigation.  *Cf.* Fed. R. Civ. P. 25(d) (providing for automatic substitution of a federal officeholder party).

## BACKGROUND

### A.  Section 111 Of The Copyright Act And The Retransmission Of Broadcast Television Signals Via Cable

22.    Section 111 of the Copyright Act creates a copyright licensing regime for cable companies to obtain the right to retransmit broadcast television signals.  17 U.S.C. § 111.

23.    Under this licensing regime, cable companies pay royalties twice a year to the Copyright Office, pursuant to Copyright Office regulations that purport to define otherwise undefined statutory terms, including "gross receipts."  *See generally* 37 C.F.R. § 210.17.  The Copyright Office, in turn, holds those royalties pending later distribution to copyright owners, based on the outcome of periodic proceedings before the Copyright Royalty Board.  *See* 17 U.S.C. § 111(d)(2)–(4).

24.    For larger cable systems, the statute defines the royalty fee to be paid to the Copyright Office as a percentage of the operator's "gross receipts from subscribers to the cable service . . . for the basic service of providing secondary transmissions of primary broadcast transmitters," with the specific percentage defined based on the number of "distant signal equivalents"—essentially a measure of the degree to which the cable system retransmits broadcast television content outside the local area of the original transmitter.  *Id.* § 111(d)(1)(B).

### B.  The Evolution Of Cable Systems And The *Cablevision* Decision

25.    According to the "the model that Congress had in mind at the time of enactment," a "cable subscriber had available from the system a single package for a flat fee containing a number of retransmitted broadcast signals and some channels produced just for cable—the 'basic service' that every subscriber received—and beyond that, individually priced specialty channels available only on cable from which the subscriber to the basic service could pick and choose—'pay cable.'"  *Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*, 836 F.2d 599, 604

(D.C. Cir. 1988).  "In this paradigmatic case, the definition of gross receipts from basic service was simple; gross receipts were the flat fee for the initial package multiplied by the number of subscribers."  *Id.* at 604–05.  It was "clear" and "undisputed" that "receipts for pay cable and other charges unrelated to programming" were not part of gross receipts.  *Id.* at 605.

26.     However, evolution of the cable industry made this picture more complex.  Among other developments, cable companies began to offer additional channels, including "familiar and popular cable-originated stations [such] as ESPN and CNN."  *Id.*  As programming options proliferated, cable companies started offering different "tiers" of channels that were separately priced.  "Because the initial package offered to subscribers might now contain, for one price, local broadcast programming, distant broadcast programming (e.g., at that time, WTBS), and highly desirable cable-originated programming (e.g., ESPN), the question arose whether cable companies could allocate part of the initial package's subscription price to cable-originated programming and exclude that amount from gross receipts."  *Id.*  In other words, the Copyright Office was confronted with the question "whether revenues from all tiers other than pay cable and from all channels within each included tier must be included in gross receipts."  *Id.*

27.     The Copyright Office agreed with the cable industry that programming tiers without broadcast programming were not subject to royalty payments; but the Office determined that cable companies must include the full monthly fee they charge for any tier that did include broadcast channels, even if that tier also included non-broadcast channels.  *Id.* at 606 (citing 43 Fed. Reg. 27827, 27832 (1978)).  The cable companies challenged this rule, arguing that they "should be allowed to attribute a portion of the revenues received as subscribers' fees for each tier containing both broadcast and cable-originated programming to the latter programming and to exclude that amount from gross receipts."  *Id.* at 607.

28.     The D.C. Circuit rejected the challenge and upheld the Copyright Office's position that "if a tier contains a broadcast signal, all subscription revenues from the tier are to be included in gross receipts."  *Id.* at 606.  In doing so, however, it rested on the since-overruled *Chevron* doctrine and concluded that the Copyright Office had chosen a reasonable interpretation of the ambiguous statutory term.  *Id.* at 614.

29.     Even more importantly, the basis of affirmance was specific to the facts at hand. Specifically, the court concluded that cable companies could not disaggregate a service tier and pay royalties only in connection with individual channels because the absence of any standalone pricing for individual channels made it difficult, if not impossible, to ascertain how to allocate the overall tier price to such channels.  *See id.* at 610-11.  For example:  "If five channels are sold as a package for $5, *and none is priced separately for individual sale*, one can conclude nothing more about the revenue that each generates individually than that it does not exceed $5."  *Id.* (emphasis added).  As a result, the court found it reasonable for the Office to insist on an "easily calculable revenue base."  *Id.*

**C.     NCTA Members' Business Practices And Bundled Service Options**

30.     NCTA's members provide (among other things) internet, cable (both basic tier services that include broadcast programming as well as many other tiers of service that do not), and voice service to millions of Americans.  Although members' businesses may vary in their particulars, they generally engage in certain common business practices, including offering discounts for bundled services.

31.     **<u>Standalone and Bundled Service Offerings.</u>**  NCTA members offer their internet, cable, and voice services as standalone products and as part of bundled offerings.  More specifically, a customer can purchase only internet, only cable, or only voice, without purchasing any other service, and pay a monthly fee for that standalone service.  Alternatively, a customer

9

might bundle internet service and cable, or cable and voice, or all three services, and pay a single rate for the resulting bundle.  Many NCTA members offer a discounted rate for such bundled services relative to the combined price of the individual services' "rack rate" as standalone products.  To illustrate:  Suppose a cable provider charges a rate of $40 per month for each of internet, cable, and voice services as standalone products.  Rather than charging a customer $120 for a "triple play" subscription to all three services (the sum of the standalone price for each individual service), the cable provider might instead charge $99 per month for a bundle of the three services—a discount of $21 per month relative to the rack rates a customer would otherwise pay.  Similar discounts often apply to bundles of two services.

32.    **Cable Service Tiers.**  As noted, cable service is offered in several "tiers."  The basic tier offering is the tier that includes local broadcast stations.  Consistent with the Communications Act, the basic tier offering is included as a component of all other cable offerings.[4]  In other words, each additional tier of service adds access to additional channels and services on top of, and inclusive of, the basic tier.  Thus, a subscriber to a cable company's highest tier of cable service has access to the largest selection of cable channels and services, including the core broadcast television channels included in the basic tier.

33.    **Set-Top Boxes and Their Modern Alternatives.**  A set-top box is a device that converts source signals, such as cable or satellite, into television signals so that the content from the source can be displayed on a television.  Set-top boxes were originally necessary to receive analog cable signals and display them on television screens.  Their capabilities evolved to include more advanced services, such as enhanced and interactive programming guides and user interfaces, pay-per-view, video-on-demand, DVR, and, eventually, online streaming and video platforms.  In

---

[4] *See* 47 U.S.C. § 543(b)(7)(A).

the 2010s, television signals began being distributed in digital format; following this development, smart televisions, which have built-in internet connectivity and applications, emerged as a cheaper and more flexible alternative to set-top boxes, allowing users to access television content directly on their TVs without additional hardware.  Many cable companies, including many of NCTA's members, now offer video applications as an alternative to or in addition to set-top box delivery of cable service.

34.    **"Cord Cutting" and the Growth of Demand for Internet Service.**  In recent years, there has been a widely observed phenomenon of so-called "cord-cutting" by consumers. Over time, the number of subscribers to conventional cable television services, regardless of whether accessed through a convertor box or through an application, has shrunk, while the number of consumers opting for various content services streamed over the internet has grown.  *See, e.g.*, John Koblin, *It's Official: Streaming Is Now the King of TV*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/business/media/streaming-beats-cable-broadcast.html ("Americans watched more television via streaming services than they did through cable and broadcast networks in the month of May [2025], Nielsen said in a report on Tuesday.  It is the first time that has happened over a full month."); Anna Nicolaou, *US 'Cord-Cutting' Gathers Pace as TV Viewers Abandon Cable*, Fin. Times (Aug. 6, 2019), https://www.ft.com/content/f4bd42ee-b7ec-11e9-8a88-aa6628ac896c; Comcast Corp. 2023 Form 10-K at 20-21, https://www.cmcsa.com/static-files/fabc4151-d6cd-4480-bf15-43a5dfd96290 (noting trend of consumers turning to streaming services "in lieu of [cable] services, which continue to experience accelerated net customer losses").  As a corollary of the growth of streaming, internet subscription services have seen substantial growth over time.  For example, Comcast's revenues from domestic broadband internet services grew 6.5% between 2021 and 2022, and a further 4.2% between 2022

and 2023.  *Id.* at 39; *see also* Charter Communications, Inc. 2024 Form 10-K at 37, https://ir.charter.com/static-files/f386360e-cd99-446e-b400-31121dc32c8c (revenue for internet services grew 3.6% between 2022 and 2023).  But, in recent years, as more subscription streaming services have emerged and subscription fees have risen, customers have started to migrate to free, ad-supported streaming television, which offers a plethora of content without subscription fees.

### D.    The Copyright Office Rulemaking Proceeding

35.    In 2005, the Motion Picture Association of America filed a petition requesting the Copyright Office to address its concerns about the reporting of "gross receipts" under Section 111, among other things, in light of the "significant technological, marketing and regulatory changes in the cable television industry" since Congress enacted Section 111.  Motion Picture Association of America, Petition for Rulemaking on Section 111 (June 7, 2005), https://www.copyright.gov/rulemaking/section111/petition20050607.pdf.  The Office then issued a Notice of Inquiry in 2006, seeking comment on the proposals and recommendations in the petition.  *See* United State Copyright Office, Notice of Inquiry (Aug. 10, 2006), https://www.copyright.gov/fedreg/2006/71fr45749.pdf.   Congress and the Copyright Office subsequently addressed certain issues raised in that notice.[5]

36.    In 2017, the Copyright Office published a Notice of Proposed Rulemaking (NPRM) to address the remaining issues from the 2005 proceeding including the "Reporting of Bundled Services in Gross Receipts."  Proposed Rule on Statutory Cable, Satellite, and DART License Reporting Practices, 82 Fed. Reg. 56926, 56931 (Dec. 1, 2017) ("Proposed Rule").  The Office

---

[5] *See* Proposed Rule on Statutory Cable, Satellite, and DART License Reporting Practices, 82 Fed. Reg. 56926, 56927 (Dec. 1, 2017) (discussing the Satellite Television Extension and Localism Act of 2010 (STELA) and STELA Reauthorization Act of 2014 (STELARA) along with the Office's regulations pursuant to these statutes).

noted that "[f]or years, cable operators . . . have marketed video, internet data, and voice services as a single bundle of communication products to subscribers for a set price." *Id.* The Office recognized that "[b]undling offers certain subscriber benefits, such as price discounts and a single monthly bill" and that "subscribers generally pay less for a bundled package than if purchasing each service individually." *Id.*

37.     To address the calculation of cable copyright royalties when cable services are bundled with non-cable services, the NPRM proposed to amend the definition of "gross receipts" under 37 C.F.R. § 201.17 in two ways. *See id.* at 56937. First, the NPRM proposed that "gross receipts shall *not* include any fees collected from subscribers for the sale of internet services or telephony services when such services are bundled together with cable service." *Id.* (emphasis added). Second, it posited that "when cable services are sold as part of a bundle of other services, gross receipts shall include fees in the amount that *would have been collected if* such subscribers received cable service as an unbundled stand-alone product." *Id.* (emphasis added).

38.     The NPRM also proposed to clarify the Copyright Office's position on equipment fees. Section 111 requires cable companies to report gross receipts only for the "basic *service* of providing secondary transmissions of primary broadcast transmitters," not for providing equipment. 17 U.S.C. § 111(d)(1)(B) (emphasis added). The Copyright Office's original rules implementing that provision said nothing about equipment fees either. Nonetheless, in 1978, two years after Congress amended the Copyright Act to include the compulsory license, the Office changed course. Asserting that it had "inadvertently omitted a reference to converters in defining gross receipts," the Office declared that converter fees should be included where "the subscriber must have a converter to receive" retransmitted broadcast signals. Compulsory License for Cable Systems, 43 Fed. Reg. 27827, 27828 (June 27, 1978).

39.     In the 2017 NPRM, the Copyright Office proposed to amend its forms to replace the term "converter" with "equipment."  82 Fed. Reg. at 56930.  The Office also proposed to revise its instructions "to specifically note that cable operators' gross receipts must include . . . equipment sales or leases if they are required to obtain tiers with broadcast signals."  *Id.*

40.     NCTA and a group of copyright owners submitted comments on the proposed rule during that rulemaking proceeding.

### 1.     *NCTA Explained That The Proposed Bundled Services Rule Violated The Copyright Act*

41.     NCTA pointed out that the proposed rule was "both internally inconsistent and at odds with the fundamental structure of Section 111."  NCTA, Comments on Proposed Rule on Statutory Cable, Satellite, and DART License Reporting Practices at 11 (Oct. 4, 2018) ("NCTA Comments"),        https://www.copyright.gov/rulemaking/section111/2018-comments/initial-comments/ncta.pdf.

42.     NCTA made clear that Section 111 "creates a statutory copyright license *only* for a cable system's public performance of works embodied in retransmitted broadcast television signals," and explained that the "current definition of gross receipts codifies this principle by expressly *excluding* various other categories of subscriber payments from the revenues on which royalties are based, such as payments for pay-cable, installation, and other non-broadcast services."  *Id.* at 11-12 (emphases added).

43.     NCTA further explained that, although "this principle is reflected in the language of the first clause of the proposed revision to the Office's gross receipts definition [which excludes internet and voice service fees]," the second clause of the proposed rule requiring gross receipts to include "the undiscounted price that 'would have been collected' from a subscriber who purchased cable service as a stand-alone product" is "in direct conflict with the first clause."  *Id.* at 12.

14

44.     NCTA emphasized that the proposed rule "would effectively apportion the entire discount offered to double or triple play customers to the non-video service components of the bundle, resulting in the inclusion of a portion of the revenues attributable to non-video services in the 'gross receipts' on which a cable operator bases the royalties it owes for providing retransmissions of broadcast signals." *Id.*

45.     NCTA also explained that the proposed rule would "conflict with the well-settled principle" that "revenues from services that are sold together with the basic service are only reportable as gross receipts if the subscriber is required to purchase those other services as a prerequisite to purchasing basic service." *Id.* at 15.  It pointed out that "[p]opular discounted multi-service bundles include Internet and voice services to meet fierce competition from national DBS companies, telephone companies, wireline and wireless providers, and Internet-based service providers." *Id.* at 15-16.  Because "[c]onsumers are not required to subscribe to those Internet or voice services to purchase basic cable service," NCTA maintained that "[n]one of the revenues from those non-broadcast services should be, directly or indirectly, conflated with basic service revenue." *Id.* at 16.

46.     Put simply, NCTA explained that the proposed rule would "allocate all discounts to non-video services" and "thereby erroneously attribute to the gross receipts for basic video service revenue received from the sale of non-video services, such as voice and Internet."  NCTA, Reply Comments on Proposed Rule on Statutory Cable, Satellite, and DART License Reporting Practices at 3 (Oct. 25, 2018) ("NCTA Reply Comments"), https://www.copyright.gov/rulemaking/section111/2018-comments/reply-comments/ncta.pdf. NCTA accordingly argued that the proposed rule is "directly contrary to the underlying statute and the Office's stated objective in this proceeding," *id.* at 2-3, and it requested "the Office [to] strike

the second clause of the proposed revision to the gross receipts definition."  NCTA Comments at

12.

**2.     *NCTA Demonstrated That Generally Accepted Accounting Principles (GAAP) Provides The Appropriate Methodology For Recognizing Revenue For Bundled Services And That The Proposed Rule Conflicted With GAAP***

47.     NCTA also showed that GAAP is the "authoritative accounting standard in the

United States and the standard applied by cable operators and other companies across the country

in order to meet various financial reporting obligations."  NCTA Comments at 13.  NCTA

highlighted the wide use of GAAP, including by the Securities and Exchange Commission, the

Financial Accounting Standards Board, and third-party auditors.  *Id.*  Indeed, as NCTA noted,

"[t]he Copyright Office itself and the Copyright Royalty Board ('CRB') recognize [] and rely on

GAAP in analyzing other compulsory licenses."  *Id.*  NCTA further noted that States also have

"expressly adopted the GAAP principle that package discounts are to be allocated proportionately

among the package's components."  *Id.* at 14.

48.     In particular, NCTA pointed out that GAAP provides "specific guidance" on

bundled discounting practice.  *Id.*  NCTA submitted a declaration from Professor William Holder,

who explained that GAAP "allocate[s] the discount for purchasing multiple services in proportion

to the relative selling prices of those services," and that the proposed rule's departure from that

practice would incorrectly "attribute revenue from other bundled services to the basic cable

service."  *Id.*  As a result, "the Office's proposed rule would treat customers who pay a bundled

discount price as if they paid the full *a la carte* rack rate for basic service [and] creat[e] broadcast

royalties on revenues that customers do not pay."  *Id.* at 14-15.

49.     NCTA further explained that the proposed rule's departure from GAAP would

result in the "burden and expense of creating and maintaining a second set of books to track

16

revenues for copyright purposes" and "[t]his second set of books would be subject to no standard accounting principles." *Id.* at 17. This would result in "subjective interpretations by different companies and giv[e] rise to inconsistent results in audits and related disputes." *Id.* It would also create "phantom" revenues when the company offers "senior citizen" discounts or outage related discounts. *Id.* at 17 n.46. Instead, by adopting GAAP, "copyright owners would be assured of objective, consistent, predictable, and fair financial reporting free of manipulation." *Id.* at 18.

### 3.     *NCTA Opposed The Copyright Office's Position On Equipment Fees*

50.     NCTA likewise contested the Copyright Office's position on equipment fees. *See* NCTA Reply Comments at 8-11. It noted that the Copyright Act makes no mention of equipment revenue. The Act instead bases royalties on the "gross receipts . . . for the basic *service* of providing secondary transmission of primary broadcast transmitters," and "[b]y definition, *equipment* fees are not *service* fees." *Id.* at 9. NCTA argued that the Office's position was particularly perverse in today's market: "[S]ubscribers typically acquire operator-provided equipment *not* to obtain basic broadcast signals that are readily available through other means . . . ., but rather to use features such as advanced guides and user interfaces, on-demand and over-the-top video content, and recording tools." *Id.* at 10.

51.     To the extent equipment fees are included in gross receipts at all, NCTA urged that they should be limited to fees for equipment that is truly "necessary" to receive broadcast retransmissions. NCTA Reply Comments at 9. As NCTA noted, many cable operators make available free apps through which subscribers may access broadcast programming. *Id.* at 10. In those circumstances, no equipment is "necessary" to receive the programming, because subscribers can choose to access the programming through a free app on their television or personal device.

52.     NCTA relied on guidance the Copyright Office's General Counsel issued in 1989. In that letter, the Office explained that, if a cable company offers a $1 box that enables subscribers

to receive all broadcast content and a $3 box that provides additional features, the cable operator need only report $1 in equipment revenue for all subscribers.  The $1 fee is the only fee necessary to receive the broadcast content—even if some subscribers choose to access the content through a $3 box instead.  *See* Letter from Dorothy Schrader, General Counsel, Copyright Office, to James F. Ireland, Esq. (Oct. 11, 1989) (Ex. A to NCTA Reply Comments).  By the same reasoning, NCTA explained, if a cable operator allows subscribers to access all broadcast content through a free software app, the necessary equipment fee is zero dollars.

### 4.     *A Group Of Copyright Owners Agreed With NCTA*

53.     NCTA's position on bundled discounts was supported by the Motion Picture Association ("MPA"),[6] along with its member companies and other producers and distributors of movies, series, and specials broadcast by television stations ("Program Suppliers").  Program Suppliers, Reply Comments on Proposed Rule on Statutory Cable, Satellite, and DART License Reporting Practices at 3 (Oct. 25, 2018) ("Program Suppliers Reply Comments"), https://www.copyright.gov/rulemaking/section111/2018-comments/reply-comments/program-suppliers.pdf.

54.     Program Suppliers explained that GAAP was "consistent with Section 111's purpose and intent."  *Id.* at 4.  They reasoned that "the purpose and intent were two-fold: on one hand, gross receipts must include all the subscriber revenues received for the basic service of providing secondary broadcast transmissions, and, on the other, gross receipts do not include revenues related to non-broadcast services."  *Id.* at 4.  They concluded that the "GAAP

---

[6] This organization was previously known as the Motion Picture Association of America and was the entity that filed the Petition for Rulemaking in 2005. *See* Motion Picture Association of America, Petition for Rulemaking on Section 111 (June 7, 2005), https://www.copyright.gov/rulemaking/section111/petition20050607.pdf.

methodology for determining the basic service portion of revenues from a bundled service meets those objectives." *Id.*

55.     They also explained why a 1988 "Notice of Policy Decision" from the Copyright Office regarding the gross receipts treatment for discounted *video* tiers was irrelevant here. *Id.* at 1 (citing Notice of Policy Decision, Compulsory License for Cable Systems; Reporting of Gross Receipts, 53 Fed. Reg. 2493 (Jan. 28, 1988)). The 1988 Notice required cable companies to report the entire amount of receipts for any tiers of service that included broadcast channels, even if it included non-broadcast channels. 53 Fed. Reg. at 2394-95. Program Suppliers explained that the "1988 Notice arose in substantially different circumstances from those present today." Program Suppliers Reply Comments at 2. In particular, they explained that the notice was "issued well before the GAAP guidelines applicable to bundled products had been developed," and without such guidelines, there was a risk back then of "cable systems adopt[ing] several self-help means to determine, for tiers that mixed broadcast and non-broadcast channels, what revenues would be apportioned to basic service and, hence, included in gross receipts." *Id.* They pointed out that, "[i]n contrast, allocation of the basic service revenues from today's bundled video, internet data, and/or voice service based on the GAAP guidelines would be consistent with how publicly traded companies, including cable operators, prepare and report other financial statements." *Id.* at 3.

56.     Program Suppliers accordingly concluded that GAAP offered a "uniform, objectively verifiable approach" that is "consistent with the purpose and intent of the Section 111 royalty plan." *Id.* at 9.

57.     MPA also agreed with NCTA's position on equipment fees. MPA acknowledged that "[t]he inclusion of 'equipment fees' in the 'gross receipts' definition is at odds with Section 111's plain language" and that it makes particularly little sense in the modern era, when

subscribers use cable boxes primarily for other advanced functions.  NCTA & MPA Notice of Ex

Parte, Statutory Cable, Satellite, and DART License Reporting Practices at 2 & n.3 (July 30, 2020)

("Joint Ex Parte Letter"),  https://www.copyright.gov/rulemaking/section111/ncta-mpa-3.pdf.

MPA also agreed that, if any equipment fees should be included in gross receipts, only fees that

are actually necessary to receive the broadcast programming should qualify.  *Id.* at 3-4.

### 5.     *Comments Opposing NCTA's Position*

58.     Despite this agreement among a broad coalition of leading copyright owners and

cable operators that GAAP should determine how to allocate bundling discounts, another group of

copyright owners (referred to during the rulemaking as "Copyright Owners II")[7] opposed the

adoption of GAAP.  Copyright Owners II, Reply Comments on Proposed Rule on Statutory Cable,

Satellite, and DART License Reporting Practices at 11 (Oct. 25, 2018),

https://www.copyright.gov/rulemaking/section111/2018-comments/reply-comments/copyright-

owners-II.pdf.  That group relied on a declaration from an accountant, Sam D. Wild, who opined

that application of GAAP could involve subjective judgments, though—critically—he identified

that issue *only* in situations where there was *no* standalone price of the component services in the

bundle, *id.* at 12 (citing declaration by Sam D. Wild).  But as NCTA pointed out, that is not the

situation with bundles of internet, cable, and voice services, which are always made available on

a standalone basis.  *See* Joint Ex Parte Letter at 5  ("[T]oday's packages reflect actual marketing

practices involving video services bundled with Internet and/or voice services that are taken by the

---

[7] This group included the Joint Sports Claimants (Major League Baseball, National Football
League, National Basketball Association, Women's National Basketball Association, National
Hockey League and National Collegiate Athletic Association), the National Association of
Broadcasters on behalf of U.S. commercial television claimants, the Public Broadcasting Service
(representing public television claimants), the Settling Devotional Claimants, and the Canadian
Claimants Group.

vast majority of cable subscribers and each of which is available separately in the marketplace."). Copyright Owners II relied heavily on the 1988 Notice, which, as noted, dealt with gross receipts from discounted *video* tiers *within* a cable service rather than bundles of video, internet, and voice services, and predated the adoption of GAAP.

59.     Copyright Owners II also opposed NCTA's position on equipment fees, arguing that the proposed change aligned with the Office's prior interpretation of "gross receipts," and asserting that a consumer's ability to freely access the broadcast content by other means because of technological changes was "irrelevant."  *See* Ex Parte Communications Letter of Copyright Owners II, Statutory Cable, Satellite, and DART License Reporting 2-3 (Sept. 16, 2020), https://www.copyright.gov/rulemaking/section111/copyright-owners-letter-5.pdf.

### E.     The Copyright Office's Final Rule

60.     On December 12, 2024—seven years after the NPRM, and nearly 20 years after first initiating rulemaking proceedings addressing "gross receipts"—the Copyright Office issued a final rule directing cable companies how to calculate gross receipts for bundled services and equipment fees.  *See* Statutory Cable, Satellite, and DART License Reporting Practices, 89 Fed. Reg. 100348, 100351-53 (Dec. 12, 2024) (codified at 37 C.F.R. pt. 201).[8]

61.     The Rule states: "[G]ross receipts shall not include any fees collected from subscribers for the sale of internet services or telephony services when such services are bundled together with cable service; instead, when cable services are sold as part of a bundle of other services, gross receipts shall include fees in the amount that would have been collected if such subscribers received cable service as an unbundled stand-alone product."  *Id.* at 100360.

---

[8] A copy of the final rule is attached hereto as Exhibit A.

62. The Copyright Office characterized this outcome as "consistent with the Office's decades-long interpretation of 'gross receipts' in section 111 as requiring reporting of all subscription fees collected by a cable operator when its service includes broadcast stations." *Id.* at 1000351. The Office noted that "when a video service tier includes both broadcast and non-broadcast stations, the Office requires the cable operator to report all of the revenues from the broader tier to be included in gross receipts, not just the revenues that would have been garnered from a broadcast-only tier." *Id.* According to the Office, "cable operators [have] not [been] permitted to prorate gross receipts within tiers of service that contain broadcast channels according to the ratio of broadcast to non-broadcast channels in a given tier." *Id.*

63. The Office questioned whether "consumer preferences and valuation of the constituent services in a bundle are accurately measured by the proportionate 'rack rate' of each service sold separately," and it asserted (without pointing to any evidence to support its assertion and qualifying its conclusion with "*may* not") that "consumers may not value the other services in the bundle (e.g., internet and/or voice) enough to pay the full asking price." *Id.* at 100353.

64. The Office determined that "[o]n the current record . . . its proposed rule reflects the appropriate interpretation of the statute"; it was "not persuaded that GAAP necessarily leads to a simpler and more appropriate calculation of the value of the video services in a bundle in the context of section 111 and congressional intent." *Id.* The Office contended that "the use of GAAP is not mandated by the statute, and using GAAP would represent a change from the Office's existing interpretation of the statute." *Id.* The Office accordingly rejected the use of GAAP to apportion bundling discounts.

65. The Copyright Office also rejected NCTA's and MPA's position on equipment fees. The Office did not dispute that the statute refers only to "service" fees, not "equipment" fees.

And it did not respond to NCTA's and MPA's argument that including equipment fees in gross receipts makes particularly little sense in an era when subscribers use their cable boxes primarily for advanced functions like video on demand, DVR recording, and voice recognition, rather than accessing broadcast content.  Instead, the Office simply asserted that, "[c]onsistent with its long-held view, the Office believes that, regardless of the descriptor used, equipment fees are properly included in gross receipts," and that "[t]he Office's approach in this area is well-established." *Id.*

66.     The Office likewise rejected NCTA's and MPA's argument that equipment fees should not be included in gross receipts when subscribers have the option to access broadcast programming through a free software app.  The Office reaffirmed that gross receipts include only "the equipment *necessary* to access broadcast services" and cited its 1989 General Counsel letter regarding the $1 and $3 boxes.  *Id.* at 100353-54 & n.97 (emphasis added).  But it then asserted that, "when a cable operator offers to provide video services through a free software application, but a subscriber opts to forego the software application in favor of a cable box, then that equipment is no less necessary to the subscriber's ability to receive broadcast signals than before."  *Id.* at 100354.  The Office did not explain how a cable box could be "necessary" to receive broadcast signals if the subscriber can access the signals through a free software app instead.

67.     The Office's Rule took effect on January 27, 2025.  *Id.* at 100348.  The Office later clarified that statements of account reflecting the Rule's new methodology for reporting gross receipts should be filed beginning with those due on March 1, 2026, covering transmissions in the last six months of 2025 and subsequent periods.  Statutory Cable, Satellite, and DART License Reporting Practices, 90 Fed. Reg. 10856, 10856-57 (Feb. 28, 2025); *Copyright Office Adjusts*

*Compliance Date in Its Earlier Rule Relating to Cable, Satellite, and DART License Reporting Practices*, U.S. Copyright Off. (Aug. 6, 2025), https://copyright.gov/newsnet/2025/1073.html.

## CLAIMS FOR RELIEF

### CLAIM I
### The Copyright Office's Decision To Reject GAAP Methodology For Bundled Discounts Is Contrary To Law

68.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

69.    The APA prohibits the Copyright Office from acting in any way that is not in accordance with law or that exceeds statutory jurisdiction, authority, or limitations.  5 U.S.C. § 706(2)(A), (C).

70.    The definition of "gross receipts" in the final rule taxes amounts that hypothetically *would have been received* if a subscriber had purchased a standalone cable service, rather than the actual "gross receipts" "for" the "basic service" of retransmitting broadcast television programming, contrary to the plain text of section 111 of the Copyright Act.  As a result, the rule calculates "gross receipts" based on revenue that the cable company never receives, in violation of the statute.

71.    The rule also violates Section 111 by charging royalties on services other than basic cable.  The Copyright Act creates a compulsory licensing scheme *only* for the retransmission of broadcast television signals over cable systems.  It does not apply to internet and voice services. Contrary to this statutory mandate, the final rule attributes revenue from internet and voice services to the cable service when these services are offered for a bundled discount by prohibiting any allocation of a bundling discount to basic cable revenue.

### CLAIM II
### The Copyright Office's Decision To Reject GAAP Methodology For Bundled Discounts Is Arbitrary, Capricious, And An Abuse Of Discretion

72.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

73.     The APA prohibits the Copyright Office from acting in any way that is arbitrary, capricious, or an abuse of discretion.  5 U.S.C. § 706(2)(A).

74.     The Copyright Office's decision to reject the GAAP methodology—and thereby compel royalty payments based on the standalone price of basic cable even when cable subscribers do not purchase that service on a standalone basis—is arbitrary, capricious, and an abuse of discretion.

75.     The Office's rejection of GAAP on the ground that it would not necessarily reflect "consumer preferences and valuations" was illogical and entirely unsupported by the rulemaking record.  The Office failed to point to anything in the rulemaking record that supported the proposition that cable subscribers value their video services more than other elements of a bundle, including internet access.  The Office relatedly ignored the problem that its final rule, by allocating bundling discounts only to internet and voice services, assumes that consumers value those services less than cable, although the Office was unable to point to any evidence or support for that assumption.  Indeed, observed consumer behavior—namely, cord cutting and the decline of cable subscriptions—directly contradicts the Office's position.

76.     The Office also failed to provide an adequate opportunity for commenters to provide evidence on critical issues that influenced its decision-making.  For instance, although the Office pointed to a paucity of evidence in the record about such "consumer preferences and valuations," it did not provide adequate notice that consumer preferences and valuations were relevant to its analysis in the NPRM, or any opportunity to submit such evidence.  Even worse, the assumptions it made about those consumer preferences in the absence of such evidence—e.g., that consumers might value cable service over internet service to an even greater degree than their relative standalone prices would suggest—were speculative and irrational.

**CLAIM III**
**The Copyright Office's Interpretation Of Gross Receipts**
**To Include Equipment Fees Is Contrary To Law**

77.  The foregoing paragraphs are incorporated by reference as if set forth in full herein.

78.  The APA prohibits the Copyright Office from acting in any way that is not in accordance with law or that exceeds statutory jurisdiction, authority, or limitations.  5 U.S.C. § 706(2)(A), (C).

79.  The Office's interpretation of "gross receipts" to include equipment fees violates the plain meaning of the Copyright Act.  The statute requires royalties to be paid on "gross receipts . . . for the basic *service* of providing secondary transmissions of primary broadcast transmitters." 17 U.S.C. § 111(d)(1)(E) (emphasis added).  It is undisputed that equipment is not a service; thus, payments received for *equipment* are not payments for secondary transmission *services*.

80.  At a minimum, "gross receipts" for "basic service" do not include equipment fees when consumers have the option of receiving broadcast content using the free applications provided by a cable operator.

**CLAIM IV**
**The Copyright Office's Interpretation Of Gross Receipts To Include Equipment Fees**
**Is Arbitrary, Capricious, And An Abuse Of Discretion**

81.  The foregoing paragraphs are incorporated by reference as if set forth in full herein.

82.  The APA prohibits the Copyright Office from acting in any way that is arbitrary, capricious, or an abuse of discretion.  5 U.S.C. § 706(2)(A).

83.  The Copyright Office's interpretation of Section 111 to include equipment fees was arbitrary and capricious because the Office failed to address substantial grounds identified during notice-and-comment rulemaking that should have led the Office to change its interpretation.

84.  Specifically, NCTA and MPA argued in their comments that the Office's interpretation was particularly inappropriate in the modern era given that subscribers now use their

26

cable boxes primarily for advanced functions like video on demand, DVR recording, and voice recognition, rather than for accessing broadcast content. Including fees for that equipment in gross receipts vastly overcompensates copyright owners, because the equipment is now used primarily for functions *other than* retransmitting the owners' broadcast content.

85.    The Office wholly failed to address that argument. Instead, it simply parroted its previous interpretation that gross receipts include equipment fees. By refusing to consider whether changed circumstances warranted reconsideration of its interpretation—and refusing even to respond to the commenters' arguments on that point—the Office disregarded its obligations under the APA.

86.    The Office's interpretation was also arbitrary and capricious because the Office's rationale for including *all* equipment fees, even when a cable provider makes broadcast content available through other, free means (like software applications), was illogical, internally inconsistent, and contrary to its duty to engage in reasoned decision-making.

87.    The Office acknowledged and reaffirmed its longstanding position that equipment fees must be included in gross receipts only when they are "necessary" for a subscriber to access broadcast programming. But the Office asserted that equipment fees for cable boxes are "no less necessary to the subscriber's ability to receive broadcast signals" merely because the subscriber can choose to receive the signals through a free alternative. That reasoning makes no sense and drains the word "necessary" of all meaning. If a subscriber can access broadcast programming through a free app, then by definition the cable box is not "necessary" to access the programming.

88.    By justifying its rule on a theory that was illogical and incoherent, the Office acted in a manner that was arbitrary, capricious, and an abuse of discretion.

## PRAYER FOR RELIEF

WHEREFORE, NCTA respectfully requests that this Court enter judgment in its favor and grant the following relief:

a.    A declaration pursuant to 28 U.S.C. § 2201 stating that:

i.    The Copyright Office's determination that "gross receipts" includes revenue that was not received by cable operators for the basic service of providing broadcast transmissions is contrary to law because it contravenes 17 U.S.C. § 111;

ii.    The Copyright Office's determination that "gross receipts . . . for the basic service" of providing broadcast transmissions includes equipment fees is contrary to law because it contravenes 17 U.S.C. § 111; and

iii.    The Copyright Office's rule is arbitrary and capricious.

b.    An order setting aside the Copyright Office's determination that gross receipts includes revenue that was never received for the basic service of providing broadcast transmissions and includes equipment fees.

c.    An order awarding NCTA its costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

d.    Such other and further relief as the Court deems just and proper.

Dated: February 27, 2026

Respectfully submitted,

*/s/ Sarang V. Damle*

Matthew A. Brill (DC Bar No. 456680)
Sarang V. Damle (DC Bar No. 1619619)
Brent T.F. Murphy (DC Bar No. 1645051)
Hasala K. Ariyaratne (DC Bar No. 90029338)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email:   matthew.brill@lw.com
         sy.damle@lw.com
         brent.murphy@lw.com
         hasala.ariyaratne@lw.com

Robert K. Kry (DC Bar No. 490545)
Jackson A. Myers (DC Bar No. 1735365)
MOLO LAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW,
Washington, DC 20037
Tel: (202) 556-2011
Fax: (202) 556-2001
Email:   rkry@mololamken.com
         jmyers@mololamken.com

*Attorneys for Plaintiff NCTA—The Internet &*
*Television Association*