**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NCTA—THE INTERNET & TELEVISION ASSOCIATION, <br><br>    *Plaintiff*, <br>  v. <br><br> UNITED STATES COPYRIGHT OFFICE, *et al.*, <br><br>    *Defendants.* | Case No. 1:26-cv-713-SLS |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 3

I.     Statutory Background ................................................................................. 3

II.    Regulatory Background ............................................................................. 5

III.   Challenged Rulemaking Amendments......................................................... 7

PROCEDURAL HISTORY ................................................................................. 9

LEGAL STANDARD ......................................................................................... 10

ARGUMENT .....................................................................................................11

I.     The Final Rule Accords with the Law ........................................................ 12

        A.     The Statute Requires the Full Value of Cable to Be Included in "Gross Receipts" ................................................................................. 14

                1.     The Statutory Text Supports a Full-Value, Service-Based Measure of "Gross Receipts"................................................................... 15

                2.     Section 111's Structure and Purpose Foreclose Proration and Require a Uniform, Administrable Measure of Gross Receipts ............... 18

                3.     The Office's Longstanding Interpretation Rejects Proration and Requires a Full-Value Measure ................................................. 20

                4.     *Cablevision* Supports the Final Rule.............................................. 24

        B.     Including Equipment Fees in "Gross Receipts" Is Required by Statute.............. 27

                1.     The Statutory Text Supports the Office's Rule ....................................... 27

                2.     Longstanding Office Practice Supports the Final Rule............................ 29

II.    The Final Rule Is Not Arbitrary and Capricious............................................ 30

        A.     The Office Reasonably Determined That the Full Value of Cable Must Be Included in "Gross Receipts................................................................. 31

                1.     The Office Reasonably Rejected GAAP-Based Proration........................ 31

        2.      Other Statutory Schemes Cannot Govern the Register's
                Administration of Section 111 ....................................................................... 35

    B.      The Office Reasonably Determined That Equipment Fees Must Be
            Included in "Gross Receipts"................................................................................ 38

III.    Remand Without Vacatur Is the Appropriate Remedy ...................................................... 40

CONCLUSION.................................................................................................................................. 43

## TABLE OF AUTHORITIES

**CASES**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993)..................................................................................... 40

*Am. Bioscience, Inc. v. Thompson,*
   269 F.3d 1077 (D.C. Cir. 2001).................................................................................. 10

*Am. Great Lakes Ports Ass'n v. Zukunft,*
   301 F. Supp. 3d 99 (D.D.C. 2018), *aff'd sub nom.*
   *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) .................................. 41

*Bayshore Cmty. Hosp. v. Azar,*
   325 F. Supp. 3d 18 (D.D.C. 2018) .............................................................................. 42

*Blue Ocean Inst. v. Gutierrez,*
   585 F. Supp. 2d 36 (D.D.C. 2008), *appeal dismissed sub nom.*
   *Blue Ocean Inst. v. Locke*, No. 09-5007, 2009 WL 1456322 (D.C. Cir. May 5, 2009) ............ 10

*Brodie v. U.S. Dep't of Health & Hum. Servs.,*
   796 F. Supp. 2d 145 (D.D.C. 2011) ............................................................................. 10

*Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.,*
   464 U.S. 89 (1983)..................................................................................................... 12

*Burlington Truck Lines, Inc. v. United States,*
   371 U.S. 156 (1962)................................................................................................... 31

*Cablevision Sys. Dev. Co. v. Motion Picture of Am.,*
   836 F.2d 599 (D.C. Cir. 1988)............................................................................. *passim*

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984)................................................................................................... 24

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971)............................................................................................. 10, 30

*Citrus HMA, LLC v. Becerra,*
   No. 20-cv-707 (CKK), 2022 WL 1062990 (D.D.C. Apr. 8, 2022) ........................................ 41

*City of Clarksville v. Fed. Energy Regul. Comm'n,*
   888 F.3d 477 (D.C. Cir. 2018)................................................................................. 15, 27

*Duncan v. Walker,*
   533 U.S. 167 (2001)................................................................................................... 16

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ................................................................................................ 34

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ................................................................................................ 10

*Fortnightly Corp. v. United Artists Television, Inc.,*
    392 U.S. 390 (1968) .................................................................................................. 3

*Garcia Pinach v. Bondi,*
    147 F.4th 117 (2d Cir. 2025) ................................................................................. 24

*Global Van Lines, Inc. v. Interstate Com. Comm'n,*
    804 F.2d 1293 (D.C. Cir. 1986) ............................................................................ 41

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ................................................................... 12, 13, 21, 24

*Lopez v. Garland,*
    116 F.4th 1032 (9th Cir. 2024), *reh'g & reh'g en banc denied by*
    151 F.4th 1196 (9th Cir. 2025) .............................................................................. 24

*Lorillard v. Pons,*
    434 U.S. 575 (1978) ................................................................................................ 29

*Motor Vehicle Mfrs. Ass'n of U.S.v. State Farm Mut. Auto. Ins.,*
    463 U.S. 29 (1983) ................................................................................ 10, 30, 31

*Murillo-Chavez v. Bondi,*
    128 F.4th 1076 (9th Cir. 2025) .............................................................................. 24

*N. Carolina Fisheries Ass'n v. Gutierrez,*
    550 F.3d 16 (D.C. Cir. 2008) ................................................................................. 41

*Nasdaq Stock Mkt. LLC v. Secs. Exch. Comm'n,*
    38 F.4th 1126 (D.C. Cir. 2022) ............................................................................. 36

*Nat'l Shooting Sports Found., Inc. v. Jones,*
    716 F.3d 200 (D.C. Cir. 2013) .............................................................................. 30

*Nat'l Wildlife Fed'n v. EPA,*
    286 F.3d 554 (D.C.Cir.2002) ................................................................................ 24

*Norfolk & W. Ry. Co. v. United States,*
    768 F.2d 373 (D.C. Cir. 1985), *cert. denied sub. nom.,*
    *Aluminum Ass'n v. Norfolk & W. Ry. Co.,* 479 U.S. 882 (1986) .......................... 25

iv

*Novartis Pharms. Corp. v. Johnson*,
  102 F.4th 452 (D.C. Cir. 2024) .................................................................. 15, 27

*Nuclear Energy Inst., Inc. v. Env't Prot. Agency*,
  373 F.3d 1251 (D.C. Cir. 2004) ...................................................................... 24

*PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*,
  362 F.3d 786 (D.C. Cir. 2004) ........................................................................ 36

*Richards v. Immigr. & Naturalization Serv.*,
  554 F.2d 1173 (D.C. Cir. 1977) ...................................................................... 10

*Shands Jacksonville Med. Ctr. v. Burwell*,
  139 F. Supp. 3d 240 (D.D.C. 2015) ................................................................ 41

*Sierra Club v. Mainella,*
  459 F. Supp. 2d 76 (D.D.C. 2006) .................................................................. 10

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ........................................................................................ 12

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021) ...................................................................... 40

*State of Ohio v. U.S. E.P.A.*,
  997 F.2d 1520 (D.C. Cir. 1993) ...................................................................... 24

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*,
  415 U.S. 394 (1974) .......................................................................................... 3

*World Shipping Council v. Fed. Mar. Council*,
  171 F.4th 410 (D.C. Cir. 2026) ...................................................................... 30

**STATUTES**

5 U.S.C. § 706 ...................................................................................................... 10

17 U.S.C. § 101 ...................................................................................................... 3

17 U.S.C. § 106 ...................................................................................................... 3

17 U.S.C. § 111 ............................................................................................ *passim*

17 U.S.C. § 115 .................................................................................................... 35

17 U.S.C. § 702 .................................................................................................... 13

22 U.S.C. § 8512 ............................................................................................................... 29

28 U.S.C. § 604 ................................................................................................................. 29

29 U.S.C. § 213 ................................................................................................................. 12

42 U.S.C. § 5846 ............................................................................................................... 12

47 U.S.C. § 543 ........................................................................................................... 29, 30

Satellite Television Extension and Localism Act ("STELA") of 2010,
    Pub. L. No. 111–175, 124 Stat. 1218 ...................................................................... 5, 8

STELA Re-Authorization Act of 2014,
    Pub. L. No. 113–200, 128 Stat. 2059 .......................................................................... 8

## LEGISLATIVE HISTORIES

H.R. Rep. No. 94-1476 (1976) ............................................................... 4, 18, 19, 35

## RULES

Fed. R. Civ. P. 56 .............................................................................................................. 10

## REGULATIONS

37 C.F.R. § 201.17 (2017) .............................................................................................. 9, 20

37 C.F.R. § 201.17 ...................................................................................................... *passim*

Compulsory License for Cable Systems,
    43 Fed. Reg. 27827 (June 27, 1978) (final rule) ...................................... 6, 7, 9, 29

Compulsory License for Cable Systems,
    49 Fed. Reg. 13029 (Apr. 2, 1984) (final rule) ............................................. 6, 21, 26

Statutory Cable, Satellite, and DART License Reporting Practices,
    89 Fed. Reg. 100348 (Dec. 12, 2024) (final rule) ................................................ *passim*

Statutory Cable, Satellite, and DART License Reporting Practices,
    90 Fed. Reg. 10856 (Feb. 28, 2025) (clarification to final rule) ................................. 9

## OTHER AUTHORITIES

https://www.copyright.gov/rulemaking/section111/ ...................................................... 7

https://www.ecfr.gov/on/2021-07-22/title-37/chapter-II/subchapter-A/part-201/section-201.17 ............ 20

Licensing Connection Newsletter (Fall–Winter 2025), Vol. 29 (circulated Jan. 9, 2025), https://copyright.gov/licensing/tlc/fall-winter-2025.pdf ................................................................. 9

MPA Petition for Rulemaking, COLC Docket No. 2005-6 (June 7, 2005) (the "Petition"), https://www.copyright.gov/rulemaking/section111/petition20050607.pdf ................................ 8

*Gross*, OXFORD ENGLISH DICTIONARY (1978) ................................................................................. 15

*Net*, OXFORD ENGLISH DICTIONARY (1978) ................................................................................... 15

*Service*, OXFORD ENGLISH DICTIONARY (1978) ............................................................................. 27

*Time: To Buy or Rent* (Nov. 22, 1982), https://time.com/archive/6700719/to-buy-or-rent/ ...................................................................... 29

U.S. Copyright Office, NewsNet Issue 1073 (Aug. 6, 2025), https://copyright.gov/newsnet/2025/1073.html .............................................................................. 9

**INTRODUCTION**

When a cable service provider retransmits broadcast television to its subscribers, it is required by statute to pay a royalty to the United States Copyright Office (the "Office"), which then distributes that royalty to the copyright owners whose works were retransmitted. The Office assesses the royalty by applying a statutory and regulatory formula, the first step of which is to determine the royalty base. Section 111 of the Copyright Act sets the royalty base as the "gross receipts" for the "basic service" of rebroadcasting broadcast television. 17 U.S.C. § 111(d)(1)(B).

Following 20 years of rulemaking, with numerous comments and *ex parte* communications, including from the NCTA in this case, the Internet & Television Association ("NCTA"), the Office promulgated its final Rule in 2024 amending how to report the royalty base for Section 111.  Relevant to this case, when a cable provider sells bundled services for a single price, such as internet plus voice plus cable,[1] the Rule assesses the value of the "gross receipts" for providing the "basic service" as the amount a cable service provider "would have received" if a customer had purchased cable alone. And when a subscriber requires equipment to receive cable and leases it from the cable service provider, the Rule considers those equipment fees as part of the "gross receipts" for providing the "basic service."  These positions largely follow the Office's consistent practice for decades, and accord with an earlier decision of the D.C. Circuit. Both of these determinations about how to calculate the gross receipts were reasonable and reasonably explained, and the Office's Rule should be affirmed.

First, the Copyright Act requires the royalty base to be the "gross receipts" for providing the basic service. "Gross receipts" is not defined by statute, but the dictionary defines "gross" as the total amount, before any deductions are made. Accordingly, the Rule requires the royalty base

---

[1] Both this brief and comments to the Rule use "video" and "cable" interchangeably.

to be the cost the service provider charges for cable alone and does not allow allocating discounts in a bundle to the price of cable for purposes of reporting gross receipts. For example, if cable, voice, and internet individually cost a consumer 50 dollars each and are bundled for 100 dollars in total, the cable "gross receipts" would be set at 50 dollars, the cost of cable individually. This is because the plain meaning of "gross" does not allow for a deduction to the price of cable to account for offsets or discounts elsewhere. This accords with the Office's longstanding practice for assessing the royalty base of different cable packages as the total cost of the cheapest package containing cable and not allowing apportionment between cable and other services within the package. Moreover, it reflects Congress's judgment to have a practical and reasonable royalty base that can be straightforwardly calculated, rather than mathematically precise. *See Cablevision Sys. Dev. Co. v. Motion Picture of Am.*, 836 F.2d 599, 611 (D.C. Cir. 1988) ("Congress *never* contemplated a precise congruence of the royalties paid and the amount of distant non-network programming actually carried. Instead, Congress picked a *convenient* revenue base and used the DSEs to discount it in a reasonable manner."). The agency reasonably considered expert claims both for and against allocating discounts, and determined that not allocating discounts was a reasonable, practicable approach.

A plain reading of the Copyright Act similarly requires equipment fees to be included in the gross receipts for providing the "basic service." The dictionary definition of "service" includes providing the materials to carry out the work for which there is a public demand. Accordingly, the "basic service" provided by cable service providers includes the equipment needed to receive cable—after all, that is a fee that a customer must necessarily pay to view the rebroadcasted transmissions. This again accords with the longstanding interpretation by the Office, which has

2

required fees for leasing converters (necessary equipment in the 1980s) to be included in the reported gross receipts.

Because the Rule is not contrary to law and is a product of reasoned decision-making, the Court should grant summary judgment to Defendants on all counts and deny NCTA' motion for summary judgment.

## BACKGROUND

### I.    Statutory Background

In 1976, Congress passed a comprehensive statutory scheme to, among other things, compensate copyright owners for retransmission of a primary transmission[2] containing copyrighted works. Prior to enactment, copyright owners were not compensated for the retransmission of their works by cable systems. *See, e.g., Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 402 (1968) (holding that a cable system that received and retransmitted broadcast signals did not "perform" the copyrighted works within the meaning of the Copyright Act.); *accord Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394, 411–15 (1974). Under the Copyright Act, copyright owners have the exclusive right "to perform the copyrighted work publicly" or authorize others to do so.  17 U.S.C. § 106.  Section 101 of the Copyright Act of 1976 defines such public performances to encompass transmission and retransmission of copyrighted works. 17 U.S.C. § 101. Section 111 provides cable operators with a statutory license to retransmit a performance or display of a work embodied in a "primary

---

[2] "A 'primary transmission' is a transmission made to the public by a transmitting facility whose signals are being received and further transmitted by a secondary transmission service, regardless of where or when the performance or display was first transmitted. In the case of a television broadcast station, the primary stream and any multicast streams transmitted by the station constitute primary transmissions."  17 U.S.C. § 111(f)(1).

3

transmission" made by a television station licensed by the Federal Communications Commission ("FCC"). *Id.* § 111.

This case concerns the statutory license provided by Section 111. Cable operators that retransmit broadcast signals in accordance with this provision are required to pay royalty fees to the Office. *Id*. § 111(d)(1)(A). As relevant to this case, the royalty amounts are determined based on a specified percentage of cable operators' reported "gross receipts" collected for secondary transmissions. *Id*. § 111(d)(1)(B). These royalty fees are remitted semi-annually to the Office, which invests the royalties in United States Treasury securities pending distribution to copyright owners eligible to receive a share of the royalties. *Id*. § 111(d)(2). The Office distributes those royalties in accordance with periodic distribution orders issued by the Copyright Royalty Board ("CRB"). *Id*. § 111(d)(4).

Congress did not define "gross receipts" among the terms defined in the Copyright Act, but the House Report accompanying the Act explained that "[f]or purposes of computing royalty payments, only receipts for the basic service of providing secondary transmissions of primary broadcast transmitters are to be considered. Other receipts from subscribers, such as those for pay-cable services or installation charges, are not included in gross receipts." H.R. Rep. No. 94-1476, at 96 (1976).

More broadly, the House Report explained that Congress sought to adopt a formula approach that is "workable and is fair and equitable to both the owners and the users of copyrighted materials and which also protects and serves the public interest." *Id.* at 360. Consistent with that objective, Congress adopted a standardized approach based on gross receipts. It directed the Register to "prescribe by regulation" the requirements governing how operators report the information needed to carry out that calculation. 17 U.S.C. § 111(d)(1)(A).

In the years following enactment, the statutory scheme continued to rely on operator-reporting. Decades later, Congress added provisions to strengthen oversight. In the Satellite Television Extension and Localism Act ("STELA") of 2010, Congress amended section 111 to add audit provisions. *See* Pub. L. No. 111–175, 124 Stat. 1218. These provisions directed the Register to establish a process for the confidential verification of statements of account ("SOAs"), which are filed by cable operators. *See* 17 U.S.C. § 111(d)(6).

These SOAs specify:

- the number of channels on which the cable system made secondary transmissions to its subscribers,

- the names and locations of all primary transmitters whose transmissions were further transmitted by the cable system,

- the total number of subscribers,

- the gross amounts paid to the cable system for the basic service of providing secondary transmissions of primary broadcast transmitters, and

-

- such other data as the Register of Copyrights may from time to time prescribe by regulation.

*Id*. § 111(d)(1)(A). Under this provision, an independent auditor may examine the books and records of cable systems to confirm the accuracy of reported gross receipts and royalty payments and identify errors. *Id.*

## II.  Regulatory Background

Following the passage of the 1976 Act, the Office undertook rulemaking proceedings to implement the statute's reporting requirements, as expressly directed by Congress. *Id. .* In these early regulations, the Office established two foundational interpretations that have guided administration of the statutory license.

5

First, the Office addressed whether a cable system may prorate subscriber fees to exclude services not covered by the compulsory license. In the preamble to its 1978 final rule defining gross receipts as "the full amount of monthly (or other periodic) service fees," the Office concluded that a cable system offering subscribers a bundled service, including both retransmission of broadcast signals and local origination programming (such as time, weather, or automated news services), for a single monthly fee, may not allocate any portion of the monthly service fee to the local origination services, and report only the balance as gross receipts. Compulsory License for Cable Systems, 43 Fed. Reg. 27827, 27832 (June 27, 1978) (final rule). The Office explained that these offerings constitute an "integral package" made available to subscribers as a single package of services. *Id.* at 27828. Accordingly, it found no statutory basis to permit proration or partial exclusion of fees associated with that package. *Id.*

In a subsequent final rule, the Office considered the reporting obligations associated with mixed tier offerings containing both broadcast and non-broadcast channels. *See* Compulsory License for Cable Systems, 49 Fed. Reg. 13029, 13034–35 (Apr. 2, 1984) (final rule). Consistent with its 1978 rule, the Office concluded that when a video service tier includes both broadcast and non-broadcast stations, the cable operator must report all the revenues from the broader tier to be included in gross receipts, not just the revenues that would have been garnered from a broadcast-only tier. In other words, cable operators are not permitted to prorate gross receipts within tiers of service that contain broadcast channels according to the ratio of broadcast to non-broadcast channels in a given tier. *Id.* at 13035.

This interpretation of gross receipts, barring proration of mixed cable channel tiers, was issued in 1984 and later upheld by the D.C. Circuit in *Cablevision*, which found the Office's inclusion of the "full amount" of monthly subscriber fees for any tier containing broadcast stations

6

"sensibl[e] and efficient[]." 836 F.2d at 612; *see also id.* at 611 ("Congress *never* contemplated a precise congruence of the royalties paid and the amount of distant non-network programming actually carried. Instead, Congress picked a *convenient* revenue base and used the DSEs to discount it in a reasonable manner.").

Second, the Office's 1978 rule addressed whether fees for "converter" equipment must be included in a cable system's gross receipts. The Office determined that where a subscriber is required to use a converter to receive, in usable form, the signals comprising the cable system's basic service of providing secondary transmissions of primary broadcast transmitters, fees for such equipment are properly included in gross receipts. 43 Fed. Reg. at 27828. This conclusion reflects the functional necessity of the equipment to the provision of the licensed service and ensures that gross receipts include the full amount of consideration paid by subscribers for access to that service.

### III. Challenged Rulemaking Amendments

On December 12, 2024, the Office issued a Final Rule (or the "Rule") updating its regulations governing the royalty reporting practices of cable operators under Section 111, SOA forms, and filing requirements. The Rule was the product of a notice-and-comment rulemaking proceeding in which, over two decades, the Office considered the views of numerous stakeholders, including NCTA and its members.[3]

- In a 2005 petition, the Motion Picture Association ("MPA") filed a petition on behalf of its member companies and other producers and/or distributors of movies and television series (hereinafter "Program Suppliers"), asking the Office to "improve the nature of the information reported on the SOAs by cable operators, particularly information relating to gross receipts," among other things. MPA Petition for Rulemaking, LOC_AR_00000002 (the "Petition").

- On August 10, 2006, the Office issued a Notice of Inquiry seeking comment on the regulatory proposals and recommendations raised by the Program Suppliers. MPA

---

[3] *See* https://www.copyright.gov/rulemaking/section111/.

Petition for Rulemaking, COLC Docket No. 2005-6 (June 7, 2005) (the "Petition"), https://www.copyright.gov/rulemaking/section111/petition20050607.pdf.

- In 2010, Congress passed STELA, followed by the STELA Reauthorization Act of 2014 ("STELARA"), which made amendments to section 111 that resolved some of the issued raised by the Program Suppliers, namely providing copyright owners the ability to audit SOAs. *See* STELA, Pub. L. No. 111–175, 124 Stat. 1218 (2010); STELARA, Pub. L. No. 113–200, 128 Stat. 2059 (2014).

- On December 1, 2017, the Office published a Notice of Proposed Rulemaking addressing the remaining issues and proposing revisions to SOA forms and the Office's related regulations to streamline administration of SOAs.

- In response, the Office received comments from groups representing cable operators and copyright owners. In addition, the Office held 19 *ex parte* meetings with interested parties, including NCTA. *See* LOC_AR_00000404–52.

The Final Rule made two amendments to 37 C.F.R. § 201.17(b)(1), defining gross receipts, which NCTA challenges.

First, the Rule amended the definition of gross receipts to clarify that "when cable services are sold as part of a bundle of other services, gross receipts shall include fees in the amount that would have been collected if such subscribers received cable service as an unbundled stand-alone product." 89 Fed. Reg. at 100360. The Office explained that the Rule reflected the best interpretation of "gross receipts" and that it was consistent "with Congress' intent for gross receipts to be calculated simply (and, by implication, audited simply)." *Id.* at 100353. This position is consistent with the Office's longstanding interpretation of "gross receipts" as requiring reporting of all fees collected by a cable operator when its service includes broadcast stations. *Id*. at 100360; *Cablevision*, 836 F.2d at 611-12.

Second, the Rule amended the definition of gross receipts to clarify that gross receipts also include "fees for any other type of equipment, device, or software necessary to receive broadcast signals that is supplied by the cable operator, even if the cable operator offers to provide services

8

through a free software application." 37 C.F.R. § 201.17(b)(1).[4] The Office explained that

including these fees in "gross receipts" is mandated because the equipment is required to access

the programming. 89 Fed. Reg. at 100354. The Office explained that since 1978, the Office's

regulations have incorporated the concept that equipment fees—or "converter fees"—would be

included in gross receipts if they were necessary to access basic secondary transmissions. *Id.*; *see*

*also* 43 Fed. Reg. at 27832.

On December 12, 2024, the Office issued the Final Rule, with an effective date of January

27, 2025. Although the Final Rule became effective in January 2025, the Office adjusted its

compliance requirement regarding the final rule's reporting obligations to apply to the SOA due

March 1, 2026, after the new SOA became available.[5]

## PROCEDURAL HISTORY

On February 27, 2026, NCTA filed a complaint against the Defendants. ECF No. 1. The

complaint asserted four claims under the APA: that the rejection of proration methodology via

generally accepted accounting principles ("GAAP") is contrary to law (Claim I) and arbitrary and

capricious (Claim II); and that the inclusion of equipment fees in gross receipts is contrary to law

---

[4] Previous versions of the rule required cable operators to include "converter" fees in their gross receipts. *Compare* 37 C.F.R. § 201.17(b)(1) *with* 37 C.F.R. § 201.17(b)(1) (July 31, 2017). The Final Rule changed the terminology in the definition of gross receipts from "converter" fees to "equipment" fees, in recognition that the latter is a better description of what is currently sold or leased to cable subscribers. 89 Fed. Reg. at 100351.

[5] *See* Statutory Cable, Satellite, and DART License Reporting Practices, 89 Fed. Reg. 100348 (Dec. 12, 2024) (final rule); Statutory Cable, Satellite, and DART License Reporting Practices, 90 Fed. Reg. 10856 (Feb. 28, 2025) (clarification to final rule) (stating that "compliance with reporting obligations published at 89 Fed. Reg. 100348, 100350 to 100356, is required as of the August 29, 2025, filing deadline"); U.S. Copyright Office, NewsNet Issue 1073 (Aug. 6, 2025), https://copyright.gov/newsnet/2025/1073.html (stating that compliance with reporting obligations published at 89 Fed. Reg. 100348, 100350 to 100356, is required as of the March 1, 2026, filing deadline); *see also* Licensing Connection Newsletter (Fall–Winter 2025), Vol. 29 (circulated Jan. 9, 2025), https://copyright.gov/licensing/tlc/fall-winter-2025.pdf (announcing that revised SOA forms and instructions are available for the 2025/2 accounting period).

9

(Claim III) and arbitrary and capricious (Claim IV). *Id.* On April 17, 2026, NCTA filed a motion for summary judgment on all claims. ECF No. 20.

## LEGAL STANDARD

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008), *appeal dismissed sub nom. Blue Ocean Inst. v. Locke*, No. 09-5007, 2009 WL 1456322 (D.C. Cir. May 5, 2009); *see, e.g., Richards v. Immigr. & Naturalization Serv.*, 554 F.2d 1173, 1177 (D.C. Cir. 1977); *see also* Fed. R. Civ. P. 56(a). A court resolving APA claims on summary judgment does not employ all the traditional summary judgment standards set forth in Federal Rule of Civil Procedure 56(c). "[B]ecause of the limited role of a court in reviewing the administrative record," *Brodie v. U.S. Dep't of Health & Hum. Servs.*, 796 F. Supp. 2d 145, 150 (D.D.C. 2011), "the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). The question is "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella,* 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citation omitted). This standard of review is "narrow," and a court applying it "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S.v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). When evaluating APA claims, a court reviews an agency decision based on the Administrative Record, *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402,420 (1971)), and may hold unlawful and set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law," 5 U.S.C. § 706(2).

**ARGUMENT**

The Court should reject NCTA's challenge to the Rule.

First, the Final Rule is lawful and the Office's treatment of "gross receipts" is the best construction of the statute. Section 111 requires cable service providers to report the "gross receipts" for providing the "basic service" of providing broadcast programming. 17 U.S.C. § 111(d)(1). The plain meaning of "gross" forbids any discount or deduction—so "gross receipts" must include the full value set and charged by the cable service provider for broadcast television, rather than a discounted price reflecting the fact that the consumer has purchased multiple separate products (i.e., a "bundle"). This accords with D.C. Circuit precedent, which upheld the long-standing Office interpretation that proration within service tiers was not allowed by Section 111. *Cablevision*, 836 F.2d at 611-12. So too does the plain meaning of "service" in "basic service" include materials and equipment required to provide the service.

Second, the Final Rule is the product of reasoned decisionmaking. The Office considered and reasonably the issues raised by NCTA in its summary judgment briefing, which are the same arguments NCTA made to the Office during twenty years of rulemaking. In short, the Office rejected GAAP methodology for bundled items because it complicated reporting and auditing, and it could introduce subjective judgments. And the Office included equipment fees in "gross receipts" for "basic services" in accordance with longstanding Office practice and because that equipment is necessary to receive the service.

Finally, should the Court agree with NCTA, it should remand to the agency without vacating the Rule. The Rule is the mechanism by which copyright owners are compensated for the use of their work, and vacating it would deprive copyright owners of their statutory royalties until a replacement scheme could be issued.

## I.      The Final Rule Accords with the Law

In deciding whether an agency has acted contrary to law, while "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024), courts may also "seek aid from the interpretations of those responsible for implementing particular statutes," which "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance consistent with the APA." *Id.* at 394 (citation omitted). Indeed, an agency's experience "may be especially informative 'to the extent it rests on factual premises within [the agency's] expertise.'" *Id.* at 402 (quoting *Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 98, n.8 (1983)). "Such expertise has always been one of the factors which may give an [agency's] interpretation particular 'power to persuade, if lacking power to control.'" *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

In some situations, "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 394. The Supreme Court acknowledges that "Congress has *often* enacted such statutes." *Id.* (emphasis added). Citing several examples, the Court explained, "some statutes 'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term," *id.,* and others "empower an agency to prescribe rules to 'fill up the details' of a statutory schemeor to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" *Id.* at 395 (citation modified); *see also id.* at n.5 (citing 29 U.S.C. § 213(a)(15) ("as such terms are defined and delimited by regulations of the Secretary"); 42 U.S.C. § 5846(a)(2) ("as defined by regulations which the Commission shall promulgate")). In such cases, the "role of the reviewing court" is "to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 395. Reviewing courts "need only fulfill their obligations under the APA to

12

independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Id.* at 404.

Section 111 is a paradigmatic example of Congress's express choice to confer broad gap-filling authority on an agency to administer a statutory scheme. Section 702 authorizes the Register "to establish regulations . . . for the administration of the functions and duties made the responsibility of the Register under this title." 17 U.S.C. § 702. And more specifically, section 111 leaves key terms, including the precise contours of "gross amounts," to be implemented by the Office through rulemaking. Section 111(d)(1) directs that cable systems deposit their compulsory license royalty fees with the Register, "*in accordance with requirements that the Register shall prescribe by regulation*," which include, among other things, "a total royalty fee . . . computed on the basis of specified percentages of the *gross receipts* from subscribers to the cable service." *Id.* § 111(d)(1)(B) (emphasis added). Additionally, cable operators must, "*in accordance with requirements that the Register shall prescribe by regulation*," complete and file SOAs "specifying . . . the gross amounts paid to the cable system for the basic service of providing secondary transmissions of primary broadcast transmitters," along with any "such other data as the Register of Copyrights may from time to time prescribe by regulation." *Id.* § 111(d)(1)(A) (emphasis added).

Congress thus "empower[ed]" the Register "to prescribe rules to 'fill up the details' of a statutory scheme." *Loper Bright*, 603 U.S. at 394–95 (citation omitted). Given that express delegation, the reviewing court's role is only to "fix the boundaries of the delegated authority" and "ensure the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* at 394 (citation modified).

13

**A.  The Statute Requires the Full Value of Cable to Be Included in "Gross Receipts"**

The Register acted squarely within her statutory authority in carrying out Congress's directive to "prescribe by regulation" the "requirements" governing how a cable system "specif[ies] the gross amounts paid . . . for the basic service of providing secondary transmissions of primary broadcast transmitters." 17 U.S.C. § 111(d)(1)(A). Exercising that delegated authority, and drawing on the Office's longstanding and consistent interpretation that "gross receipts" must include the full value subscribers pay for the basic service, the Office reasonably rejected NCTA's proration approach and clarified that "when cable services are sold as part of a bundle of other services, gross receipts shall include fees in the amount that would have been collected if such subscribers received cable service as an unbundled stand-alone product." 37 C.F.R. § 201.17(b)(1).

This interpretation is faithful to section 111's text, which focuses on "gross amounts," and not a discounted or prorated amount determined by accounting conventions. It accords with section 111's structure, which uses "gross receipts" as a standardized, administrable baseline for calculating royalties to preserve comparability between reported revenues and subscriber charges. And it advances the statute's purpose by ensuring royalties are calculated on the full economic value of the licensed retransmission service to prevent underreporting (and thus undercompensation of copyright holders) via allocation and proration.

By contrast, NCTA's proposed proration approach would substitute non-statutory accounting standards for the clear baseline Congress authorized the Register to implement. Allowing cable operators to dilute that baseline through GAAP-based allocations, as NCTA proposed during the notice-and-comment process, would introduce subjectivity and depart from the Office's decades-long interpretation of "gross receipts."  The Rule is thus not only permissible, but it is the best reading of the statute in light of section 111's text, structure, and purpose.

14

1. <u>The Statutory Text Supports a Full-Value, Service-Based Measure of "Gross Receipts"</u>

Section 111(d)(1)(A) directs cable operators to "deposit with the Register . . . in accordance with requirements that the Register shall prescribe by regulation . . . [a] statement of account . . . specifying . . . the gross amounts paid to the cable system for the basic service of providing secondary transmissions of primary broadcast transmitters." 17 U.S.C. § 111(d)(1)(A). The best reading of that text requires reporting the full, undiminished amounts subscribers paid "for the basic service," and forecloses the proration approach advanced by NCTA.

When "addressing a question of statutory interpretation, [courts] begin with the text." *City of Clarksville v. Fed. Energy Regul. Comm'n*, 888 F.3d 477, 482 (D.C. Cir. 2018). And in "constru[ing] th[e] text, [courts] look to the ordinary meaning of its key terms." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024). The statutory text supports the Office's interpretation.

The plain meaning of "gross" in "gross receipts" and "gross amounts" supports the Office's interpretation. The ordinary meaning of the term "gross" amounts is the "[e]ntire, total, whole. . . (as opposed to *net*) of an amount, value, weight, number, or the like, before necessary deductions have been made." *Gross*, OXFORD ENGLISH DICTIONARY (1978). It stands in contrast with the term "net," which represents an amount "remaining after all necessary deductions have been made." *Net*, OXFORD ENGLISH DICTIONARY (1978). By directing operators to report "gross amounts," Congress required a measure that is not reduced by internal accounting allocations (or discounts).

Taking this definition of "gross," the statute can be read as: "the [entire, total, and whole] amounts paid [before necessary deductions have been made] to the cable system for the basic service of providing secondary transmissions of primary broadcast transmitters." 17 U.S.C. § 111(d)(1)(A) (substituting the OED definition of "gross" in brackets). As the D.C. Circuit has

15

already held in the context of service tiers that include both broadcast and non-broadcast channels, that means reporting the full amount paid for access to the tier that provides the secondary transmissions. *Cablevision*, 836 F.2d at 611-12. And in the context of bundled offerings that combine video with internet and/or voice services, it means reporting the full amount the operator charges for access to the basic retransmission service if purchased on its own.

NCTA's interpretation would allow a cable service provider to deduct a bundle's discount from the standalone price of providing cable service. MSJ at 17-18. By applying a deduction, NCTA's interpretation moves from "gross" receipts ("total… before necessary deductions are made") to "net" receipts ("remaining after deductions have been made"). *See Gross*, *Net*, OXFORD ENGLISH DICTIONARY (1978). NCTA's interpretation of the statute is fundamentally flawed because it eliminates "gross" from the statute. That approach does not follow basic rules of statutory interpretation. *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (when construing a statute courts "give effect, if possible, to every clause and word." (citation omitted)).

The Office's Rule implements the best reading of the statute by using the cable operator's own pricing to identify "the gross amounts paid . . . for the basic service." 17 U.S.C. § 111(d)(1)(A). Although the Rule refers to the amount that "would have been collected" for the service on a standalone basis, 37 C.F.R. § 201.17(b)(1), that figure is not hypothetical. It reflects the operator's stated price for access to the basic service. In that way, the Rule identifies the portion of the subscriber's payment properly understood as "paid for" that service. And because the subscriber, in fact, pays at least that amount to obtain access to the "basic service" in the bundled transaction, before discounts are applied, the Rule does not require operators to report amounts

16

they did not receive.[6]  Instead, it prevents operators from reducing reported amounts through post-hoc accounting allocations. *Cablevision* flatly rejects that approach. 836 F.2d at 610 (D.C. Cir. 1988). In *Cablevision*, much like here, NCTA advanced an interpretation that "allow[ed] cable companies to assign monetary values to non-broadcast programming that is combined with broadcast programming in a mixed tier and to exclude those amounts from gross receipts." *Id.* And just as NCTA reads "gross" out of the statute here, in *Cablevision* the D.C. Circuit concluded NCTA's interpretation would "read[] 'basic service' out of the statute." *Id*. This Court should likewise reject NCTA's arguments and uphold the Final Rule.

NCTA's reliance on the phrase "actual gross receipts" in subsections 111(d)(1)(E) and (F) does not change this analysis. *See* MSJ at 24. This provision applies only if the actual gross receipts are below a certain monetary threshold, at which point the statute provides a mandatory adjustment. Thus, in context, that phrase distinguishes between a cable operator's total reported gross receipts and the statutorily adjusted gross receipts used to calculate reduced royalty rates for smaller systems. In other words, "actual" identifies the starting figure (the operator's total reported receipts) before applying the prescribed deduction. 17 U.S.C. § 111(d)(1)(E)(i) (stating that "gross receipts . . . shall be computed by subtracting from such actual gross receipts" a specified amount).

---

[6] To argue that the standalone video price is not what an operator "actually receives" in a bundled transaction, NCTA produces hypothetical numbers that suggest bundled offerings are cheaper than video-alone offerings. MSJ at 19–20. There is no evidence of bundled offerings being cheaper than video-alone offerings, either in the record or produced in this litigation. On the contrary, in comments to the Office, NCTA twice used an example of an operator whose "rate card rate for basic cable, Internet, and voice services is $40 each, when purchased individually, but the triple-play bundle of all three can be purchased for $90, a $30 discount."  LOC_AR_00000315; LOC_AR_00000445 ("[I]f basic cable, Internet, and voice service are individually offered at a monthly rate of $40 each, but the triple-play bundle of all three can be purchased for a monthly rate of $90, the package price represents a $10 (25%) discount for each service."). Using this example, the Office's Rule would require an operator to report $40 of the $90 it received as "the gross amounts paid . . . for the basic service," which is an amount the operator "actually received." 17 U.S.C. § 111(d)(1)(A).

It does not define what counts as "gross receipts," much less for purposes of subsection 111(d)(1)(B). And it does not prescribe how revenue must be attributed in a bundled offering.

Nothing in section 111 authorizes NCTA's alternative approach, *i.e.* to use a GAAP-based methodology to allocate the discount for bundled services among various components, prorating the cost of the basic service for reporting "gross receipts." The statute does not refer to GAAP, proration allocation, or any other method for discounting the amount paid for the covered service. By requiring operators to report "gross amounts paid . . . for the basic service," Congress adopted a full-value, service-based measure to determine royalties owed to copyright owners for the retransmission of their works.

> 2. Section 111's Structure and Purpose Foreclose Proration and Require a Uniform, Administrable Measure of Gross Receipts

The Office's interpretation accords with the structure and purpose of the statute, as well as a longstanding interpretation applied by the D.C. Circuit. Section 111 established a standardized method for calculating royalties. The statute determines royalties "on the basis of specified percentages of the gross receipts from subscribers to the cable service," applying a set of fixed rates and adjustments. *Id.* § 111(d)(1)(B). That structure reflects a deliberate choice to use a common revenue base that can be applied uniformly and straightforwardly across the cable industry. Congress designed this license to provide compensation to copyright owners without the complexities of individual negotiations. *See* H.R. Rep. No. 94-1476, at 89–90.

The D.C. Circuit has recognized the importance of administrability in section 111. In *Cablevision*, the D.C. Circuit explained that Congress "picked a *convenient* revenue base" and used other mechanisms to approximate value, rather than attempting to measure the precise worth of retransmitted programing in each instance. 836 F.2d at 611–12. The court noted that the statute relies on "an easily calculable revenue base" to support a workable royalty system. *Id.* at 611; *see*

H.R. Rep. No. 94-1476, at 360. That design would be undermined if the definition of gross receipts turned on GAAP, which may vary depending on interpretative choices applied. 89 Fed. Reg. at 100353; LOC_AR_00000361-62.

The reporting provisions in the statute support the same objective and encourage transparency to permit auditing and oversight. Section 111 requires cable operators to file SOAs that disclose, among other things, subscriber information and service categories along with the gross amounts paid for retransmission service. 17 U.S.C. § 111(d)(1)(A). Those SOAs are intended to allow the Office, the CRB, and copyright owners to review and verify reported amounts. Congress later strengthened that review function by establishing audits to confirm the accuracy of reported amounts. *Id.* § 111(d)(6). Specifically, as amended by STELA, section 111(d)(6) directed the Register to establish a system for the "confidential verification by copyright owners . . . of the information reported on the semiannual" SOAs so that an auditor can "confirm the correctness of the calculations and royalty payments." *Id.* A royalty fee that depends on varied allocation methodologies would frustrate external verification by making reported figures less transparent. Moreover, Plaintiffs' proposal—that the gross receipts be calculated via GAAP accounting methods—would be inconsistent with the type of reporting that needs to be included in the SOA, which do not require operators to disclose the information necessary to verify those calculations.[7] That omission further suggests that Congress did not contemplate a GAAP-based allocation methodology.

---

[7] For example, to ensure reporting obligations are sufficient to permit meaningful verification and audit, it might have been necessary to require that SOAs include additional data such as the number of subscribers using bundled or mixed offerings, or other details pertaining to the calculation of an allocated receipt.

19

The Rule supports the objectives of the statute by providing a simple method for identifying the amount paid for the basic retransmission service. It looks to the operator's own pricing to determine what to attribute to access that service and applies that figure across bundled and unbundled offerings. Because that amount is derived from the operator's publicly stated rates, it results in SOAs and royalties that can be verified by copyright owners. It also aligns with the statute's direction to report "*gross* amounts," since it does not permit the operator to reduce the reported amount through allocation of bundled discounts.

NCTA's proposed proration approach does not align with the structure of the statute. Under its view, the amount attributed to the "basic service" would depend on how each operator applies GAAP to bundled offerings. Those allocations can vary based on pricing strategies, bundle composition, and accounting assumptions. The result would be a revenue base that is neither uniform, nor readily verifiable without intense discovery. That is at odds with a statute that relies on standardized reporting and straightforward verification.

3. <u>The Office's Longstanding Interpretation Rejects Proration and Requires a Full-Value Measure</u>

For decades, the Office has understood "gross receipts" to include the full amount of subscription fees collected when a service provides access to broadcast signals. In its historic regulations and guidance, the Office has required operators to report "the full amount of monthly (or other periodic) service fees for any and all services or tiers of services which include one or more secondary transmissions of television or radio broadcast signals, for additional set fees, and for converter fees." 37 C.F.R. § 201.17(b) (2017), https://www.ecfr.gov/on/2021-07-22/title-37/chapter-II/subchapter-A/part-201/section-201.17. That interpretation does not permit operators to isolate only a portion of the revenue from a service tier that includes broadcast channels. Rather,

when broadcast signals are part of the service offered, the entire amount paid for access to that service is included in gross receipts.

The Office has applied that principle in the context of mixed service tiers for over forty years. When a tier includes both broadcast and non-broadcast channels, operators must report all revenues from that tier, not a subset based on the relative number of broadcast channels. The Office adopted that interpretation as early as 1984 and has followed it consistently since. *See* 49 Fed. Reg. at 13035. This interpretation has been accepted by the D.C. Circuit. *Cablevision*, 836 F.2d at 611 ("In short, the reasonableness of the regulatory requirement that all revenues from a tier containing one retransmitted broadcast signal be included in gross receipts cannot be attacked for its failure to allow cable systems to attribute a value to nonbroadcast programs and to subtract that value from gross receipts."). This longstanding rule reflects a basic understanding of the statute. When a subscriber pays for a service that includes broadcast secondary transmissions, the payment is treated as made for that service, and it is reported in full. *Loper Bright*, 603 U.S. at 386 (respect for an agency's interpretation is especially warranted when the "interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time").

This same reasoning applies when cable service, including broadcast retransmissions, is sold as part of a bundle with internet or voice services. In the Final Rule, the Office concluded that extending its existing understanding to bundled offerings is consistent with its prior interpretation and with the statute. *See* 89 Fed. Reg. at 100351–53. Carrying forward the same full-value principle that governs mixed tiers, the Rule provides that, when a cable service is sold as part of a bundle, gross receipts include the amount that would have been collected for the cable service on a standalone basis. *See id.* at 100351–53, 100359–60. It identifies the value of the service that

includes broadcast secondary transmissions and requires that amount to be reported without reduction.

The Office considered and rejected proposals to replace that approach with GAAP-based proration. As discussed in detail below, in the Final Rule, the Office explained that GAAP does not provide a reliable or uniform method for determining the value of video services in a bundle. *See id.* at 100353. The record showed that GAAP allocations depend on assumptions about consumer preferences, pricing strategies, and the availability of standalone offerings. *Id.* For example, in cases where the bundled services, which can amount to as many as twelve, do not each have a standalone price, GAAP would require the operator to estimate each price "by considering, among other things, market conditions, entity-specific factors, and information about the customer or class of customer." LOC_AR_00000362. These features are in tension with the statutory scheme, which is designed to produce a straightforward and verifiable measure of gross receipts.

The Office also found that adopting a proration approach would depart from the statutory design. Section 111 uses gross receipts as a baseline for calculating royalties and contemplates a method that can be applied consistently. As the Office explained, a more subjective allocation method would undermine the "simplicity of calculating gross receipts," which is one of the statute's core features. 89 Fed. Reg. at 100353. Therefore, the Office declined to change its interpretation, concluding that its existing understanding remains the better reading of the statute and the more workable rule in practice.

NCTA cannot rely on the different and lower royalty rates in subsections 111(d)(1)(E) and (F), which provide the royalty formulas for smaller operators whose gross receipts are under a certain amount. MSJ at 23-24; 17 U.S.C. § 111(d)(1)(E)-(F). NCTA argues that, because subsections 111(d)(1)(E) and (F) use the term "actual gross receipts" and then equates "actual gross

22

receipts" with "gross receipts," the statute leaves no room for "*hypothetical* revenues subscribers 'would have paid' *if* they had ordered service on a standalone basis." MSJ at 24 (emphasis in original). But NCTA's "hypothetical" revenue theory is just that—imaginary. Because in all instances, the cable service provider is receiving actual revenue for the bundled service, the subscriber is paying for the cable service, and thus the cable service provider receives actual gross receipts for the "basic service of providing secondary transmissions of primary broadcast transmitters." 17 U.S.C. § 111(d)(1)(A). There is nothing hypothetical about these revenues. Even if there were, allocating the full value of the basic cable service is just as "hypothetical" as allocating a portion of a bundle's discount to the value of the basic cable service; but the former fulfills the statutory term "gross," whereas the other does not.

NCTA attempts to argue that the rule allows the Office to impermissibly collect royalties on providing services beyond the "basic service." MSJ at 25-26. Not so. As described above, the rule simply solves the problem of what value to allocate to the "basic service," using the cable service providers' own pricing. While this may not capture the "precise value" of the basic service in every conceivable bundle combination, Congress selected a convenient and practical revenue base rather than attempting to measure the precise value received by cable operators in every instance. *See Cablevision*, 836 F.2d at 611–12 ("Congress *never* contemplated a precise congruence of the royalties paid and the amount of distant non-network programming actually carried. Instead, Congress picked a *convenient* revenue base and used the DSEs to discount it in a reasonable manner.").

NCTA raises the specter of a pricing scheme where a bundle of services is offered for less than the cost for cable. MSJ at 25. There is no evidence that any bundle has ever been offered at such a price, nor was this provided to the Office when NCTA provided comments on the proposed

rule. *See* n.6 *supra*. Any such argument is thus waived. *State of Ohio v. U.S. E.P.A.*, 997 F.2d 1520, 1528 (D.C. Cir. 1993) ("We do not reach the merits of this argument because the States waived the claim by failing to raise it during rulemaking proceedings before the Agency."); *see also Nuclear Energy Inst., Inc. v. Env't Prot. Agency*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) ("It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review."); *Nat'l Wildlife Fed'n v. EPA,* 286 F.3d 554, 562 (D.C.Cir.2002) ("[T]here is a near absolute bar against raising new issues – factual or legal – on appeal in the administrative context.").

### 4. *Cablevision* Supports the Final Rule

Contrary to NCTA's framing, MSJ at 22–23, *Cablevision* supports the Office's interpretation of "gross receipts," including in the context of bundled offerings, and recognizes that section 111 relies on a standardized revenue base rather than a precise measure of value. The decision does not endorse proration. It rejects interpretations that would reduce reported receipts based on how operators package and price their services.

Notably, *Cablevision* did not turn on deference alone.[8] The court examined the statutory text and structure and upheld the Office's interpretation because it fit the design of the statute.

---

[8] To the extent deference played any role, NCTA is incorrect to contend that the Supreme Court's overruling of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), overrules the D.C. Circuit's holding in *Cablevision*. In *Loper Bright*, the Court confirmed that "holdings of cases that specific agency actions are lawful are still subject to statutory *stare decisis*," noting that "mere reliance on *Chevron* cannot constitute a special justification for overruling such a holding." 603 U.S. at 412 (citation modified); *see also Murillo-Chavez v. Bondi*, 128 F.4th 1076, 1087 (9th Cir. 2025) (holding that, after *Loper Bright*, the court is bound by prior precedents that applied *Chevron* deference); *Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024) (holding that even after *Loper Bright*, court was bound by circuit precedent based on *Chevron* deference), *reh'g & reh'g en banc denied by* 151 F.4th 1196 (9th Cir. 2025); *Garcia Pinach v. Bondi*, 147 F.4th 117, 133 (2d Cir. 2025) (continuing to apply precedent originally decided under *Chevron*).

Exercising independent judgment, the court rejected cable operators' interpretation of the statute, finding that it "violate[d] the canon of construction that effect should be given to every word of the statute so that no part is rendered 'inoperative or superfluous.'" 836 F.2d at 610 (quoting *Norfolk & W. Ry. Co. v. United States*, 768 F.2d 373, 379 (D.C. Cir. 1985), *cert. denied sub. nom.*, *Aluminum Ass'n v. Norfolk & W. Ry. Co.*, 479 U.S. 882 (1986)). The court explained that Congress selected a convenient and practical revenue base rather than attempting to measure the precise value received by cable operators in every instance. *See id.* at 611–12 ("Congress *never* contemplated a precise congruence of the royalties paid and the amount of distant non-network programming actually carried. Instead, Congress picked a *convenient* revenue base and used the DSEs to discount it in a reasonable manner."); *id.* at 612 ("Congress . . . chose an easily calculable revenue base and used the DSEs to approximate the value received by the cable companies."). That reasoning reflects the court's own understanding of how section 111 operates.

Nor is *Cablevision* limited to the narrow dispute NCTA describes. *See* NCTA MSJ at 22 (suggesting that *Cablevision* only relates to "how to define 'basic service' for purposes of a cable-only subscription"). The court did not only describe how to define "basic service." It addressed how to measure "gross receipts" where a cable operator's offering includes different combinations of programming. *Cablevision,* 836 F.2d at 601. In addressing the broader issue, *Cablevision* rejected an interpretation that would allow operators to reduce reported receipts through the way they structure their offerings and favored instead the "convenient revenue base" Congress adopted. *Id.* at 611-13. That concern applies here. A proration method would allow operators to reduce the reported value of the secondary transmission service based on how they bundle and price other services.

Finally, NCTA mischaracterizes the hypothetical discussed in *Cablevision* as "closely track[ing] the GAAP calculation of gross receipts." MSJ at 23. Closely tracking the Office's Rule, the D.C. Circuit instead explained that when services are sold as a bundle, the price of the component basic service may serve as a reference for identifying its value. The court described a system with three tiers of service: (1) Tier A, containing only broadcast signals for $10, (2) Tier B, containing non-broadcast and broadcast signals for $4, and (3) Tier C, containing only non-broadcast signals for $9. The court explained that, if all three services were offered for a discount at $22 (rather than the combined price of $23), then the "$14 price," consisting of the standalone prices for the broadcast tiers, "is . . . an accurate reflection of the value placed on the package," and thus, "could be used in calculating gross receipts." 836 F.2d at 614–15. This conclusion is consistent with the Office's Rule.

NCTA places undue weight on the phrase "could be used to calculate" in *Cablevision*, suggesting that the standalone price itself is not the gross receipt, "but rather can be used to allocate the discounted price among bundled services." MSJ at 23. That is incorrect. *Cablevision*'s use of the term "could be used to calculate" reflects the regulatory context. At the time, and still today, the Office's regulations defined "gross receipts" to include not only subscriber fees, but also other amounts associated with the provision of the secondary transmission service, such as "converter fees" and "additional set fees." *See* 49 Fed. Reg. at 13037; 37 C.F.R. § 201.17(b)(1) ("Gross receipts also include . . . fees for any other type of equipment, device, or software necessary to receive broadcast signals that is supplied by the cable operator."). In that context, the court explained that the standalone price identifies the value of the "basic service" within a bundled offering, which then can be added to the broader calculation of gross receipts. The court did not suggest that the bundled discount should be divided among services based on a proportional

26

allocation. Like the Office's Rule, the court's decision treats the standalone price as an appropriate measure of the value of the services that include broadcast signals. *Cablevision,* 836 F.2d at 614–15.

**B.  Including Equipment Fees in "Gross Receipts" Is Required by Statute**

Section 111 and the Office's longstanding practice support including equipment fees in gross receipts. The Office considered NCTA's argument against including equipment fees, addressed commenters' concerns, and explained its reasoning in a way that is consistent with the statute and its longstanding interpretation. 89 Fed. Reg. at 100353–54. Section 111 requires cable operators to report the amounts paid "for the basic service of providing secondary transmissions of primary broadcast transmitters." *Id.* at 100348.

1.  The Statutory Text Supports the Office's Rule

As with construing "gross," when "addressing a question of statutory interpretation, [courts] begin with the text." *City of Clarksville*, 888 F.3d at 482. And in "constru[ing] th[e] text, [courts] look to the ordinary meaning of its key terms." *Novartis Pharms. Corp.*, 102 F.4th at 460. The definition of "service" is "provision (of labor, material appliances, etc.) for the carrying out of some work for which there is a constant public demand." *Service*, OXFORD ENGLISH DICTIONARY (1978). The "material appliance" included in the definition of "service" would accommodate including equipment required to receive secondary transmissions, as they are provided by the cable service to carry out the work of receiving secondary transmissions for which there is a constant public demand.

Applying this definition, to determine whether a charge is required to be reported as part of these gross amounts, the relevant question is whether the charge is part of what a subscriber must pay to obtain access to the service. Equipment (formerly, converter) fees fall within that

category. Where equipment (be it software or hardware) is required to receive secondary transmissions, the fee is not a separate, unrelated charge. 89 Fed. Reg. at 100354. It is part of the amount the subscriber must pay to access the "basic service." *Id.*

NCTA relies on an unduly narrow view of the term "service" and overlooks the reporting requirement in the statute. *See* MSJ at 32–34. As noted above, section 111 directs operators to report the gross amounts subscribers pay to access the basic service. *Supra* Section I.A; 17 U.S.C. 111(d)(1)(A)-(B). Charges for equipment used to access the secondary transmissions are properly included in those gross amounts. As reflected in the Oxford Dictionary definition, the price of a service often includes charges for the means by which the service is delivered. Cable service is delivered through equipment or software applications that enable a subscriber to receive secondary transmissions. Installation fees are properly distinguished from equipment fees, as they are typically charges incurred to initiate service, and not recurring amounts paid to continue to receive it.

Nor can NCTA find help elsewhere in the statute. NCTA states that "cable system" is defined as one that "makes secondary transmissions . . . to subscribing members of the public who pay for *such service*." MSJ at 32 (quoting 17 U.S.C. § 111(f)(3)). NCTA removes the portion of the definition that includes the provision of these signals as part of the service: "makes secondary transmissions *of such signals or programs by wires, cables, microwave, or other communications channels* to subscribing members of the public who pay for such service." 17 U.S.C. § 111(f)(3) (emphasis added). The statute contemplates "service" as encompassing more than just the receipt of secondary signals—service includes the means by which a subscriber receives the signals. This is reflected by the definition of a "subscriber," "a person or entity that receives a secondary transmission service from a cable system and pays a fee for the service." *Id.* § 111(f)(13)(A). A

subscriber could not receive a secondary transmission without paying for the portion of the service that provides the necessary equipment. To use an analogy from an older time of telecommunications, if the phone company required consumers to rent their analogue phone from the company in order to make a phone call, the cost of the service of telephone service would include both the monthly lease phone and the cost to make a call. *Time: To Buy or Rent* (Nov. 22, 1982), https://time.com/archive/6700719/to-buy-or-rent/. The same concept applies here.

2. <u>Longstanding Office Practice Supports the Final Rule</u>

Congress adopted the Office's longstanding interpretation of "gross receipts" to include fees for necessary equipment when it did not disturb that interpretation in amendments to the statute. The Office has taken the view that necessary equipment should be included in gross receipts since the inception of section 111. 89 Fed. Reg. at 100353. Its regulations have defined "gross receipts" as including converter and additional set fees since 1978. *See* 43 Fed. Reg. at 27832. Congress's decision not to disturb the Office's longstanding interpretation when it amended section 111 in 2010 supports the Office's Rule. *Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."). Thus, because Congress adopted the Office's interpretation when it amended the specific statute at issue in this case, NCTA's reliance on unrelated statutes, MSJ at 33, is unwarranted.

Even if Congress had not ratified the Office's interpretation, NCTA's reliance on other statutes is unconvincing, as these are not analogous, or related, to setting a compulsory license on secondary transmissions of copyrighted works. *Id*.; *see* 28 U.S.C. § 604(g)(2) (describing the duties of the Director of the Administrative Office of the United States Courts); 22 U.S.C. § 8512 (describing sanctions on Iran). Arguably the closest statute that NCTA cites, 47 U.S.C. § 543,

29

which sets rates for the provision of basic service, includes "equipment" fees under "Establishment of basic service tier rate regulations." *Id*. § 543(b); *id*. § 543(b)(3). And the equipment subject to the regulated rate is that equipment "required to access programming"—reflecting the Office's rule.

NCTA's position would permit operators to characterize equipment as optional or point to alternative delivery methods to avoid reporting fees that are in fact tied to the receipt of the basic service. The Office has long rejected such approaches in favor of administrable rules that include the full, "gross amounts" paid for access to the basic service.

## II.    The Final Rule Is Not Arbitrary and Capricious

Arbitrary and capricious review remains "narrow in scope." *World Shipping Council v. Fed. Mar. Council*, 171 F.4th 410, 416-17 (D.C. Cir. 2026) (citing *State Farm*, 463 U.S. at43). Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park*, 401 U.S. at 416. An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. A court may not "substitute its judgment for that of the agency," *id.*, and must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quoting *State Farm*, 463 U.S. at 43). In short, the agency's decision should be affirmed as long as there is a "'rational connection between the facts

found and the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 246 (1962)).

### A. The Office Reasonably Determined That the Full Value of Cable Must Be Included in "Gross Receipts

As discussed in more detail *supra*, the Office found that assessing the full value of cable when determining "gross receipts" accords with the goals of section 111 for a consistent, transparent, and practicable royalty base. *See supra* at A.2-4. As the Office explained, a more subjective allocation method such as that advanced by NCTA would undermine the "simplicity of calculating gross receipts," which is one of the statute's core features. 89 Fed. Reg. at 100353. Therefore, the Office declined to change its interpretation, concluding that its existing understanding remains the better reading of the statute and the more workable rule in practice.

#### 1.  The Office Reasonably Rejected GAAP-Based Proration

In their comments, NCTA proposed using GAAP-based measures of revenue as an alternative valuation approach.  The Office directly addressed the principal arguments for GAAP advanced by the Plaintiff and explained why it declined to adopt that methodology. It considered the comments and expert declaration offered by NCTA. However, it concluded that GAAP does not provide a reliable or appropriate measure of the value of the secondary transmission service. This judgment was reasonable and ought be affirmed.

The Office identified two primary issues with GAAP-based proration.

**The GAAP-based proration is subjective**: First, it explained that the GAAP methodology relies on subjective assumptions about consumer valuation that could undermine "one of the goals of section 111, namely, simplicity of calculating gross receipts." 89 Fed. Reg. at 100353. Acknowledging the declaration submitted by NCTA of Professor William Holder, which characterizes GAAP as the authoritative standard for the preparation of financial statements, the

31

Office observed that his implementation of GAAP "assumes that consumer preferences and valuation of the constituent services in a bundle are accurately measured by the proportionate 'rack rate' of each service sold separately," *i.e.*,  GAAP assumes the consumer values each bundled item at its stand-alone price.  *Id.* at 100351–53. But the Office found that that assumption is not necessarily correct. It noted that "[b]undling may be a reflection of the cable operator's desire to maximize revenue," reasoning that "consumers may not value the other services in the bundle (*e.g.*, internet and/or voice) enough to pay the full asking price, and that a discounted bundle that includes those other services at a price slightly higher than the video alone, maximizes cable system revenue." *Id.* at 100353.

Further, the Office found that the record did not establish that all bundled services are available on a standalone basis, thus making it difficult "to determine whether the use of GAAP . . . would be an appropriate measure of the value of the video services that must be included in gross receipts." *Id.* As one commenter observed, "[i]t is not unusual for a multi-product bundle to contain dozens (not just three) of different service elements" that "do not have a standalone selling price because the [operator] does not market them outside of a bundle." LOC_AR_00000361. The commenter continued, "[a]bsent a stand-alone selling price, GAAP would require the [operator] to estimate the price by considering, among other things, market conditions, entity-specific factors, and information about the customer or class of customer," LOC_AR_00000361–62, which would make GAAP allocations more subjective and less verifiable.

Based on that analysis, NCTA argues that the Office relied on "consumer valuations" as a reason to reject GAAP principles, but that consumer valuations would in fact support discounting the value of cable service in a bundle for royalty calculations, and that it was not able to respond or provide evidence on "consumer valuations." MSJ at 31-32. NCTA misconstrues the Office's

conclusion. The record suggested that GAAP relies too heavily on consumer preferences to determine a valuation for the cable service. In 2018, a copyright owner group submitted a declaration raising concern that GAAP would import subjectivity by requiring operators to make assumptions about consumer preferences. *See* LOC_AR_00000370–72. Thus, the Office only relied on commenter concerns about the potential subjectivity of assessing "consumer valuations" as a reason to reject GAAP insofar as unpriced bundle items would need to be assigned a value to apply GAAP, and this would require assessing the fair market price, or consumer valuation, of that bundled item. 89 Fed. Reg. 100352. This would necessarily complicate royalty calculations and introduce subjectivity.  The Office was not basing its determination on "consumer valuation" as such.  *Id.* at 100353.

In contrast, the Office's Rule is "consistent with Congress's intent for gross receipts to be calculated simply." *Id.* As demonstrated by NCTA's own arguments in its brief, it would be an exercise of fact finding and subjective evaluation to accurately assess the value of a non-bundled item. MSJ at 31 ("If anything, consumers are likely to place a premium on internet service.").

Finally, NCTA was able to (and did) respond to these subjectivity arguments. *See* AR_LOC_00000361 (non-MPA copyright owners arguing "GAAP would require the CSO to estimate the price by considering, among other things, market conditions, entity-specific factors, and information about the customer or class of customer," on October 15, 2018); AR_LOC_00000446 (NCTA arguing that "[t]he non-MPA copyright owners' assertion that adopting GAAP will involve widespread subjective judgments rings hollow in the face of that reality" on July 30, 2020). Based on the arguments and evidence provided by both commentators, the Office was "not persuaded that GAAP necessarily leads to a simpler and more appropriate

33

calculation of the value of the video services in a bundle in the context of section 111 and congressional intent." 89 Fed. Reg. 100353.

**GAAP is not accurate to the value of video:** After considering what the statute permits and the record evidence, the Office concluded that GAAP does not necessarily lead to a "simpler and more appropriate calculation of the value of the video services in a bundle in the context of section 111 and congressional intent." *Id*. The Office found that "including the full, non-bundled value of the video services is consistent with Congress' intent that the 'gross receipts' reported serve as the baseline against which royalties are calculated, and further conclude[d] that its proposal is consistent with Congress' intent for gross receipts to be calculated simply (and, by implication, audited simply)." *Id.* That conclusion followed a "reasonably explained" evaluation of the record. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.").

The Office grounded its reasoning in the text and structure of section 111, along with its longstanding interpretation of "gross receipts," which has required reporting the full value of services that include broadcast secondary transmissions and has rejected proration within mixed service tiers. The Office noted that the threshold issue, whether GAAP is permitted under section 111, was questioned even by a commenter advocating for GAAP; they recognized that adopting GAAP would depart from the method used to calculate receipts over the past forty years.[9] 89 Fed.

---

[9] The Motion Picture Association of America, Inc., on behalf of its member companies and other producers and/or distributors, stated that although "the Office *could* adopt a new gross receipts interpretation to allow use of GAAP methodology for allocating basic service revenues from a bundled video, internet data, and/or voice service on the basis of changed circumstances," there is still "the question of whether adoption of the GAAP methodology would be consistent with Section 111's purpose and intent." LOC_AR_00000398. They acknowledge that accepting GAAP would

Reg. at 100353. Consistent with its longstanding interpretation, the Office explained that the statute uses "gross receipts" as a baseline for calculating royalties and is designed to operate in a simple and "workable" manner. *Id.* at 100351–53; H.R. Rep. No. 94-1476, at 360. That understanding is consistent with D.C. Circuit precedent recognizing that Congress adopted "a convenient revenue base" and "an easily calculable" proxy rather than a precise valuation method. *Cablevision*, 836 F.2d at 611–12.

2. Other Statutory Schemes Cannot Govern the Register's Administration of Section 111

Congress established a specific structure in section 111 for calculating royalties, and the Office's directive is to apply that structure as written, and not to replace it with approaches drawn from other provisions. NCTA incorrectly suggests that the Office must import standards from other statutory schemes into section 111. *See* MSJ at 27–29. One such standard NCTA relies on is in section 115, but section 115 could not be applied to section 111.

Section 115 covers compulsory royalties for copies of musical works. 17 U.S.C. § 115. Specifically, section 115 does not establish a royalty base, formula, or method for determining royalties comparable to section 111's "gross receipt"-based formula. Nor does section 115 use the term "gross receipt." Instead, it delegates the determination of rates and terms to the Copyright Royalty Judges. 17 U.S.C. § 115(c)(1)(E)–(F). Section 115 rates are set through adjudicatory proceedings based on factors such as industry practice, evidentiary records, and substantial expert testimony regarding economic theory and consumer behavior. Conversely, section 111 does not delegate the core elements of the royalty calculation process to a rate-setting body. Under this section, Congress specified the calculation and required that royalties be determined based on the

---

"represent[] a change from how gross receipts were calculated under the 1988 Notice's policy." LOC_AR_ 00000402.

35

"gross amounts paid . . . for the basic service of providing secondary transmissions of primary broadcast transmitters," together with specified rate tiers and adjustments. *Id.* § 111(d)(1)(A). This statutory scheme provides both the royalty base and the mechanism for calculating payments. The fundamental differences between these provisions justifies different interpretative treatment. *PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*., 362 F.3d 786, 796 (D.C. Cir. 2004) ("The words of the statute should be read in context, the statute's place in 'the overall statutory scheme' should be considered, and the problem Congress sought to solve should be taken into account." (citation omitted)).

Likewise, the existence of other statutory schemes, such as the scheme underlying a carrier's reporting obligations for revenues of bundled offerings for Universal Service Fund contributions, does not show that the Office acted arbitrarily. Different statutes impose different requirements and serve different purposes. The fact that GAAP may be used in other contexts does not mean that it is permissible—let alone required—here. The Office's Rule addressed that point directly, acknowledging that while GAAP may be used widely in financial reporting,[10] "calculating royalties is different and distinct from preparing financial statements." 89 Fed. Reg. at 100352 (quoting Decl. of Sam D. Wild, CPA (Oct. 24, 2018) at LOC_AR_00000369). The Office reasonably concluded that GAAP is not an appropriate methodology under section 111.

\* \* \*

---

[10] In making this argument, NCTA claims that the Rule treats "similarly situated people differently." MSJ at 30 (quoting *Nasdaq Stock Mkt. LLC v. Secs. Exch. Comm'n*, 38 F.4th 1126, 1141 (D.C. Cir. 2022). This is incorrect. While the Rule may require cable providers to perform a separate accounting than that required by state regulators, each cable provider is treated the same under the rule.

36

As copyright owner representatives[11] observed, "NCTA's argument for an approach divorced from the governing statute echoes its approach three decades ago in *Cablevision*." LOC_AR_00000358. Highlighting the D.C. Circuit decision, they noted, "Congress could have adopted the approach advocated for by NCTA but it did not:"

> Attempting to fine tune the gross receipts base to include only revenues from items reimbursable by the [rate-setting tribunal] is a plausible approach *a priori*, **but it ignores Congress's actual decision** and would ultimately render the DSE mechanism[12] superfluous….If an allocation between broadcast and non-broadcast programming revenues in each tier were required by the statutory scheme, one would wonder why Congress did not call for a further allocation, to remove local broadcast revenues from gross receipts, and do away with the DSE system altogether. The answer, it seems to us, must be that DSE calculations were considered more practical and were therefore adopted in lieu of attempts at such allocation.

LOC_AR_00000358–59 (quoting *Cablevision*, 836 F.2d at 611) (footnote not in original). So too is assessing the full value of the underlying cable service (the price set by the cable service provider itself) "more practical and [therefore preferable to] attempts at such allocation." *Cablevision*, 836 F.2d at 611

---

[11] These representatives included the Joint Sports Claimants (Major League Baseball, National Football League, National Basketball Association, Women's National Basketball Association, National Hockey League and National Collegiate Athletic Association), National Association of Broadcasters on behalf of U.S. commercial television claimants, Public Broadcasting Service (representing public television claimants), Settling Devotional Claimants, and Canadian Claimants Group. LOC_AR_00000350.

[12] Not at issue here, but the royalty fee paid by cable service providers also contains a distant signal equivalent ("DSE") component. 17 U.S.C. § 111(d)(1)(B).  A DSE refers to "the value assigned to the secondary transmission of any non-network television programming carried by a cable system in whole or in part beyond the local service area of the primary transmitter of such programming." *Id.* § 111(f)(5)(A)(i).  It "is computed by assigning a value of one to each primary stream and to each multicast stream (other than a simulcast) that is an independent station, and by assigning a value of one-quarter to each primary stream and to each multicast stream (other than a simulcast) that is a network station or a noncommercial educational station."  *Id.* § 111(f)(5)(A)(ii).

37

### B. The Office Reasonably Determined That Equipment Fees Must Be Included in "Gross Receipts"

Consistent with the definition of "service," the fees for equipment necessary to receive the basic service are properly included in the gross receipts for providing that service. Because the inclusion of these fees is mandated by the statutory text, it could not be arbitrary and capricious.

NCTA argues that the equipment fee portion of the rule is arbitrary and capricious because of changed circumstances—some cable subscribers can sometimes receive programming over free applications—and because the rule is allegedly inconsistent. MSJ at 34-39. The Office considered these arguments, because NCTA raised the same arguments when commenting on the proposed rule. LOC_AR_00000443-44. Both arguments fundamentally misunderstand the Office's position and the statutory requirement to include equipment fees as part of the gross receipts for providing service where the equipment is necessary to receive the service.

After considering NCTA's arguments, the Office disagreed and explained that even where a subscriber could use an application instead of leased equipment to view the relevant programming, the fee for the chosen method of access remains part of the amount paid to receive the service. 89 Fed. Reg. at 100353–54. It reasoned, "when a cable operator offers to provide video services through a free software application, but a subscriber opts to forego the software application in favor of a cable box, then that equipment is no less necessary to the subscriber's ability to receive broadcast signals than before." *Id.* at 100354. Based on that reasoning, the Office determined that "gross receipts shall include all equipment charges collected for any equipment used to access broadcast signals." *Id.* It further clarified that the rule applies when "the cable operator charges a fee for the use of a software application to be used in lieu of physical equipment used to receive broadcast services." *Id.* This reflects the statutory mandate to report the gross

receipts for the provision of the basic service, and as described *supra*, equipment fees are part of the basic service.

NCTA argues that the rule is inconsistent because it is premised on equipment being necessary to receive the basic service, and some cable service providers provide service through a free application. MSJ 36-38. It is not clear from the record that every subscriber has the ability to access or use the application offered by the cable service provider. Thus, when they elect to (or, depending on the bundle or offering, must) lease equipment from the cable service provider to access the basic service, the properly apportioned fee for that equipment is included in the gross receipts because the equipment is necessary. Although some subscribers may not need equipment to access the basic service and are not required to lease equipment, including fees on equipment necessary for the provision of the basic service in the royalty base accords with Congress's intent to create a convenient and practical revenue base, rather than to individually identify which equipment is necessary for which subscribers. *See Cablevision*, 836 F.2d 611–12 ("Congress *never* contemplated a precise congruence of the royalties paid and the amount of distant non-network programming actually carried. Instead, Congress picked a *convenient* revenue base and used the DSEs to discount it in a reasonable manner."); *id.* at 612 ("Congress . . . chose an easily calculable revenue base and used the DSEs to approximate the value received by the cable companies.").

NCTA relies on an Office letter from 1989, which said if a cable service provider offered a simple basic converter for $1 that provided access to broadcast services, and a more advanced converter box for $3 that provided access to broadcast services and non-broadcast services, the cable service provider could exclude $2 from the "gross receipts" for the more advanced converter box "if and only if" the broadcast services on the basic converter box are identical to the broadcast services on the more advanced converter box. LOC_AR_00000393. NCTA argues that this letter

39

means if a subscriber has an alternative way to access broadcast programming, no equipment fee should be included in "gross receipts." MSJ at 37.

NCTA's characterization of that letter, which clarifies reporting for equipment fees that have portions solely apportionable to non-broadcast services, is incorrect. *See id*. at 37. That letter addresses a different circumstance in which a portion of an equipment fee could be identified as solely "attributable to non-broadcast services," and thus excluded from gross amounts for the basic service. LOC_AR_00000393. It does not suggest, as NCTA argues, that equipment fees may be excluded whenever a subscriber has an alternative means of accessing the basic service. Here, even when a free application exists, if the subscriber opts to use a cable box, that leased equipment remains a means by which the subscriber receives the basic service. Unlike the scenario discussed in the 1989 letter, this fee is not limited to, or segregable as, an amount associated only with non-broadcast services.

## III.    Remand Without Vacatur Is the Appropriate Remedy

Even if this Court concludes that some aspect of the Rule is flawed, it should not vacate the whole Rule, but should instead remand without vacatur. Courts are "not without discretion to leave agency action in place while the decision is remanded for further explanation." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (citation omitted). The decision whether to vacate depends on "the seriousness of the order's deficiencies" and "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (citation omitted). The seriousness of a deficiency "is determined at least in part by whether there is 'a significant possibility that the [agency] may find an adequate explanation for its actions' on remand." *Standing Rock Sioux Tribe*, 985 F.3d at 1051 (citation omitted). Second, it must analyze "the disruptive consequences" that vacatur would engender. *Id*. at 1051 (quoting *Allied-*

40

*Signal*, 988 F.2d at 150-51).

Here, NCTA alleges that the Rule is arbitrary and capricious because the Office failed to address changed circumstances or to address various points raised by NCTA during rulemaking. Although the Office did respond to NCTA's comments and arguments made during rulemaking, should the Court determine additional explanation is needed, the Office has the benefit of a large administrative record, compiled over the course of approximately twenty years, with which to supplement any deficiency the Court finds. Accordingly, the first *Allied Signal* factor favors remand.

Even if the Court identifies a serious deficiency under the first factor of *Allied Signal*, that factor would not be dispositive. *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 270 (D.D.C. 2015) ("There is no rule requiring either the proponent or opponent of vacatur to prevail on both factors"). If it were dispositive, the answer would always be vacatur and remand, thereby swallowing the rule. Instead, "resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives," *id.*, and courts have often remanded without vacatur notwithstanding the seriousness of the agency order's deficiencies. *See Citrus HMA, LLC v. Becerra*, No. 20-cv-707 (CKK), 2022 WL 1062990, at *10 (D.D.C. Apr. 8, 2022) (remanding without vacatur based on the second *Allied-Signal* factor); *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 105 (D.D.C. 2018), (remanding without vacatur even though the first *Allied-Signal* factor favored vacatur), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020); *Shands Jacksonville Med. Ctr.*, 139 F. Supp. 3d at 270 (same); *see also N. Carolina Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) (expressing preference for a "simple remand" (without vacatur) in a case in which the agency had been found to have violated a statute); *Global Van Lines, Inc. v. Interstate Com. Comm'n*, 804 F.2d

41

1293, 1305 n. 95 (D.C. Cir. 1986) ("We agree with the Commission that when an agency committing an error of law has discretion to determine in the first instance how it should be rectified, the proper course is to remand the case for further agency consideration in harmony with the court's holding.") (citing cases); *Bayshore Cmty. Hosp. v. Azar*, 325 F. Supp. 3d 18, 24–25 (D.D.C. 2018) (remanding without vacatur where the agency had committed a legal error because "vacatur … exceeds what is required to resolve the parties' dispute").

The Rule governs important aspects about how section 111 is administered. Vacatur would create uncertainty regarding the proper methodology for reporting and calculating royalties under the statutory license, potentially disrupting the orderly collection and distribution of royalties to copyright owners pending further proceedings. Remand without vacatur would avoid that disruption, and protect the interests of affected copyright owners, while preserving the status quo during any additional agency consideration. In contrast, the cable service providers can request refunds for any overpayment while the Rule is being updated. 37 C.F.R. § 201.17(l)(4). NCTA has already submitted refund requests in connection with this litigation should the Rule be vacated.[13] Vacating the rule would result in one-sided harm to copyright owners, whereas remanding the Rule would not cause harm to cable service providers. Indeed, the Office requires a rule in order to determine the amounts payable to copyright owners, and it makes sense for cable providers to keep

---

[13] The Office stipulated it would stay its consideration of the refund requests while the litigation was pending, and that if NCTA prevailed in this litigation in whole or in part, (a) the Office would consider timely any refund requests by NCTA's members for refunds of royalty overpayments under the Rule for all periods during the pendency of this litigation without regard to any delays caused by the litigation, and (b) if the Rule is found invalid in whole or in part after exhaustion of all appeals, Defendants will refund any overpayments documented in such refund requests in whole or in part based on the theories at issue in the litigation, consistent with the court's final judgment.

submitting payments under the old rule while also seeking refund requests. Once the new rule is promulgated, the Office can issue refunds using the difference between the old rule and the new rule. But there is no mechanism to make up the difference for copyright owners should the old rule be vacated.

At a minimum, if this Court determines that there is error in the Office's rulemaking, it should request supplemental briefing on remedy to allow the parties to address that issue with the benefit of the Court's merits ruling.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in the Office's favor.

DATED: May 22, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JOSEPH BORSON
Assistant Branch Director

/s/ Michael Bruns
Michael Bruns
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov

Counsel for Defendants

43