**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NCTA—THE INTERNET & TELEVISION ASSOCIATION,<br><br>*Plaintiff*,<br>v.<br><br>UNITED STATES COPYRIGHT OFFICE, *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-713-SLS<br><br>The Honorable Sparkle L. Sooknanan<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. The Government's Defense of the Bundled Discounts Rule Fails ........ 2

A. The Government's Textual Defense of the Bundled Discounts Rule Fails ........ 2

1. The Government's Reading of Section 111 Is Flawed ........ 2

a. The Government's Focus on the Term "Gross Receipts" Misses the Key Question—"Gross Receipts" *for What*? ........ 4

b. The Government's Administrability Concerns Are Illusory ........ 8

2. The Government's Appeal to Deference Fails After Loper Bright ........ 9

3. Cablevision Supports NCTA, Not the Government ........ 12

B. The Bundled Discounts Rule Is Arbitrary and Capricious ........ 14

II. The Rule's Treatment of Equipment Fees Is Contrary to the Statute and Arbitrary and Capricious ........ 18

A. Section 111's Plain Meaning Does Not Cover Equipment Fees ........ 18

B. The Rule Is Arbitrary and Capricious ........ 21

III. The Court Should Vacate the Rule ........ 24

CONCLUSION ........ 26

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Am. Great Lakes Ports Ass'n v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020) ....................24

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
22 F.4th 1018 (D.C. Cir. 2022) ....................17

*Am. Radio Relay League, Inc. v. FCC*,
524 F.3d 227 (D.C. Cir. 2008) ....................17

*AMG Cap. Mgmt., LLC v. FTC*,
593 U.S. 67 (2021) ....................21

*AT&T Corp. v. Iowa Utils. Bd.*,
525 U.S. 366 (1999) ....................23

*Bridgeport Hosp. v. Becerra*,
108 F.4th 882 (D.C. Cir. 2024) ....................25

*Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*,
836 F.2d 599 (D.C. Cir. 1988) .................... *passim*

*Campaign Legal Ctr. v. FEC*,
2025 WL 1768099 (D.D.C. June 26, 2025) ....................15

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) ....................10

*City of Waukesha v. EPA*,
320 F.3d 228 (D.C. Cir. 2003) ....................22

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
146 F.4th 1144 (D.C. Cir. 2025) ....................23

*Ctr. for Biological Diversity v. U.S. Off. of Surface Mining Reclamation & Enf't*,
2026 WL 1506550 (D.D.C. May 29, 2026) (Sooknanan, J.) ....................24, 25

*Ctr. for Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026) ....................24

*Env't Health Tr. v. FCC*,
9 F.4th 893 (D.C. Cir. 2021) ....................21

*GTE Service Corp. v. FCC*,
205 F.3d 416 (D.C. Cir. 2000) ........................................................................................23

*Gulf Restoration Network v. Haaland*,
47 F.4th 795 (D.C. Cir. 2022) ..................................................................................21, 22

*In re MCP No. 185*,
124 F.4th 993 (6th Cir. 2025) ........................................................................................11

*Institutional S'holder Servs. Inc. v. SEC*,
718 F. Supp. 3d 7 (D.D.C. 2024), *aff'd*, 142 F.4th 757 (D.C. Cir. 2025)..............................19

*Institutional S'holder Servs., Inc. v. SEC*,
142 F.4th 757 (D.C. Cir. 2025) ........................................................................................11

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................................................................................................10, 11

*Moctezuma-Reyes v. Garland*,
124 F.4th 416 (6th Cir. 2024) ....................................................................................10, 11

*Nat'l Parks Conservation Ass'n v. Jewell*,
62 F. Supp. 3d 7 (D.D.C. 2014) ........................................................................................25

*Pac. Gas & Elec. Co. v. FERC*,
113 F.4th 943 (D.C. Cir. 2024) ..........................................................................................9

*Shands Jacksonville Med. Ctr. v. Burwell*,
139 F. Supp. 3d 240 (D.D.C. 2015) ..................................................................................17

*Sokol World Ent., Inc. v. Small Bus. Admin.*,
2022 WL 4547540 (D.D.C. Sep. 28, 2022) ......................................................................18

*Standard Lime & Cement Co. v. United States*,
329 F.2d 939 (Ct. Cl. 1964) ................................................................................................7

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012)..........................................................................................................19

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*,
103 F. Supp. 3d 133 (D.D.C. 2015), *aff'd*, 852 F.3d 1131 (D.C. Cir. 2017)..........................21

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)............................................................................................................9

*Westar Energy, Inc. v. FERC*,
473 F.3d 1239 (D.C. Cir. 2007) ........................................................................................18

## STATUTES

5 U.S.C.
§ 706 ........ 10
§ 706(2)(A) ........ 24

17 U.S.C.
§ 111(d)(1) ........ 11
§ 111(d)(1)(B) ........ *passim*
§ 111(f)(3) ........ 20
§ 115 ........ 17, 18
§ 702 ........ 11

29 U.S.C. § 213(a)(15) ........ 10

42 U.S.C. § 5846(a)(2) ........ 10

47 U.S.C. § 543(b) & (b)(3) ........ 20

## REGULATIONS

17 C.F.R. § 210.4-01(a)(1) ........ 16

37 C.F.R. § 385.2 ........ 17

89 Fed. Reg. at 100353 ........ 15

## OTHER AUTHORITIES

Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 5.03 (Mar. 2026 update) ........ 7

Daniel Frankel, *Samsung Leads US CTV Market Increasingly Dominated by Smart TVs*, StreamTV Insider (Mar. 31, 2025) ........ 24

*Discount*, American Heritage Dictionary of the English Language (5th ed. 2022) ........ 7

*Gross*, Oxford English Dictionary (1978) ........ 6

*Gross Receipts*, Black's Law Dictionary (12th ed. 2024) ........ 6

*Gross Receipts Defined*, Internal Revenue Service, https://www.irs.gov/charities-non-profits/gross-receipts-defined ........ 6

*Net Income or Loss*, West's Tax Law Dictionary (Jan. 2026 update) ........ 7

*Net*, Oxford English Dictionary (1978) ........ 7

S. Rep. No. 94-473 (1975) ........ 20

*Service*, American Heritage Dictionary of the English Language (3d ed. 1992) ..........................19

*Service*, Oxford English Dictionary (2d ed. 1989) ........................................................................19

*Service*, Webster's Third New Int'l Dictionary (1976) ................................................................18

## INTRODUCTION

The government's attempt to defend the Copyright Office's Rule fails at every level. As to the Rule's methodology for calculating gross receipts when cable service is bundled with other services at a discounted price, the government fails to rehabilitate the Office's flawed textual interpretation or its inadequate rulemaking process. On the text, the government's argument depends on a single dictionary definition of the word "gross," divorced from any of the statute's surrounding text or context, to jump to the conclusion that the "full amount" of the standalone price of cable should be used notwithstanding that the cable operator receives less. But the government's interpretation ignores what the statute makes clear: The relevant gross receipts are those *from cable subscribers*, *for basic cable service*—not those for other services or those that the company "would have" collected if subscribers had purchased a different service package.

Perhaps sensing the weakness of its textual argument, the government falls back on appeals to deference under an exception to *Loper Bright* and to the D.C. Circuit's decision in *Cablevision*. But neither argument helps the government here. There is no express delegation of interpretive authority in Section 111. And *Cablevision* supports NCTA, not the government.

Finally, the government's defense of the Office's rulemaking process cannot obscure that the Office reflexively adhered to its "longstanding" interpretation, without providing a reasoned basis for rejecting GAAP, even though that accounting system is universally applied in every other context. The bundled discount provisions of the Rule should be set aside.

The government fares no better in defending the Office's treatment of equipment fees. Section 111 limits the royalty base to receipts for "the basic service of providing secondary transmissions." The ordinary meaning of "service" is the performance of an *action* (like making transmissions), not the distribution of a *good* (like a set-top box). And regardless, the only

"service" the statute mentions is "providing secondary transmissions"—not providing equipment. The government responds by cherry-picking a single inapt dictionary definition and claiming that Congress silently ratified the Office's approach by enacting a law that had nothing to do with equipment fees. Those anemic arguments cannot overcome the statute's ordinary meaning.

The Rule's treatment of equipment fees is also arbitrary and capricious. The government does not defend the Office's failure to respond to comments about the changed circumstances that undermined the Office's original rationale. And it fails to resolve the Rule's internal inconsistency: The Rule acknowledges that only fees for "necessary" equipment should be included while ordering royalties on *all* equipment fees regardless of the availability of a free alternative. The government's speculative post hoc theory that some subscribers might not have access to free software apps bears no resemblance to the agency's rationale. And had the agency ever raised this theory, the evidence would have soundly refuted it.

The Court should grant NCTA's motion for summary judgment, deny the government's cross-motion, and set aside the Rule.

## ARGUMENT

### I. THE GOVERNMENT'S DEFENSE OF THE BUNDLED DISCOUNTS RULE FAILS

#### A. The Government's Textual Defense of the Bundled Discounts Rule Fails

The centerpiece of the government's defense is a flawed textual analysis that focuses on the wrong words of the statute. The government's argument also rests on a conception of agency deference that has been vitiated by the Supreme Court. And it misreads the key precedent in this area, which supports NCTA, not the government.

##### *1. The Government's Reading of Section 111 Is Flawed*

Section 111 assesses statutory royalties on "the gross receipts from subscribers to the cable service . . . for the basic service of providing secondary transmissions of primary broadcast

transmitters." 17 U.S.C. § 111(d)(1)(B). The government does not dispute that Section 111 assesses royalties only on the gross receipts paid "for" basic cable service—not amounts paid for any other service, like voice or internet. *See* Gov. Br. at 14. As NCTA explained, when basic cable is bundled together with other non-cable services (like voice and internet) for a single discounted price, the statute necessarily requires some methodology for allocating the amounts received from subscribers to the various components of the discounted bundle. *See* NCTA Br. at 18-20. During the rulemaking proceeding, NCTA proposed that, to fulfill the requirements of the statute, the gross receipts from basic cable service be determined according to GAAP, as they would be in any other circumstance. That means that any discount for the overall bundle should be allocated proportionally among the various services based on each of their standalone prices. That is the only reliable way to ensure that "gross receipts" for basic cable service reflect the revenues the cable provider *actually receives* from the cable-service component of the discounted bundle—i.e., the price the customer *actually paid* for cable service purchased in this manner.

Notably, the government does not dispute that some sort of allocation is necessary. The government is not arguing, for instance, that cable companies should pay royalties on the *full* amount received from customers for the bundle. But rather than providing any method for determining the price *actually paid* by a subscriber for the basic cable portion of a discounted bundle, the Copyright Office's Rule requires royalties be calculated and paid based on the *undiscounted* amount a customer *would have paid* if she purchased basic cable service *alone*. *Id.*

The government unpersuasively posits that the statute *requires* the Rule's illogical approach. It makes two points. First, it relies on the dictionary definition of the word "gross" to argue that "gross receipts" exclude "necessary deductions." Gov. Br. at 14-15. Claiming that a discount for bundled services is a "deduction," it contends that "gross receipts" must mean the

hypothetical price a customer would have paid for standalone service, no matter what she actually paid. *Id.* at 15-16. Second, the government argues that its reading is necessary to make the statute "administrable," because GAAP is supposedly "subjective" and would undermine "uniformity." *See id.* at 18-20. Both arguments are fundamentally flawed.

**a. The Government's Focus on the Term "Gross Receipts" Misses the Key Question—"Gross Receipts" *for What*?**

According to the government, one need look no further than the dictionary definition of "gross" to understand the statute. The government urges that the term "gross" as used in "gross receipts" means a "whole" amount "before deductions." *See* Gov. Br. at 14-16. Based on that definition, the government asserts that "gross receipts" must mean the "full," undiscounted price for basic cable as a standalone service, regardless of whether a customer *actually paid* that undiscounted price. *See id.* But this argument fails on multiple levels.

The government's myopic focus on the term "gross receipts" ignores the broader statutory context. The question is not what "gross" or "gross receipts" means in isolation—NCTA does not dispute that royalties are assessed on the "full amount" of revenues *for basic cable service*. The question is how one determines the "full amount" of gross receipts "from subscribers to *the cable service . . . for the basic service of providing secondary transmissions*" when basic cable service is included with other non-cable services in a discounted bundle. 17 U.S.C. § 111(d)(1)(B) (emphasis added). In other words, knowing that "gross" means the "full amount" does not tell you what the *relevant* "full amount" is in this context. As the government must concede, the relevant "full amount" is the amount paid *for basic cable service*. *See, e.g.*, *Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*, 836 F.2d 599, 605 (D.C. Cir. 1988) ("[C]harges unrelated to programming . . . [are] not to be a part of gross receipts."); *see also* Gov. Br. at 14. And, contrary to the government's argument, the "full amount" paid *for basic cable service* when it is included

in a bundle with other services at a discount is a proportional share of *the discounted price* the subscriber *actually paid*—not the standalone rate a subscriber *would have paid* if she had purchased a different service package altogether. NCTA Br. at 18-20. That is not only the most natural understanding of what the statutory language means, but is also consistent with how revenues from each of these various services are accounted for in every other context. *Id.*

Thus, under the government's interpretation, "gross receipts" captures *more* than the "full amount" of receipts attributable to cable services, because it "include[s] fees in the amount that *would have been collected if* such subscribers received cable service as an unbundled stand-alone product." AR0086 (emphasis added). In other words, the Rule assumes hypothetical revenue from a standalone cable service that the consumer never purchased. The government responds that "the amount that 'would have been collected' . . . is not hypothetical" because "the subscriber, in fact, pays at least that amount to obtain access to the 'basic service' in the bundled transaction, before discounts are applied." Gov. Br. at 16. But the Rule by its terms applies even where a bundle costs *less* than the standalone rate for basic cable service. As NCTA explained, in that situation, the Rule would require cable companies to pay royalties on *more revenue* than the subscriber actually paid *in total*. *See* NCTA Br. at 19. The government admits this consequence, but quibbles that there is no evidence in the administrative record that this has actually occurred. Gov. Br. at 23-24. That misses the point: The fact that "gross receipts" under the government's interpretation could mean *more than* total receipts underscores that the Rule—and the government's defense of it—is irrational.

Even when the total cost of a discounted bundle is more than the standalone price of basic cable service, the government offers no good reason to use the standalone price that the customer *would have* paid had she purchased a different service. The government does not dispute that

discounting is occurring, and that the cable provider is therefore *receiving* less than the full price for each of the bundled services. But the government's interpretation impermissibly attributes more of that revenue—and none of the discount—to cable service. Indeed, although the government concedes the Office has no authority to assess royalties on revenues from non-cable services (such as internet and voice), Gov. Br. at 14, at the same time it does not seriously dispute that the Rule has precisely that effect, *see id.* at 23 (citing NCTA Br. at 25-26, which raises this argument). That is because when the royalty is assessed based on the standalone rate for cable and the entire discount for a bundle is allocated to internet and voice, the inevitable result is to include non-cable revenues within the royalty calculation. The government dismisses this concern as flowing from Congress's choice of a "convenient and practical revenue base" rather than one that captures the "'precise value' of the basic service." *Id.* But the Copyright Office is not empowered to collect royalties on these non-cable revenues, because copyright owners are not entitled to royalties on those services under Section 111. *See, e.g.*, *Cablevision*, 836 F.2d at 605. This concededly impermissible result alone undermines the government's position.

The government protests that NCTA's interpretation would effectively treat the statute as though it uses the term "*net* receipts." Gov. Br. at 15-16. But that argument makes elementary mistakes about the meaning of gross receipts, net receipts, deductions, and discounts.

The government asserts that gross receipts are those "before necessary deductions have been made." *Id.* at 15 (citing *Gross*, Oxford English Dictionary (1978)). In general, that is correct—"gross receipts" are "[t]he total amount of money . . . received by a business taxpayer for goods sold or services performed in a taxable year, before deductions." *Gross Receipts*, Black's Law Dictionary (12th ed. 2024); *see also Gross Receipts Defined*, Internal Revenue Service, https://www.irs.gov/charities-non-profits/gross-receipts-defined ("Gross receipts are the total

amounts the organization received from all sources during its annual accounting period, without subtracting any costs or expenses.").

The government then veers off course, arguing that allocating part of the discount for bundled services to the revenues from basic cable service counts as "applying a deduction." *Id.* at 16. It claims that the discounted revenues are equivalent to the receipts "remaining after all necessary deductions have been made," and thus constitute "net receipts." *See id.* at 15 (citing *Net*, Oxford English Dictionary (1978)).

But deductions are things like costs, expenses, or taxes—i.e., amounts that one subtracts (deducts) from revenues *already received*. *See, e.g.*, Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 5.03 (Mar. 2026 update) (discussing deductions for federal income tax purposes); *Net Income or Loss*, West's Tax Law Dictionary (Jan. 2026 update) (referring to "deductible expenses" and defining net income or loss as "[b]usiness income less business expenses"). In contrast, the reduced bundle price here is a "*discount*": an amount subtracted from the price of a service before it is sold and before any revenues are received from a customer. *See, e.g.*, *Discount*, American Heritage Dictionary of the English Language (5th ed. 2022) ("To sell or offer for sale at a reduced price."). When a customer pays a discounted price for a service, the difference between the full sticker price and the discounted price is (by definition) money the company *never received*. *Cf. Standard Lime & Cement Co. v. United States*, 329 F.2d 939, 947 n.18 (Ct. Cl. 1964) ("[T]rade discounts are deemed reductions in sales price thus not includible in taxpayer's total gross income."). In other words, a discount is not a "receipt" of any kind.

Assessing royalties based on a cable company's profits from cable service (i.e., revenues less expenses) would be the kind of assessment based on "net receipts" or "net income" that the

statute might foreclose. But when customers actually pay a discounted price, assessing royalties only on the portion of the discounted revenue that is attributable to basic cable service is a faithful implementation of Section 111's direction to calculate royalties on the "gross receipts from subscribers to the cable service . . . for the basic service of providing secondary transmissions of primary broadcast transmitters." 17 U.S.C. § 111(d)(1)(B). On the government's logic, if a subscriber purchased basic cable service at a temporary promotional rate of $20 rather than the usual full rate of $50, the cable operator would have to report $50 in gross receipts on the theory that the $30 discount was a "deduction." Not even the government defends that absurd result.

**b. The Government's Administrability Concerns Are Illusory**

Unable to defend the Rule on the text, the government turns to policy arguments. It argues that the Rule's use of standalone, undiscounted prices for cable service is necessary to advance Congress's goal of creating a "uniform" and "administrable" measure of gross receipts. *See* Gov. Br. at 18-20. The government asserts that using GAAP would create disuniformity by injecting "the complexities of individual negotiations" for subscription prices into the royalty calculation, and argues that a "royalty fee that depends on varied allocation methodologies would frustrate external verification by making reported figures less transparent." *Id.* at 18-19. But that is a red herring: There are no "individual negotiations" involved. Cable providers offer their services—including bundled services—at uniform, advertised rates; they do not haggle for the price of every bundle sold any more than they individually negotiate standalone rates. *See* AR0445. Indeed, the Office's Rule *depends* on the uniform nature of cable providers' advertised rates. *See* Gov. Br. at 20 (noting that the Rule "looks to the operator's own pricing" for cable service drawn "from the operator's publicly stated rates"). Far from introducing "varied allocation methodologies" that "would frustrate external verification," GAAP relies on the *same objective inputs* to allocate a

discount among components in a bundle. GAAP, moreover, supplies a *uniform methodology* that is widely required across financial reporting and auditing contexts precisely because it supplies an *objective* and *externally verifiable* system of accounting. *See* AR0326-40 (Declaration of Professor William Holder). The government fails to explain how its Rule is any more uniform, objective, or administrable than NCTA's approach.

In any event, the government's claim that its Rule serves the "purpose of the statute," Gov. Br. at 18, ignores that "policy concerns cannot override the text of a statutory provision." *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 950 (D.C. Cir. 2024). As the Supreme Court has repeatedly observed, "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014). The Office cannot displace a statute that assesses royalties based on gross receipts actually received for basic cable service with a Rule that does so based on hypothetical revenues that *would have* been received if the customer had purchased a *different service*, even if it thinks such a Rule better aligns with Congress's intentions.

### *2. The Government's Appeal to Deference Fails After* **Loper Bright**

Lacking the best reading of the text, the government seeks deference for the Copyright Office's "longstanding interpretation" of Section 111. Gov. Br. at 20-24. But the premise that the Rule's interpretation of gross receipts is "longstanding" or "decades-long" is factually incorrect. *See* Gov. Br. at 20-24; AR0077. That assertion is based on the Office's rulemaking in the 1980s about whether revenues should be disaggregated on a channel-by-channel basis. *Cf. Cablevision*, 836 F.2d at 610. As discussed further below, that is an entirely separate question from how to determine gross receipts in the case of discounted bundles for basic cable, other video services,

and non-cable services. Indeed, the Office acknowledged that it was promulgating the Rule precisely because the Office's prior interpretation did *not* settle the question. *See* AR0077.

In any event, whether the interpretation is "longstanding" is beside the point. As the government must concede, after the Supreme Court's decision in *Loper Bright*, "courts, not agencies, . . . decide '*all* relevant questions of law' arising on review of agency action." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) (quoting 5 U.S.C. § 706). Thus, this Court "must 'begin with the plain text' even if [the Copyright Office] has previously interpreted the statute," and even if the Office's previous interpretation is longstanding. *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1234 (D.C. Cir. 2026).

To avoid that result, the government attempts to shoehorn this case into a narrow exception recognized in *Loper Bright* for statutes that "'expressly delegate' to an agency the authority to give meaning to a particular statutory term." *Loper Bright*, 603 U.S. at 394-95. But such express delegations are rare, and the delegation must be clear—"imprecise wording alone won't cut it." *Moctezuma-Reyes v. Garland*, 124 F.4th 416, 421 (6th Cir. 2024). "Congress must empower an agency to regulate in accordance with its 'judgment' or 'opinion,' or when the agency 'finds' some condition to hold true." *Id.* Two examples cited in *Loper Bright* itself are illustrative: First, a Fair Labor Standards Act provision creating an exemption from the statute's requirements for certain employees engaged in certain activities, "*as such terms are defined and delimited by regulations of the Secretary*." 603 U.S. at 395 n.5 (quoting 29 U.S.C. § 213(a)(15)). Second, a provision of the Energy Reorganization Act of 1974 requiring notification when a regulated facility "contains a defect which could create a substantial safety hazard, *as defined by regulations which the Commission shall promulgate*." *Id.* (quoting 42 U.S.C. § 5846(a)(2)). Both statutes expressly vest the agency with specific authority to "define" a particular statutory term.

There is no comparable language expressly delegating authority to the Copyright Office to define "gross receipts." The government first points to 17 U.S.C. § 702, which states: "The Register of Copyrights is authorized to establish regulations not inconsistent with law for the administration of the functions and duties made the responsibility of the Register under this title." *See* Gov. Br. at 13. But that provision, housed in an entirely separate section of the Copyright Act, grants no interpretive authority at all, much less authority to define "gross receipts." The government next points to 17 U.S.C. § 111(d)(1). But that provision merely says that royalties and statements of account should be deposited with the Copyright Office "in accordance with requirements that the Register shall prescribe by regulation." 17 U.S.C. § 111(d)(1). It authorizes the Copyright Office to regulate the mechanics of depositing statements of account and royalties, not to define the phrase "gross receipts."

Nor is this a case in which Congress has used broad language that implicitly invites elaboration. To the contrary, "gross receipts" is a well-established accounting and financial term with an ascertainable meaning, not an open-ended "term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" *Loper Bright*, 603 U.S. at 395. And it is not a term about which anyone would expect the Copyright Office to have subject matter expertise. Indeed, courts have repeatedly rejected the government's recent attempts to claim deference for interpretations *within* an agency's expertise, even in cases involving significantly broader statutory terms. *See, e.g.*, *In re MCP No. 185*, 124 F.4th 993, 1012 (6th Cir. 2025) (rejecting deference to FCC's interpretation of the phrase "the public switched network"); *Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 766-67 (D.C. Cir. 2025) (rejecting deference to SEC's interpretation of the term "solicit"); *Moctezuma-Reyes*, 124 F.4th at 420-21 (rejecting deference to BIA's interpretation of the phrase "exceptional and extremely unusual hardship").

The Copyright Office's interpretation in the Rule is not entitled to deference. This Court should set it aside as contrary to the statute.

### *3.* **Cablevision** ***Supports NCTA, Not the Government***

The government next looks to the D.C. Circuit's decision in *Cablevision* for support. *See* Gov. Br. at 24-27. But *Cablevision* supports *NCTA's* position.[1]

First, the government places significant weight throughout its brief on the *Cablevision* court's comment that in Section 111 "Congress picked a convenient revenue base" rather than one with "precise congruence" between "the royalties paid and the amount of distant non-network programming actually carried." *Cablevision*, 836 F.2d at 611-12 (emphasis omitted); *see* Gov. Br. at 17-18, 23, 25 (citing *Cablevision*). But that language does not bear the weight the government seeks to place on it. It concerned a factual scenario that is distinguishable multiple times over.

In *Cablevision*, the only revenues at issue were those from cable service alone. 836 F.2d at 601-02. The question was how to determine the "gross receipts" attributable to *basic* cable service when broadcast channels (subject to Section 111 royalties) and non-broadcast channels (not subject to royalties) were offered together as a package as part of the same cable tier. *Id.* at 610. Because a customer generally could not purchase a subscription on a channel-by-channel basis, there were no publicly advertised standalone prices for individual channels within any cable tier—just the price of the tier overall. *Id.* at 611-12. In that scenario, the Copyright Office interpreted "gross receipts" from "basic service" to include all revenues from subscriptions to any

---

[1] Contrary to the government's assertion, NCTA does not argue that *Loper Bright* "overrule[d]" *Cablevision*. *Cf.* Gov. Br. at 24 n.8. As explained above, NCTA's argument is that, in light of *Loper Bright*, the Copyright Office is not entitled to deference *now* for the Rule challenged *here*. *See supra* at 9-12. And the Office cannot rely on deference it received in *Cablevision* to support the Rule, because *Cablevision*'s holding addressed an entirely different issue. *See Cablevision*, 836 F.2d at 615 (noting the rule at issue "never addressed . . . discounting [but] focused on the treatment of individual [cable] tiers").

cable tier that included broadcast channels. *Id.* The D.C. Circuit agreed with that interpretation, in part because the lack of any standalone per-channel prices meant that there was no objectively verifiable way to apportion the revenues between broadcast and non-broadcast channels within a tier: "[I]ncluding all revenues from any separately priced tier that contains one or more broadcast stations is a convenient, indeed perhaps *the only reasonable*, *way* of computing gross receipts." *Id.* at 612 (emphasis added). The court also noted a substantial risk of gamesmanship if cable companies were "to attribute any amount they see fit to cable-originated programming" while attributing "only a minuscule portion of revenues, at the option of a cable company," to broadcast programming that would be "included in gross receipts." *Id.* at 611 n.20, 614.

Here, by contrast, the revenues at issue include *non-cable services*, like voice or internet, that indisputably are *not* subject to Section 111 royalties. *See id.* at 605. And standalone prices *do exist* for each of the services included in a bundle, because each is advertised and sold separately in addition to being sold on a bundled basis. Indeed, the Rule *assumes* that standalone prices exist: The standalone price is what the Copyright Office insists must be used to calculate gross receipts. *See* AR0086 ("[G]ross receipts shall include fees in the amount that would have been collected if such subscribers received cable service as an *unbundled stand-alone product*." (emphasis added)). Thus, unlike in *Cablevision*, there *is* a "convenient" and "obvious method of attribution" for a discounted bundle price: using GAAP based on the proportional standalone price of each service. *Cablevision*, 836 F.2d at 611 & n.20. Given that gross receipts from basic cable can be determined with "precise congruence" (as the statute requires), *Cablevision* does not give the Copyright Office permission to adopt a different methodology that assesses royalties on *other* revenues simply because it deems it to be "convenient." *Id.* at 611-12; *see* 17 U.S.C. § 111(d)(1)(B).

Second, the government argues that "NCTA mischaracterizes the hypothetical discussed in *Cablevision*" and contends that the hypothetical instead "[c]losely track[s] the Office's Rule." Gov. Br. at 26. The government argues that when the *Cablevision* court stated that the $14 unbundled, standalone price of cable tiers that include broadcast channels "could be used in calculating gross receipts," it endorsed the Rule's view that the undiscounted price of cable should be used for gross receipts. *Id.* (quoting *Cablevision*, 836 F.2d at 614-15). But that is not the most natural reading of *Cablevision*. *Cablevision* did not say that $14 *is* the amount of gross receipts to report—it said that figure "could be used" to calculate gross receipts in the specific context of a discounted bundle of channels. *Cablevision*, 836 F.2d at 614-15. The government protests that the reason *Cablevision* used the phrase "could be used" is because "gross receipts" also includes *other fees*, and so the court was merely suggesting that the $14 number could be added to those other fees to determine the total gross receipts. *See* Gov. Br. at 26-27. But that is only the government's speculation—it is not what the *Cablevision* court *said* motivated its reasoning. *Compare* 836 F.2d at 614-15, *with* Gov. Br. at 26. The more natural explanation is the simpler one: that when *Cablevision* said an undiscounted price "could be used" to calculate gross receipts in the context of a discounted bundle, it meant that discounts could be allocated proportionally. At a minimum, *Cablevision* is *consistent with* NCTA's interpretation of the statute. It certainly does not rule out NCTA's interpretation.[2]

**B. The Bundled Discounts Rule Is Arbitrary and Capricious**

The government does not dispute that GAAP is universally recognized as the gold standard for revenue recognition and allocation and is used in virtually every other regulatory and business

[2] Indeed, as NCTA noted in its motion, *Cablevision*'s consideration of this hypothetical was dictum. *See* 836 F.2d at 616 ("If this dispute is not abstract, it is certainly not yet well defined enough for judicial review.").

context. Indeed, cable systems are *required* to use GAAP's approach to bundled discounts when computing franchise fees in many states. *See* NCTA Br. at 29 n.9. The Rule nonetheless deviates from this universally recognized approach and forces cable companies to maintain a "second set of books" that is "subject to no standard accounting principles." AR0317. As NCTA explained in its motion, the Copyright Office provided no cogent reason for taking that anomalous approach. The government now offers four arguments in an attempt to rehabilitate the Office's flawed decision-making process, but its defenses do not withstand scrutiny.

First, the government argues that the Office was justified in rejecting GAAP in this context because GAAP is "subjective." Gov. Br. at 31. That is so, the government says, because GAAP "relies on subjective assumptions about consumer valuation that could undermine . . . simplicity of calculating gross receipts.'" *Id.* (quoting 89 Fed. Reg. at 100353). But GAAP does not rely on "consumer valuation" at all—it relies on the publicly advertised standalone prices set by cable companies for each service in a bundle. *See* ASC 606-10-32-36.[3] That is the same source that *the Rule's* methodology relies on to value cable service. AR0086. And using that publicly verifiable information, GAAP applies a uniform and objective mathematical formula to allocate any discount in price among the services in the bundle. *See* ASC 606-10-32-36; *see also* AR0326-38 (declaration of accounting professor William Holder). There is nothing subjective about this methodology. Indeed, the fact that GAAP provides an externally verifiable and consistent rubric

[3] The government offers no response to NCTA's point that the Office violated the APA by failing to give notice that it intended to rely on consumer perception, or to cite any evidence of consumer perception in support of the Rule's conclusions. *Compare* NCTA Br. at 31, *with* Gov. Br. at 31-32. To the extent consumer valuations are relevant at all, the Rule's methodology is subject to the same critique. *Cf. Campaign Legal Ctr. v. FEC*, 2025 WL 1768099, at *8 (D.D.C. June 26, 2025) (noting a rule is "arbitrary or capricious" when it "appl[ies] the very bright line rule it expressly disclaimed"). The Rule assumes that consumers value cable more than any other service in a discounted bundle. As NCTA has already explained, that is not plausible given the widely observed phenomenon of cord-cutting. *See* NCTA Br. at 31.

is precisely why it is required for reporting financial results in virtually every other relevant context. *See, e.g.*, 17 C.F.R. § 210.4-01(a)(1) (SEC regulations require GAAP); *see also* NCTA Br. at 28-29 & n.9 (providing other examples).

Second, the government argues that the Office appropriately rejected GAAP because it applies only when each service in a bundle has a standalone price, and there may be services in a bundle that do not have a standalone price. *See* Gov. Br. at 32 (citing AR0361-62). That argument is another red herring. It is based on one comment from the rulemaking that asserts that cable providers "do not have standalone selling prices for only nonbroadcast signals." AR0361 n.6. But whether standalone prices exist for individual nonbroadcast channels ("signals") is irrelevant. It has been settled since *Cablevision* that gross receipts from basic cable service include *all* receipts from any tier that includes broadcast channels, and that receipts are not disaggregated on a channel-by-channel basis. *Cablevision*, 836 F.2d at 610-12. For GAAP purposes, a relevant standalone price still exists: the standalone price for any tier that includes broadcast channels.[4]

Regardless, the comment the government cites has nothing to do with the issue here: how to calculate gross receipts when cable is combined with non-video services like phone and internet. The government cites no evidence that *those* services lack standalone prices, and even if they did, NCTA has been clear that GAAP does not apply anytime there *are not* standalone prices for one of the services in the bundle. *See* NCTA Br. at 30; ASC 606-10-32-36 (GAAP methodology

[4] As for allocating discounts across any additional cable tiers that include only nonbroadcast channels, the government does not argue that such tiers lack their own standalone pricing that would preclude applying GAAP (because they do not), and the comment does not suggest otherwise. Even if there were additional cable tiers without a standalone price attributable to them, that would simply mean that one would use the full price of cable service that includes broadcast channels (rather than only the portion attributable to basic cable service) for purposes of allocating a discount under GAAP. So GAAP would still supply an answer in that scenario too.

requiring standalone prices). The Office's concern is thus unfounded. Indeed, *the Office's own methodology* would fail in the same circumstance.

Third, the government argues that the Office fulfilled its obligations under the APA because "NCTA was able to (and did) respond to the[] [Office's] subjectivity arguments" about GAAP, but the Office was not persuaded by them. *See* Gov. Br. at 33-34. But that response is a non sequitur. To be sure, the government must "afford[] interested parties a reasonable opportunity to participate in the rulemaking process," including an "opportunity to present relevant information." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008). But that is not the APA requirement that NCTA accuses the Office of violating. Instead, NCTA's argument is that the Office failed to "offer reasoned responses" to "significant comments" from NCTA and others advocating for GAAP, *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 261 (D.D.C. 2015)—not that NCTA had no opportunity to present information to the agency. Moreover, it is not enough for the Office to simply assert that it "was 'not persuaded.'" Gov. Br. at 33-34 (quoting AR0079). It must "engage the arguments raised before it." *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018, 1025 (D.C. Cir. 2022). By failing to do so, the Office "has not engaged in reasoned decision making," and its Rule must be set aside. *Id.*

Finally, the government downplays the fact that the Copyright Office has applied GAAP accounting to bundled discounts in other contexts. Gov. Br. at 35-36. As NCTA explained, the Copyright Office has adopted GAAP accounting for calculating revenue subject to statutory licensing royalties for musical compositions when digital music services bundle music subscriptions with other services. *See* NCTA Br. at 27-28; *see also* 17 U.S.C. § 115; 37 C.F.R. § 385.2. The government accuses NCTA of "incorrectly suggest[ing] that the Office must import standards from other statutory schemes into section 111," and protests that these "other statutory

schemes cannot govern the Register's administration of section 111." Gov. Br. at 35 (capitalization normalized). But the government's response misses the mark.

NCTA's point is not that the Office was *required* to "import" the rules from Section 115 (or any other context). The point instead is that the Office did not even acknowledge that it has adopted in other contexts precisely the approach it rejected here, much less attempt to distinguish the different treatment. The APA required the Office to provide a reasoned explanation for that different treatment. The Office failed to do so. That is textbook arbitrary decision-making. *See Sokol World Ent., Inc. v. Small Bus. Admin.*, 2022 WL 4547540, at *5 (D.D.C. Sep. 28, 2022) ("It is a 'fundamental norm of administrative procedure' that an agency must 'treat like cases alike.'" (quoting *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007)).

## II. THE RULE'S TREATMENT OF EQUIPMENT FEES IS CONTRARY TO THE STATUTE AND ARBITRARY AND CAPRICIOUS

The Rule's inclusion of equipment fees in "gross receipts" contradicts the plain meaning of Section 111. It is also arbitrary and capricious twice over: The Office arbitrarily refused to address substantial arguments about changed circumstances that undermined its policy choice, and the Rule is internally inconsistent because it requires payment of royalties on *all* equipment fees, despite conceding that only *necessary* equipment fees should be included.

### A. Section 111's Plain Meaning Does Not Cover Equipment Fees

The statute's plain text forecloses the Office's interpretation. Section 111 requires royalties on "the basic *service* of providing secondary transmissions." 17 U.S.C. § 111(d)(1)(B) (emphasis added). A "service" is the performance of an action—it is paradigmatically distinct from a "good" like a cable set-top box. Countless dictionaries bear out that ordinary meaning. *See, e.g.*, *Service*, Webster's Third New Int'l Dictionary (1976) ("conduct or performance that assists or benefits someone or something"; "deeds useful or instrumental toward some object"; "useful labor that

does not produce a tangible commodity"); *Service*, American Heritage Dictionary of the English Language (3d ed. 1992) ("work done for others as an occupation or a business"); *Service*, Oxford English Dictionary (2d ed. 1989) ("[t]he section of the economy that supplies needs of the consumer but produces no tangible goods"). Dictionaries endorse that meaning even in contexts closely related to the one here. *See Service*, Oxford English Dictionary (2d ed. 1989) (defining "service" in "broadcasting" as "the supply of programmes by a particular broadcasting station").

The government responds by latching onto a single cherry-picked dictionary definition that defines "service" as the "provision (of labor, material appliances, etc.) for the carrying out of some work." Gov. Br. at 27 (quoting Oxford English Dictionary (1978)). But the fact that a solitary dictionary definition "is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012); *see also Institutional S'holder Servs. Inc. v. SEC*, 718 F. Supp. 3d 7, 22-23 (D.D.C. 2024) (similar), *aff'd*, 142 F.4th 757 (D.C. Cir. 2025). In ordinary usage, "internet service" does not include selling a computer. "Mail delivery service" does not include selling a mailbox. And "phone service" does not include selling a telephone (contra the government's made-for-litigation claim, Gov. Br. at 29). The government's lone definition is a particularly thin reed for ordinary meaning here: That same dictionary defines "service" in a directly relevant context in a way that squarely refutes the government's position. *See Service*, Oxford English Dictionary (2d ed. 1989) ("the supply of programmes by a particular broadcasting station").

In any event, Section 111 imposes royalties only on the "service of *providing secondary transmissions*," not the service of providing equipment. 17 U.S.C. § 111(d)(1)(B) (emphasis added). The government's dictionary argument is thus beside the point. Even if the ordinary meaning of "service" included providing "material appliances," that would not help the

government. The only "service" Section 111 covers is providing *secondary transmissions*, not the supposed "service" of distributing set-top boxes.

The government argues that the statutory reference to "mak[ing] secondary transmissions . . . *by wires, cables, microwave, or other communications channels*" shows that the "service" includes "the means by which a subscriber receives the signals." Gov. Br. at 28 (quoting 17 U.S.C. § 111(f)(3)). That is incorrect. The emphasized language simply confirms that the "service" is making secondary transmissions, whether done by wires, cables, or other means. That does not mean the *wires and cables themselves* are a "service."

The government ignores the legislative history entirely. No surprise there: That history makes clear that Section 111 *excludes* charges for "the installation of equipment." S. Rep. No. 94-473, at 81 (1975). Installation charges are quintessential fees "a subscriber must pay to obtain access to the service"—the test the government urges the Court to adopt. Gov. Br. at 27. The government's proposed definition thus is *not* the one Congress had in mind. *See Cablevision*, 836 F.2d at 605 ("[C]harges unrelated to programming . . . were not to be a part of gross receipts . . . .").

In other statutes where Congress wanted to reach both services and equipment, it said so. *See* NCTA Br. at 33 (collecting examples). The Communications Act illustrates the point: Congress authorized rate regulation for "installation and lease of the equipment used by subscribers" in that statute *precisely because* those rates would not otherwise obviously fall within "basic service tier rate regulations." 47 U.S.C. § 543(b), (b)(3); *cf.* Gov. Br. at 29-30.

Finally, the government asserts that Congress ratified the Office's position by enacting Section 104(c) of the Satellite Television Extension and Localism Act of 2010 ("STELA"), Pub. L. No. 111-175, 124 Stat. 1218, 1231-39 (2010). Gov. Br. at 29. But the ratification canon applies only where Congress "comprehensively revise[s] a statutory scheme," not where it "ma[kes] only

isolated amendments" that render it "impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of [an] interpretation." *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 81 (2021). Section 104(c) of STELA did not "comprehensively revise" anything—it tinkered with Section 111's mechanism for computing royalties and created a new audit procedure. 124 Stat. at 1231-39. Moreover, the ratification canon is inapplicable if Congress "did not re-enact the entire [statute] and did not amend the relevant language." *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 153-55 (D.D.C. 2015), *aff'd*, 852 F.3d 1131 (D.C. Cir. 2017). Section 104(c) had nothing to do with equipment fees, the definition of "gross receipts," or the meaning of "service" at all. The ratification canon therefore does not apply here.

**B. The Rule Is Arbitrary and Capricious**

Even if the statute did not compel NCTA's interpretation, the Rule should be vacated because it flunks the APA's requirement of reasoned decision-making. The Office failed to respond to substantial arguments about changed circumstances. And the Rule is internally inconsistent: The Office acknowledged that only "necessary" equipment fees should be included in gross receipts, but it then ordered operators to pay royalties on *all* equipment fees, even when free alternatives are available to subscribers.

**1.** Agencies must "respond to 'objections that on their face seem legitimate.'" *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 803 (D.C. Cir. 2022). And they must offer more than "conclusory statements" in the face of "evidence that . . . the factual premises underlying [their] prior judgment have eroded." *Env't Health Tr. v. FCC*, 9 F.4th 893, 903 (D.C. Cir. 2021). The Office failed to do that here. NCTA showed that the factual premises underlying the Office's original rationale for including equipment fees had all but evaporated. Whereas early converters

were "must have" accessories for receiving broadcast programming, today's cable boxes, when used at all, are mainly used for "advanced functionalities" such as video on demand and digital video recording. AR0385; AR0442-43 & n.3. Nowhere in the Rule's sparse three paragraphs of analysis did the Office even acknowledge, let alone grapple with, those changed circumstances.

The government has no meaningful response. It asserts that "[t]he Office considered these arguments, because NCTA raised the same arguments when commenting on the proposed rule." Gov. Br. at 38 (citing only NCTA's comments). But agencies must actually "*respond* to 'objections that on their face seem legitimate.'" *Gulf Restoration Network*, 47 F.4th at 803 (emphasis added); *see City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003) (agency must "respond in a reasoned manner to [comments] that raise significant problems"). A court cannot simply *assume* that, because a party made an argument, the agency must have considered and rejected it for some sufficient (albeit unknown) reason. That is not how administrative law works.

**2.** The Rule is also internally inconsistent. The Office acknowledged that only fees for equipment that is "necessary to access broadcast services" should be included in gross receipts. AR0079-80. But just a few sentences later, it ordered cable operators to pay royalties on fees for *all* equipment subscribers use to access broadcast programming, even if subscribers could use a free app to access the very same content instead. According to the Office, when "a subscriber opts to forego the software application in favor of a cable box," the box "is no less necessary . . . than before." AR0080. That theory drains the term "necessary" of all meaning.

The government does not dispute that the Office traditionally imposed royalties only for *necessary* equipment. Indeed, it doubles down on that standard by arguing that the standard is *statutorily compelled*. *See* Gov. Br. at 38 (standard is "mandated by the statutory text"). But equipment is not "necessary" to access content if subscribers have other, cheaper alternatives. *See*

*AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388-90 (1999) (network elements were not "necessary" when substitutes were available); *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 422-24 (D.C. Cir. 2000) (rejecting agency interpretation of "necessary" to mean merely "used or useful"). If a restaurant offers either a spoon or a fork to eat a meal, the fork is not "necessary" cutlery just because some patrons choose to use it. The government offers no response. Instead, it simply rehashes the Office's incoherent theory that, because some customers might *choose to use* set-top boxes to receive broadcast programming, that equipment is "necessary" to access the programming. Gov. Br. at 38. That is a non sequitur, not reasoned decision-making.

The government fails to square its position with the 1989 General Counsel letter that the Rule endorsed. AR0079-80 & n.97. That letter explained that, if a cable operator offers a $1 cable converter box and a $3 box that both provide access to all broadcast content, the operator need only report $1 for *all* subscribers, even subscribers who opted for the $3 box. AR0393-94. There is no way to reconcile that guidance with a rule that cable operators must pay royalties based on whatever equipment subscribers *choose* to use. The government tries to limit the 1989 letter to "apportionable" equipment. Gov. Br. at 39-40. But the letter mentions no such distinction. And the Rule never grapples with the letter's reasoning at all.

Finally, the government defends the Rule as "convenient and practical" because "[i]t is not clear from the record that every subscriber has the ability to access or use the application offered by the cable service provider." *Id.* at 39. But this Court "may not accept . . . counsel's *post hoc* rationalizations for agency action." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1167 (D.C. Cir. 2025). The Rule says that software apps are irrelevant because whatever equipment subscribers choose to use is automatically "necessary"—not that cable

operators owe royalties only for subscribers who lack access to free software apps, and that the Office would round that proportion up to 100% as an administrative convenience. AR0079-80.

The Office never even hinted it was considering such a theory. That omission was plainly prejudicial because, given the opportunity, cable operators would have shown that the vast majority of their subscribers can use a free software app to access all broadcast content, including anyone with a Smart TV, tablet, streaming device, smartphone, personal computer, or Roku box. *See* AR0385; AR0418; Daniel Frankel, *Samsung Leads US CTV Market Increasingly Dominated by Smart TVs*, StreamTV Insider (Mar. 31, 2025), https://www.streamtvinsider.com/video/samsung-leads-us-ctv-market-increasingly-dominated-smart-tvs (reporting that "smart TVs are now in 83% of the 122 million U.S. TV households"). The percentage matters: If 95% of subscribers lack access to free software apps, perhaps the Office could reasonably round that number up to 100%. But that plainly is not the case if the number is more like 5%. For that reason too, the government cannot salvage the Office's decision with its new post hoc rationale.

## III. THE COURT SHOULD VACATE THE RULE

The Court should reject the Copyright Office's request to remand without vacating the Rule. "[W]hen an agency's action is unlawful, 'vacatur is the normal remedy.'" *Ctr. for Biological Diversity v. U.S. Off. of Surface Mining Reclamation & Enf't*, 2026 WL 1506550, at *15 (D.D.C. May 29, 2026) (Sooknanan, J.) (quoting *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 378 (D.C. Cir. 2026)). "That is because Congress has directed courts to 'hold unlawful and set aside agency action' that is 'not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). For that reason, "remand without vacatur [is] an *exceptional remedy*." *Id.* (quoting *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020)) (emphasis added). The government has not justified that exceptional remedy here.

If the Court finds any aspect of the Rule contrary to the statute, vacatur is clearly required. "[R]emand-without-vacatur is unavailable" where the agency "lacks authority to take a certain action." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024).

If the Court finds the agency's reasoning arbitrary and capricious, it should likewise vacate the Rule. Before granting the "exceptional remedy" of remand without vacatur, the Court must consider "the seriousness of the order's deficiencies" and "the disruptive consequences" that may ensue. *Ctr. for Biological Diversity*, 2026 WL 1506550, at *15. NCTA has pointed to numerous serious deficiencies. The Office relied on a fundamental misunderstanding of GAAP and failed to engage with important criticisms as well as its own contrary approach in an analogous context. It also relied on an internally contradictory rationale to justify its equipment fees rule: It imposed royalties on fees for equipment that is plainly optional despite now conceding that the statute permits fees only for necessary equipment. These are not minor analytical shortcomings that could be cured by spilling more ink on remand. They are fundamental errors in the Office's analysis.

Nor can the government show that vacating the Rule would be substantially more disruptive than leaving it in place. Vacatur would merely reinstate the regime that cable operators have relied on for decades. *See Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 21-22 (D.D.C. 2014) (vacating rule because doing so would "result in the reinstatement of the [previous] [r]ule, which governed . . . for over 25 years and with which the regulated community is familiar"). The government's approach, by contrast, threatens severe prejudice: The government admits that it plans to make "distribution[s] of royalties to copyright owners" while any remand unfolds. Gov. Br. at 42. The government never explains how it will get any of that money back.

The Court should accordingly set aside the Rule.

## CONCLUSION

For the foregoing reasons, NCTA's motion for summary judgment should be granted, the government's cross-motion should be denied, and the Rule should be set aside.

Dated: June 26, 2026

Respectfully submitted,

*<u>/s/ Sarang V. Damle</u>*
Sarang V. Damle (DC Bar No. 1619619)
Matthew A. Brill (DC Bar No. 456680)
Brent T.F. Murphy (DC Bar No. 1645051)
Hasala K. Ariyaratne (DC Bar No. 90029338)
**LATHAM & WATKINS LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: sy.damle@lw.com
matthew.brill@lw.com
brent.murphy@lw.com
hasala.ariyaratne@lw.com

Robert K. Kry (DC Bar No. 490545)
Jackson A. Myers (DC Bar No. 1735365)
**MOLO LAMKEN LLP**
The Watergate, Suite 500
600 New Hampshire Avenue, NW,
Washington, DC 20037
Tel: (202) 556-2011
Fax: (202) 556-2001
Email: rkry@mololamken.com
jmyers@mololamken.com

*Attorneys for Plaintiff NCTA—The Internet & Television Association*