**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NCTA—THE INTERNET & TELEVISION ASSOCIATION,<br><br>      *Plaintiff*,<br><br>  v.<br><br>UNITED STATES COPYRIGHT OFFICE, *et al.*,<br><br>      *Defendants*. | Case No. 1:26-cv-713-SLS |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.     The Final Rule Accords with the Law ............................................................................ 2

     A.     The Statute Requires the Full Value of Cable to Be Included in "Gross Receipts" ........................................................................................................... 2

     B.     Including Equipment Fees in "Gross Receipts" Is Required by Statute ................. 8

II.     The Final Rule Is Not Arbitrary and Capricious .......................................................... 11

     A.     The Office Reasonably Determined That the Full Value of Cable Must Be Included in "Gross Receipts" .................................................................................. 11

     B.     The Office Reasonably Determined That Equipment Fees Must Be Included in "Gross Receipts" .................................................................................. 15

III.     Remand Without Vacatur Is the Appropriate Remedy ................................................. 19

CONCLUSION .......................................................................................................................... 20

## TABLE OF AUTHORITIES

**CASES**

*Bailey v. United States*,
516 U.S. 137 (1995)...................................................................................................... 7

*Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am.*,
836 F.2d 599 (D.C. Cir. 1988)............................................................................... *passim*

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
143 F.4th 518 (D.C. Cir. 2025) ...................................................................................10, 11

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)...................................................................................................... 10

*King v. Burwell*,
576 U.S. 473 (2015)........................................................................................................ 7

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024).....................................................................................................8, 11

*Pac. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*,
113 F.4th 943 (D.C. Cir. 2024)....................................................................................... 7

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)........................................................................................................ 8

*Sokol World Enter., Inc. v. Small Bus. Admin.*,
No. 21-cv-2385 (TSC), 2022 WL 4547540 (D.D.C. Sep. 28, 2022) ........................................ 14

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302, 325 (2014)................................................................................................ 7

**STATUTES**

17 U.S.C. § 111 ..................................................................................................... *passim*

47 U.S.C. § 543................................................................................................................ 9, 14

Satellite Television Extensions and Localism Act of 2010,
Pub. L. No. 111-175, 124 Stat. 1218.................................................................................. 10

**LEGISLATIVE HISTORIES**

H.R. Rep. No. 94-1476 (1976) .................................................................................. 6

S. Rep. No. 94-473 (1975) ...................................................................................... 9

**REGULATIONS**

37 C.F.R. § 201.17(b)(1) (2023) ............................................................................ 16

37 C.F.R. § 201.17(b)(1) (2026) ....................................................................... 1, 16

47 C.F.R. § 76.901 ............................................................................................... 14

47 C.F.R. § 76.920 ............................................................................................... 14

Compulsory License for Cable Systems,
   43 Fed. Reg. 27827 (June 27, 1978) ................................................................ 10

Statutory Cable, Satellite, and DART License Reporting Practices,
   89 Fed. Reg. 100348 (Dec. 12, 2024) ........................................................ *passim*

**OTHER AUTHORITIES**

*Discount*, OXFORD ENGLISH DICTIONARY (1978) ................................................... 3

*Gross*, OXFORD ENGLISH DICTIONARY (1978) ..................................................... 2

*Net*, OXFORD ENGLISH DICTIONARY (1978) ......................................................... 2

*Service*, OXFORD ENGLISH DICTIONARY (1978) ................................................... 9

**INTRODUCTION**

Section 111 requires cable service providers to report "the gross receipts from subscribers to the cable service . . . for the basic service of providing secondary transmissions of primary broadcast." 17 U.S.C. § 111(d)(1)(B). Reflecting the best reading of the statutory text, the Copyright Office's Final Rule instructs cable service providers to report the revenue of discounted bundles that include cable as the price of the "cable service as an unbundled stand-alone product." 37 C.F.R. § 201.17(b)(1). And because the equipment cable service providers lease are the means by which a consumer receives the basic service, these equipment fees are necessarily part of the basic service.

NCTA advances a strained interpretation of Section 111's "gross receipts" that would attribute a portion of the discount on a bundle to the price of cable service. If NCTA were correct, operators could downwardly manipulate royalty payments by artificially inflating the stand-alone cost for bundled items with cable and then attribute the resulting bundled discount to cable when the discount more properly comes from discounting the other bundled items. The D.C. Circuit rejected a similar interpretation in *Cablevision System Development Co. v. Motion Picture Ass'n of America*, 836 F.2d 599 (D.C. Cir. 1988); the logic of that decision justifies the Office's interpretation here.

NCTA also challenges the Final Rule's requirement that cable service providers report the fees charged for leasing equipment necessary to receive cable. But the plain statutory text requires royalty fees "for the basic service of *providing* secondary transmissions of primary broadcast." 17 U.S.C. § 111(d)(1)(A) (emphasis added). The only way that these secondary transmissions can be "provided" to a consumer who opts to lease equipment is via the equipment provided by the service provider. Thus, the fees for the lease of that equipment are fees for the service of providing

1

secondary transmissions. Lacking a foothold in the statutory text, NCTA turns to legislative history. But that history addresses one-time installation fees. In contrast, renting the equipment is an ongoing fee for the "basic service" of getting cable. And the statutes invoked by NCTA that reference equipment leasing are too far afield to have any applicability to Section 111.

Nor is the Final Rule arbitrary and capricious. The Office explained the basis for the Final Rule and addressed significant comments and criticism in detail in the Federal Register. To sustain its attack on the Office's reasoning, NCTA flatly ignores portions of the record, mischaracterizes the Final Rule, and employs ever shifting arguments unsupported by the record.

## ARGUMENT

### I.     The Final Rule Accords with the Law

#### A.  The Statute Requires the Full Value of Cable to Be Included in "Gross Receipts"

Section 111(d)(1)(A) directs cable operators to "deposit with the Register . . . in accordance with requirements that the Register shall prescribe by regulation . . . [a] statement of account . . . specifying . . . the gross amounts paid to the cable system for the basic service of providing secondary transmissions of primary broadcast transmitters[.]" 17 U.S.C. § 111(d)(1)(A). The best reading of that text requires reporting the full, undiminished amounts subscribers paid "for the basic service," and forecloses the proration approach advanced by NCTA.

1. That conclusion flows from the ordinary meaning of the term "gross." It refers to the "[e]ntire, total, whole. . . (as opposed to *net*) of an amount, value, weight, number, or the like, before necessary deductions have been made." *Gross*, OXFORD ENGLISH DICTIONARY (1978). "Net," by contrast, refers to the amount "remaining after all necessary deductions have been made." *Net*, OXFORD ENGLISH DICTIONARY (1978). By directing operators to report "gross

amounts," Congress required a measure that is not reduced by internal accounting allocations (or discounts).

NCTA relies on inapposite tax-law definitions to argue that a "discount" must be excluded from "gross" receipts. But the ordinary meaning of "discount" is a reduction from gross value—which means that gross value must first be calculated without regard to any discounts. *Discount*, OXFORD ENGLISH DICTIONARY (1978). In any event a discount on stand-alone cable is plainly different than a discount on bundled services, where cable does not have its own discounted price.

NCTA concedes that "gross receipts" means the "full amount" of revenues for basic cable service. Pl's. Opp'n to Defs.' Cross-Mot. for Summ. J., at 4, ECF No. 24. NCTA posits that the only way to "ensure that 'gross receipts' for basic cable service reflect the revenues the cable provider *actually receives* from the cable-service component of the discounted bundle" is to (1) invoke GAAP-accounting principles, (2) prorate the total discount, (3) assume each component of the bundle is entitled to an equal share of the discount, (4) discount the price of providing cable service by the prorated amount, and (5) report that amount. *Id*. at 3. According to NCTA, the Final Rule fails to adhere to the statutory text because it relies on "hypothetical," rather than actual, revenue.

NCTA has it backwards. The Final Rule values the cable-portion of the bundle at the *actual price* the operator advertises for cable. NCTA's method, on the other hand, relies on a discounted price not reflected by the consumer's payments, the cable service providers' receipts, or any advertised price for cable service. NCTA calls the price of stand-alone cable the "price that the customer *would have paid* had she purchased a different service." *Id*. at 5-6. But cable is not a "different service" when offered as part of a bundle than when it is offered by itself. And contrary to NCTA's contention, there is a "good reason" not to treat the price of cable (and thus the royalties

due) as less than its stand-alone price when that service is packaged in a bundle with other services: under NCTA's proposed reading, a cable service provider could downwardly manipulate the royalties it pays for retransmissions, depriving copyright owners of the full amounts they are owed.

Under NCTA's rule, a cable service provider could downwardly manipulate gross receipts by bundling cable with a low value item and artificially setting a high stand-alone price for the low value item. The resulting "discounted bundle" reflects reducing the price of the low value item to its proper price. Under NCTA's proposed rule, a cable service provider could then shift the discount properly attributed from the low-price item to cable, downwardly manipulating gross receipts. For example, if cable's market value is $50, and voice is $10, a cable service provider could separately price each at $50, bundle the two for $60 (the actual market value for both), and discount the reported gross receipt for cable to $30 per subscriber (far below its market price), even though the true discount is attributable to voice, not cable. Indeed, the record reflects that cable is "rarely, if ever, discount[ed] . . . when it is sold on a stand-alone basis." LOC_AR_00000465.

*Cablevision* recognized this problem and noted it can be solved by looking at the stand-alone price: "if a subscriber can buy a given tier without purchasing any others, its nominal price will be at least as great as its value." 836 F.2d at 615 (applying principle to a mixed-tier example and concluding that the stand-alone full price for broadcast signals is "an accurate reflection of the value placed on the package and could be used in calculating gross receipts from retransmission from the" discounted offering). If NCTA is right about what the statute means, operators can drive royalties to the floor just by offering an artificially high stand-alone price for one of the non-cable services in a bundle. That can't be right. For that reason, the Final Rule assesses the royalty base as the nominal, stand-alone price of cable. While NCTA fears that the Final Rule could require royalties in excess of the price of the bundle if a hypothetical operator were to charge less for the

bundle than for stand-alone cable, ECF No. 24 at 5, it points to no evidence that any operator would have incentive to offer such a pricing scheme.

NCTA also objects that failure to adopt its preferred method of allocation results in the collection revenue for internet or voice. *Id*. at 6. Not so. As the D.C. Circuit explained in *Cablevision*, the concept of "gross receipts" does not require NCTA's method of allocation. There, the court held that an operator offering a tier containing both broadcast and nonbroadcast programs was not required to exclude from royalties a portion of the joint receipts equal to the value of the nonbroadcast programs. The court found "no requirement in the statute or its history that the fee paid by a cable system reflect precisely the value it received from retransmissions—indeed, as we have shown, in many cases the relationship is skewed considerably." *Cablevision*, 836 F.2d at 611. The same logic applies here: when an operator offers cable as part of a bundle with other services, the statute does not require that the Office adopt GAAP accounting principles to exclude the prorated value of non-cable services from the gross receipts. If an NCTA member truly wanted to report a discounted cable rate for its royalty payments, it could avoid paying the full rate on cable by segregating its services and selling each at a discount. *Id*. at 612 ("A company can segregate all its secondary transmissions into a single tier and thus avoid including in gross receipts any revenues from cable-originated programming."). That a cable service provider might pay "higher than necessary fees" by obtaining "marketing advantages" in offering a bundle does not affect the reasonableness of the Final Rule. *Id.*

Seeking to avoid the logic of *Cablevision*, NCTA argues that the question in *Cablevision* "was how to determine the 'gross receipts' attributable to basic cable service when broadcast channels (subject to Section 111 royalties) and non-broadcast channels (not subject to royalties) were offered together as a package as part of the same cable tier," not how to determine "gross

receipts" attributable to basic cable service offered as part of a bundle. ECF No. 24 at 12-13 (quoting *Cablevision*, 836 F.2d at 610). But the two questions are both ultimately about how to determine gross receipts for royalty-carrying items when they are sold with something else. *Cablevision* provides the answer: "the reasonableness of [a] regulatory requirement . . . cannot be attacked for its failure to allow cable systems to attribute a value to nonbroadcast programs and to subtract that value from gross receipts." 836 F.2d at 611.

NCTA also alleges that *Cablevision* can be distinguished because there it was not possible to allocate the value of the package of broadcast and non-broadcast to determine a price for cable. But the Final Rule deals with a similar problem: in a discounted bundle, one can conclude nothing more about the discount applied to each item individually than that it does not exceed the total discount of the bundle. *Cablevision* pointed out the "artificiality" of assigning an equal value to each channel. *Id.* at 611-12. Far from being an "obvious method of attrition," ECF No. 24 at 13 (quoting *Cablevision*, 836 F.2d at 611 n.20.), NCTA's GAAP approach mirrors the approach *Cablevision* rejected: artificially assigning an equal discount to each service in a bundle.

2. The Office's interpretation accords with the structure and purpose of the statute. Section 111 established a standardized method for calculating royalties. The statute determines royalties "on the basis of specified percentages of the gross receipts from subscribers to the cable service," applying a set of fixed rates and adjustments. 17 U.S.C. § 111(d)(1)(B). That structure reflects a deliberate choice to use a common revenue base that can be applied uniformly and straightforwardly across the cable industry. Congress designed this license to provide compensation to copyright owners without the complexities of individual negotiations. *See* H.R. Rep. No. 94-1476, at 89–90 (1976). The Office's interpretation serves that purpose by ensuring

6

that, when cable is offered as part of a discounted bundle, the royalty its tied to something "uniform" and "administrable": the price of cable as a stand-alone service.

NCTA does not dispute the purpose of the statute is to advance a "uniform" and "administrable" measure of gross receipts. ECF No. 24 at 8. Nor does it dispute that the Final Rule advances these goals. *Id.* Instead, NCTA retreats to general maxims that "an agency has no power to tailor legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Id*. at 9 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014) and citing *Pac. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, 113 F.4th 943, 950 (D.C. Cir. 2024)). But the Office's interpretation does not violate this maxim. Rather, consistent with well-established principles of statutory construction, the Office's interpretation gives an undefined term ("gross receipts") a meaning that makes sense in light of the explicit purpose of the statute. *King v. Burwell*, 576 U.S. 473, 498 (2015) ("A fair reading of legislation demands a fair understanding of the legislative plan"); *Bailey v. United States*, 516 U.S. 137, 145 (1995) ("We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme.").

NCTA's interpretation, by contrast, undermines the statutory purpose by permitting "allocations [to] vary based on pricing strategies, bundle composition, and accounting assumptions." Defs' Mem. in Supp. of their Mot. for Summ. J., at 20, ECF No. 21-1. Tellingly, NCTA does not address this argument. Nor does it address the auditing provisions introduced by Congress that a GAAP system would undermine. *See id*. at 19. NCTA's proposed GAAP methodology fatally undermines the statutory purpose and scheme, and for that reason should be rejected.

3. Even if the statutory term "gross receipts" were ambiguous, the Court should adopt the Office's interpretation.

7

*First*, Congress conferred broad gap-filling authority on the Office to administer Section 111. ECF No. 21-1 at 12-13; *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). As explained in Defendants' brief, Congress repeatedly instructed the Register "to prescribe rules to 'fill up the details' of a statutory scheme." *Loper Bright*, 603 U.S. at 395 (citation omitted); ECF No. 21-1 at 12-13. NCTA does not even argue that these provisions convey no gap-filling authority. ECF No. 24 at 9-12. Nor could they: *Cablevision* held the Register has gap-filling authority. 836 F.2d at 610 ("We think Congress saw a need for continuing interpretation of Section 111 and thereby gave the Copyright Office statutory authority to fill that role").

*Second*, even where Congress has not given the agency the authority to fill gaps, courts may "seek aid from the interpretations of those responsible for implementing particular statutes," which "'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance' consistent with the APA." *Id.* at 394 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). While NCTA asserts that the Copyright Office has no "subject matter expertise" about the term "gross receipts," ECF No. 24 at 11, it does not dispute that the Office has expertise in assessing, collecting, and distributing royalties under 17 U.S.C. § 111(d)(2). And it is this subject matter expertise that counsels against adopting GAAP, which is hard to implement and verify (which is required by 17 U.S.C. § 111(d)(6)).[1] *See* ECF No. 21-1 at 19.

### B. Including Equipment Fees in "Gross Receipts" Is Required by Statute

Section 111 also requires including equipment fees in gross receipts. That is because part of providing the service is providing the equipment necessary for a subscriber to receive the

---

[1] Indeed, the Register similarly has expertise governing the verification process. 17 U.S.C. § 111(d)(6) ("The Register of Copyrights shall issue regulations to provide for the confidential verification by copyright owners whose works were embodied in the secondary transmissions of primary transmissions pursuant to this section of the information reported on the semiannual statements of account filed under" Section 111(d).)

secondary transmissions. Longstanding agency practice reflects that common-sense understanding, and Congress ratified that understanding when it reenacted Section 111 in STELA.

1. NCTA attempts to draw a sharp distinction between a "service" and the "equipment" necessary to provide it. ECF No. 24 at 18-19. But, as Defendants explained, the ordinary meaning of "service" may include the provision of equipment. ECF No. 21-1 at 27; *Service*, OXFORD ENGLISH DICTIONARY (1978) ("provision (of labor, material appliances, etc.) for the carrying out of some work for which there is a constant public demand."). To be sure, the statute imposes royalties on the "service of *providing secondary transmissions*," not the service of providing equipment. ECF No. 24 at 19-20; 17 U.S.C. § 111(d)(1)(B). But that does not compel the exclusion of equipment fees. After all, secondary transmissions cannot be provided to a consumer unless they have equipment to receive it. Thus, the service *must* include the fees service providers charge for providing equipment used to receive secondary transmissions.

NCTA provides examples where "service" does not include *selling* equipment. *Id*. But NCTA's argument does not hold when the examples are modified to reflect the situation here: *leasing* from a service provider the equipment necessary to receive the service. Indeed, and contrary to NCTA's reading, *id*. at 20, the legislative history shows, at most, that installation and pay-cable costs are excluded. S. Rep. No. 94-473, at 79 (1975); H.R. Rep. No. 94-1496, at 96. Equipment and software lease fees are fundamentally different. Unlike the "initial," labor-related cost of installation, S. Rep. No. 94-473, at 79, lease fees are recurring payments for continued access to the "secondary transmissions of primary broadcast transmitters."[2] And unlike pay-cable

---

[2] NCTA repeats its arguments about other statutes. ECF No. 24 at 20. As Defendants explained, these statutes are not analogous or related. ECF No. 21-1 at 29-30. In addition, NCTA's reliance on the Communications Act undermines its argument. There, Congress referred to both "installation" and "lease" charges when it intended both concepts to be treated alike. 47 U.S.C. §

services, lease fees are not separate offerings outside the scope of the Section 111 license. Equipment and software lease fees are charges associated with the subscriber's ability to receive the retransmitted broadcast signals that are subject to Section 111.

2. In any event, Congress ratified the Office's long-standing interpretation of "service" including fees for equipment necessary to receive the service by passing STELA. NCTA disputes this, claiming that STELA did not reenact or comprehensively revise the statute. ECF No. 24 at 20-21. NCTA is mistaken.

Since the inception of Section 111, the Office has taken the view that necessary equipment should be included in gross receipts. Statutory Cable, Satellite, and DART License Reporting Practices, 89 Fed. Reg. 100348, 100353 (Dec. 12, 2024). Its regulations have defined "gross receipts" as including converter and additional set fees since 1978. *See* Compulsory License for Cable Systems, 43 Fed. Reg. 27827, 27832 (June 27, 1978). Against that backdrop, Congress reenacted the statutory text at issue without any indication that it wished to depart from the statutory understanding: STELA revised Section 111(d)(1)(A) and reenacted in its entirety Section 111(d)(1)(B)-(D), the very sections at dispute here. Satellite Television Extensions and Localism Act of 2010, Pub. L. No. 111-175, 124 Stat. 1218, 1231-32. In so doing, Congress implicitly ratified the Office's interpretation. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156 (2000) (finding implied ratification where "[i]t is hardly conceivable that Congress . . . was not abundantly aware of what was going on" (citation omitted)); *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 143 F.4th 518, 538 (D.C. Cir. 2025) ("Our respect for the [agencies'] understanding of brokers and carriers is 'especially warranted' because . . . '[their] interpretation was issued

---

543(b). NCTA's example also demonstrates that these are distinct charges that are not synonymous. However, Section 111's legislative history mentions installation charges alone.

roughly contemporaneously with enactment of the statute and remained consistent over time'—for more than 70 years." (quoting *Loper Bright*, 603 U.S. at 386)); *see also Crowley Gov't Servs.*, 143 F.4th at 540 ("Congress amended the ICA multiple times against this regulatory backdrop . . . Congress knew and adopted the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." (citation modified)).

## II.  The Final Rule Is Not Arbitrary and Capricious

### A.  The Office Reasonably Determined That the Full Value of Cable Must Be Included in "Gross Receipts"

The Office found that assessing the full value of cable when determining "gross receipts" accords with the goals of Section 111 for a consistent, transparent, and practicable royalty base. As the Office explained, a more subjective allocation method such as that advanced by NCTA would undermine the "simplicity of calculating gross receipts," which is one of the statute's core features. 89 Fed. Reg. at 100353. Therefore, the Office declined to change its interpretation, concluding that its existing understanding remains the better reading of the statute and the more workable rule in practice.

Defendants explained that the Office reasonably rejected GAAP-based proration because GAAP-based proration is subjective. Defs.' Opp'n to Pl's. Mot. for Summ. J., at 31, ECF No. 22. NCTA maintains that GAAP is not subjective because it applies a uniform and mathematical formula to allocate the discount. *Id*. at 15-16. But NCTA does not meaningfully grapple with the Office's concerns with GAAP. As the Office stated, "[b]undling may be a reflection of the cable operator's desire to maximize revenue," reasoning that "consumers may not value[3] the other services in the bundle (*e.g.*, internet and/or voice) enough to pay the full asking price, and that a

---

[3] NCTA mistakenly states Defendants did not respond to NCTA's accusation that the Office did not give notice or provide evidence of consumer perception. Defendants did so at ECF No. 21-1 at 32-33.

discounted bundle that includes those other services at a price slightly higher than the video alone, maximizes cable system revenue." 89 Fed. Reg. at 100353. This would have the effect of manipulating downward the royalty due on video,[4] mirroring the concerns the D.C. Circuit had in *Cablevision*. 836 F.2d at 615.

NCTA accuses the Office of failing to "offer reasoned responses" to "significant comments" from NCTA and others advocating for GAAP and thus acted arbitrarily and capriciously. ECF No. 24 at 17 (citation omitted). To be clear, NCTA is shifting the goal posts: in its initial brief, it argued the Office failed "to provide notice to parties that it intended to rely on consumer perception at all." Pl's. Mot. for Summ. J., at 31, ECF No. 20. NCTA has ignored the Government's response and has instead shifted to alleging a failure to offer reasoned responses to significant comments.

In any event, the Office did not simply state that it was "not persuaded" by comments supporting GAAP. ECF No. 24 at 17. It also carefully addressed the drawbacks of GAAP, citing comments, declarations of accounting experts, and *ex parte* meetings with NCTA and other commentors. 89 Fed. Reg. 100353. By all measures, the Office meaningfully heard and responded to significant comments.

The Office also reasonably rejected GAAP because some elements of a bundle may not have stand-alone prices, which either drastically complicates applying GAAP or renders it inoperable. ECF No. 21-1 at 32. The Office based that conclusion on a comment that "multi-product bundles" sometimes contain "service elements" that "do not have a stand-alone selling

---

[4] To use the same example as earlier, a consumer values video at $50 dollars and voice at $10 dollars. A service provider could set the price of video and voice at $50 dollars each. The cable service provider provides a bundle of video and voice at $60. To distribute the value of the discount equally between video and voice would artificially depress royalties due on video.

price because the CSO does not market them outside of a bundle." LOC_AR_00000361. NCTA

incorrectly portrays this comment as speaking only about nonbroadcast signals, ECF No. 24 at 16,

but the comment's reference to nonbroadcast signals was given only as an example of this practice,

LOC_AR_00000361. The Office reasonably relied on this comment and supporting evidence that

GAAP would be unwieldy to apply across all the bundled offerings.

NCTA then states that the Final Rule only applies to video, Internet, and voice with known

stand-alone pricing, so the fact that some bundles may include other services without a price is

irrelevant. ECF No. 24 at 16. NCTA is mistaken. The Final Rule applies to all bundled services

containing cable. 89 Fed. Reg. 100351. Thus, the problem of items without stand-alone prices in

bundles apply squarely to any adoption of GAAP in a proposed rule.

Seeming to acknowledge the problem non-priced items cause for GAAP methodology,

NCTA pivots and argues that "NCTA has been clear that GAAP does not apply anytime there *are*

*not* stand-alone prices for one of the services [of a] bundle." ECF No. 24 at 16. NCTA never raised

this argument during the notice-and-comment rulemaking and fails to cite any portion of the record

in support.[5] Instead, it cites ASC 606-10-32-36, which is not included in the record. *Id.* In any

event, it would meaningfully complicate audits and reporting (required by 17 U.S.C. § 111(d)(6)

and (d)(1), respectively), if GAAP only applied sometimes based on the cable service providers

say-so.

---

[5] Instead, NCTA cites to ASC 606-10-32-36, which is the Accounting Standards Codification for
non-governmental entities. Interestingly enough, ASC 606-10-32-36 on its terms belies NCTA's
characterization of a simple, mechanical allocation, as it would not allow equal discount allocation
"when an entity has observable evidence … that the entire discount relates to only one or more,
but not all, performance obligations in a contract." ASC 606-10-32-36. This echoes the concerns
of *Cablevision* and the Office in GAAP impermissibly attributing a discount to cable that more
accurately belongs to another bundled item.

NCTA also alleges the Final Rule would be fatally flawed under the Office's reasoning because there could also be instances where there is no stand-alone price for cable. But the law requires cable companies to provide a separate Basic Tier containing broadcast signals to which subscription is required before access to any other service tier. *See* 47 U.S.C. § 543(b)(7)(A); 47 C.F.R. §§ 76.901, 76.920. There is, therefore, always a stand-alone rate for the Basic Tier. *See also* LOC_AR_00000466.

Finally, the Office explained how the royalty structure of Section 111 is specific, unique, and not analogous to other statutes governing royalties on other works. ECF No. 22 at 35-36. NCTA does not dispute the differences between Section 111 and the statutes it references. ECF No. 24 at 17-18. Rather, NCTA's point seems to be that the Office was required to explain why it was not applying the GAAP approach from these unrelated statutes. *Id.* During the rulemaking process, these statutes were not referenced by NCTA or any other commentor, and compulsory licensing schemes for music and other works were only referenced in a single footnote. LOC_AR_00000337 n.20. There is no requirement that an agency, *sua sponte*, perform textual analysis on other statutes and distinguish the one it is making regulations to implement. And contrary to NCTA's assertion that the Office failed to "treat like cases alike," ECF No. 24 at 18 (citation omitted), the Office explained that Section 111 is not like any of the other statutes invoked by NCTA in this litigation, ECF No. 22 at 35-36.

The principle to "treat like cases alike" arises most commonly in adjudications. Indeed, in Plaintiffs' *Sokol World Entertainment, Inc. v. Small Business Administration*, the issue was whether the SBA treated one application different from competitor applications. No. 21-cv-2385 (TSC) 2022 WL 4547540, at *5 (D.D.C. Sep. 28, 2022). Here, there is no "like case" to treat "alike" and NCTA's argument fails.

14

**B. The Office Reasonably Determined That Equipment Fees Must Be Included in "Gross Receipts"**

Consistent with the definition of "service," the fees for equipment necessary to receive the basic service are properly included in the gross receipts for providing that service. Because the inclusion of these fees is mandated by the statutory text, it cannot be arbitrary and capricious.

NCTA alleges that the Office did not "respond to objections that on their face seem legitimate," specifically mentioning its objection that some subscribers can receive cable service using free applications and do not need equipment. ECF No. 24 at 21-22 (citation omitted). That objection is not legitimate because it fundamentally misunderstands the Office's position: where a consumer *does* lease the necessary equipment to receive cable service, then the equipment is part of the basic service of receiving cable and properly included in "gross receipts." 89 Fed. Reg. at 100354. Indeed, the Office provided that exact response: "[w]hen a cable operator offers to provide video services through a free software application, but a subscriber opts to forego the software application in favor of a cable box, then that equipment is no less necessary to the subscriber's ability to receive broadcast signals than before." *Id.*

The Final Rule also responded to NCTA's objections by referencing an explanation given by Copyright Owners in an *ex parte* communication:

> NCTA and MPA have not explained which specific "software apps" they are referring to or confirmed that such apps provide complete access to a cable operator's basic service package. Moreover, NCTA and MPA do not explain the circumstances in which a cable subscriber may obtain the apps. They do not say, for example, whether a cable subscriber may obtain basic service via a "software app" without having first paid for a cable subscription that includes a mandatory equipment rental fee. Thus, the record simply does not support NCTA and MPA's factual premises on which they base their arguments.

LOC_AR_00000501. Incorporating this response to NCTA's objections, the Office fully responded.

15

Indeed, the Office updated the language of the Rule because it appreciated comments stating that technology had evolved beyond the use of physical equipment to provide retransmission service. While the former rule included as gross receipts charges for "set fees, and for converter fees," 37 C.F.R. § 201.17(b)(1) (2023), the revised Rule updated the provision to include monthly charges for "equipment, device, or software necessary to receive broadcast signals." 37 C.F.R. § 201.17(b)(1) (2026). This amendment demonstrates that the Office considered and responded to commenters' claims regarding "changed circumstances."

NCTA's opposition rehashes its previous arguments: that the rule is inconsistent, that set-top boxes are no longer "required equipment," and that the 1989 General Counsel letter compels excluding equipment from gross receipts. ECF No. 24 at 22-23. For the reasons explained in the Office's Opening Brief, ECF No. 21-1 at 38-40, NCTA is mistaken. Because the Final Rule refers to equipment that is "necessary" to receive cable, NCTA asks the court to draw the backward inference that the *statute* requires an inquiry into whether equipment is truly "necessary." ECF No. 24 at 22-23. But the statute asks only one thing: what are the gross *receipts* subscribers paid to receive the basic retransmission service. 17 U.S.C. § 111(d)(1)(B). If a subscriber paid equipment fees to receive the basic retransmission service, then the statute demands that these fees be included in gross receipts.

Section 111 requires cable operators to report "the gross amounts paid to the cable system for the" retransmission service. Thus, as noted above, the statute is concerned with identifying the receipts subscribers paid for the service. The Rule's instruction to include "fees for any other type of equipment, device, or software necessary to receive broadcast signals" as gross receipts, 89 Fed. Reg. at 100359, implements that statutory directive by identifying the category of receipts attributable to providing the basic service. If a subscriber leases a certain operator-provided

16

equipment, device, or software to access broadcast signals, receipts for such items are properly included as *receipts* subscribers paid to receive the basic retransmission service.

NCTA's reliance on the Office's 1989 letter overlooks a critical factual distinction. The letter addressed a hypothetical in which the Office could reasonably determine, based on the facts presented, that subscribers could receive the same broadcast programming through the lower-cost converter box ($1) and that the additional converter charge ($2) was attributable solely to non-broadcast programming unless additional broadcast signals were also provided. Therefore, the Office permitted the allocation of only the portion attributable to the broadcast programming as "gross receipts." LOC_AR_00000393.

This rulemaking proceeding presented a materially different circumstance. The Office did not have a comparable factual basis to conclude that subscribers could receive the same broadcast programming through free applications and that the equipment lease fees are solely attributable to non-broadcast programming or capabilities. Nothing in the administrative record established that every subscriber who opted to lease equipment could instead receive the same broadcast signals through the cable operator's free software application. During the rulemaking proceeding, NCTA's own submission assumed that subscribers would access the free software application (and consequently, the signals that constitute the basic service) "with a 'smart TV' or a third-party device (such as a Roku box)," LOC_AR_00000443, which suggests that access to the software application could depend on subscribers having compatible third-party hardware. But the record did not establish that every subscriber offered the application could satisfy such prerequisites. The Office also recognized the limits of the record, noting that it did not establish "whether cable operators offering subscribers a free software application for video services condition access to the

17

application on the purchase of internet service, or other services, from the cable operator." 89 Fed. Reg. at 100354 n.99.

Next, NCTA argues that the Office offered *post hoc* rationalizations for the Final Rule by arguing here that the Final Rule's approach is convenient and practical because "[i]t is not clear from the record that every subscriber has the ability to access or use the application offered by the cable service provider." ECF No. 24 at 23. But this was no *post hoc* rationalization: it is referenced by the Final Rule: "[where] a subscriber opts to forego the software application in favor of a cable box, then that equipment is no less necessary to the subscriber's ability to receive broadcast signals *than before*." 89 Fed. Reg. at 100354 (emphasis added); *see also id.* at n.99. "Before" references the time when a subscriber was unable to access or use the software application.

Finally, NCTA attempts to fault the Office for NCTA's own failure to develop the administrative record, arguing that it was prejudiced because the Office did not specifically ask NCTA to submit data regarding how many subscribers can use a free app to access all broadcast content. ECF No. 24 at 24. But NCTA stated during the notice and comment period in an *ex parte* communication that "we can confirm that *many* operators, including NCTA's larger members, permit subscribers to use an app to access basic cable service without having to lease a set-top device from the cable provider." LOC_AR_00000419 (emphasis added). The Office did not act arbitrarily or capriciously in concluding that "many" did not mean *all*. Notably, NCTA did not address the Office's other response to NCTA's objection. When NCTA objected to the Final Rule because subscribers could access cable programming via free application, the Copyright Owners responded by *ex parte* letter to explain that the Office should not rely on application access to categorically exclude equipment fees because NCTA had not provided information on whether "such apps provide complete access to a cable operator's basic service" or "explain[ed] the

18

circumstances in which a cable subscriber may obtain the apps." LOC_AR_00000505. Accordingly, the record did not establish that subscribers who leased equipment invariably did so by choice rather than necessity. Thus, the Office reasonably declined to assume that every equipment lease reflected a voluntary preference for equipment rather than a need to access the service through operator-provided equipment.

In summary, the Office adequately explained its position, noted the flaws in relying on an app-based approach, and provided NCTA with the opportunity to respond. That NCTA failed to provide information that would counter these concerns does not make the Office's determination unreasonable.

### III.    Remand Without Vacatur Is the Appropriate Remedy

Even if this Court concludes that some aspect of the Rule is flawed as arbitrary and capricious, it should not vacate the whole Rule, but should instead remand without vacatur. As the Office explained, ECF No. 21-1 at 40-42, the primary errors alleged by NCTA are failures to meaningfully address comments or provide explanation. On remand, the Office could correct these errors by providing additional information or addressing the specific comments the Court finds significant and unaddressed. *Id.*

NCTA identifies several purported errors and states, without explanation, that they "are not minor analytical shortcomings that could be cured by spilling more ink." ECF No. 24 at 25. But the purported errors they identify—*e.g.*, the supposed lack of engagement with certain criticism, lack of explanation regarding approaches in other statutory contexts, and internally contradictory reasoning—call for exactly that. With "more ink" the Office could further articulate its position and address any issues with its reasoning.

As the Office has explained, vacatur of the Final Rule would result in significant disruption and one-sided harms to copyright owners that rely on Section 111 royalties. ECF No. 21-1 at 42-

19

43. Section 111 reimburses copyright owners; if they are entitled to higher royalties under the Final Rule, vacating it (and effectively delaying it's implementation while the Office provides additional explanation) would unfairly reduce the amount of royalties they will ultimately collect and leave them without recourse. In contrast, allowing the rule to remain in place while the Office promulgates a new rule on remand would cause no harm to cable service providers, as there is a mechanism to refund them for any overpayment should the new final rule provide less royalties than the current Final Rule.

NCTA is silent on this one-sided harm. They merely state that the Government "never explains" how it will get royalties back from copyright owners. ECF No. 24 at 25. Given that the funds are currently held in interest-bearing securities with the U.S. Treasury pending distribution to copyright owners, the government does not need to get money back from copyright owners to protect the interest of all parties. By leaving the rule in place, the Office continues to collect the royalties copyright owners are due, and cable service providers may be made whole via refunds in the event that NCTA's position prevails. But there is no way to make copyright owners whole if the rule is vacated.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in the Office's favor.

20

DATED: July 17, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

NOAH T. KATZEN
Assistant Branch Director

*/s/ Michael Bruns*
Michael Bruns
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov

*Counsel for Defendants*

21